# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GEORGIA FIREFIGHTERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-20-0576 |
| ANADARKO PETROLEUM CORPORATION, *et al.*, | § § § | |
| Defendants. | § | |

## <u>MEMORANDUM AND ORDER</u>

This securities case is before the Court on the Motion to Dismiss [Doc. # 60]

filed by Defendants Anadarko Petroleum Corporation ("Anadarko"), and R. A.

Walker, Robert G. Gwin, Robert P. Daniels, and Ernest A. Leyendecker III

("Individual Defendants"), seeking dismissal of the Amended Complaint

("Complaint") [Doc. # 55] filed by Lead Plaintiffs Norfolk County Council as

Administering Authority of the Norfolk Pension Fund, Iron Workers Local # 580 Joint

Funds, and Building Trades United Pension Trust Fund ("Plaintiff").[1]  Plaintiff filed

---

[1]     The case was originally filed by Georgia Firefighters' Pension Fund, and the caption
reflects the original Plaintiff.  However, by Order [Doc. # 41] entered May 15, 2020,
the Court appointed Norfolk County Council as Administering Authority of the
Norfolk Pension Fund, Iron Workers Local #580 Joint Funds, and Building Trades
United Pension Trust Fund as Lead Plaintiffs.

its Opposition [Doc. # 61] to the Motion to Dismiss, and Defendants filed a Reply [Doc. # 62].  The Court has reviewed the full record and applicable legal authorities. Based on this review, the Court **denies** the Motion to Dismiss.

## I.   <u>BACKGROUND</u>

Prior to its acquisition by Occidental Petroleum Corporation ("Occidental") in August 2019, Anadarko "was one of the world's largest independent oil and natural gas exploration and production companies."  Complaint, ¶ 2.  Anadarko was publicly traded on the New York Stock Exchange.  *See id.*  Defendant Walker was Anadarko's Chairman, President, and Chief Executive Officer ("CEO").  Defendant Gwin was Anadarko's Executive Vice President of Finance and Chief Financial Officer ("CFO") from May 2013 until November 2018.  Defendant Daniels was Anadarko's Executive Vice President of International and Deepwater Exploration from May 2013 until he retired in December 2016.  Defendant Leyendecker was Senior Vice President of Exploration Gulf of Mexico from February 2014 until he was promoted to Senior Vice President of International Exploration in April 2015, then promoted to Executive Vice President of International and Deepwater Exploration in August 2016.  Walker, Gwin, and Daniels were members of Anadarko's Executive Committee.

In early 2009, Anadarko discovered the "Shenandoah" oil field in the Gulf of Mexico and began drilling appraisal wells.  *See id.*, ¶ 3.  The Shenandoah field is

located approximately 200 miles south of New Orleans and spans an area of approximately 13,000 acres. *See id.*, ¶ 26. "Anadarko operated the Shenandoah field with a 30% working interest" with partners "ConocoPhillips (40% working interest), Cobalt International Energy, L.P. (20% working interest), and Marathon Oil Corporation (10% working interest)." *Id.*, ¶ 28.

Plaintiff alleges that based on the results of the "Shen 2" appraisal well in 2013, "Defendants hailed the Shenandoah basin as 'one of the largest discoveries in the company's history' with 'the potential to become one of the most prolific new areas in the deep-water Gulf of Mexico.'" *Id.*, ¶ 3. Plaintiff alleges that Defendants stated that data acquired from Shen 2 indicated "excellent-quality reservoir and fluid properties." *Id.*

Plaintiff alleges that Anadarko described the next appraisal well, Shen 3, "as an even greater success" when, in reality, "Shen 3 was a dry hole." *See id.*, ¶ 4. Plaintiff alleges that, notwithstanding the "bad information about Shenandoah," Defendants "continued to provide glowing reports quarter-after-quarter and for two more appraisal wells in 2015 and 2016." *Id.*

Plaintiff alleges that "it was known internally" at Anadarko that appraisal well Shen 4, drilled in 2015, "was 'garbage.'" *Id.*, ¶ 54. Plaintiff alleges specifically that "Shen 4 showed poor results due to poor production and bottom-hole pressure and had

relied on a bad model, leading to oil column content which had more water versus oil than previously estimated." *Id*. Plaintiff alleges that "data obtained from Shen 4 mandated a downward adjustment to Shenandoah's size estimates [but] Defendants elected to manipulate the data to maintain their exaggerated narrative without revealing materially adverse known facts." *Id*., ¶ 58. Plaintiff alleges that Defendants manipulated the data by recalibrating Shenandoah maps "to hide known faults from their partners so they could not detect or expose the scheme." *See id.*, ¶ 60. Plaintiff alleges that Anadarko, through Leyendecker's directives, "concealed data highly relevant to an assessment of the size and overall economic analysis of Shenandoah" and that the "true maps were not shown to Anadarko's partners or to the public." *Id*.

Plaintiff alleges that Lea Frye, Anadarko's Senior Reservoir Engineer and team lead for the Shenandoah project, "repeatedly objected to Anadarko's dissemination of misleading information about Shenandoah and urged the Company to come clean with investors." *Id.*, ¶ 6. Plaintiff alleges that as a reservoir engineer, "it was Frye's job to evaluate the size of an oil field resource to develop economic models." *Id*., ¶ 39. Plaintiff alleges that by February 2014, "Frye had assembled and presented undeniable evidence that Anadarko was exaggerating Shenandoah's potential to the market." *Id*., ¶ 6. Plaintiff alleges that in late April 2016, "Frye provided Defendants with a detailed 20-page letter previewing much of the same information" she would

later submit to the Securities and Exchange Commission ("SEC") on May 6, 2016. *See id.*, ¶¶ 73-74. Frye resigned on May 18, 2016. *Id.*, ¶ 75.

Plaintiff alleges that Anadarko's Risk Consistency Team ("RCT") "served an internal audit function by reviewing the exploration team's methods for reporting on resources to prevent 'salesmanship and overly optimistic evaluations of exploration prospects.'" *Id.*, ¶ 66. Plaintiff alleges that the RCT was asked to examine the Shenandoah project, specifically its size. *See id.* Plaintiff alleges that the RCT determined that the "resource claims made by exploration executives needed a significant downward adjustment." *Id.*, ¶ 67.

Plaintiff alleges that "[e]ach new appraisal, and Anadarko's own RCT findings that the Shenandoah resource needed a significant downward adjustment, confirmed Frye's analysis." *Id.*, ¶ 6. Plaintiff alleges that Anadarko persisted in its refusal to "level with investors." *Id.* Plaintiff alleges that, instead, Anadarko continued "to overstate Shenandoah's size and economic viability, while concealing known adverse information necessary to enable investors (and their partners) to avoid being deceived." *Id.*, ¶ 67.

On May 2, 2017, in its first quarter 2017 SEC Form 10-Q ("2017 10-Q"), Anadarko disclosed "a $467 million impairment charge and expensed $435 million in suspended exploratory well costs for Shenandoah." *See id.*, ¶ 7. Plaintiff alleges

that this further validated the analyses prepared and provided to Defendants by Frye and the RCT.  *See id.*  On May 3, 2017, Anadarko's common stock price fell approximately 8%.  *See id.*

On August 17, 2020, Plaintiff filed its Amended Complaint alleging in Count I that Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  Plaintiff alleges that Defendants (a) engaged in a scheme to defraud; (b) "omitted to state one or more material facts necessary" to make statements "not misleading;" and (c) engaged in a fraudulent or deceptive act, practice, and course of business.  *See id.*, ¶ 174.  In Count II, Plaintiff alleges that the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as controlling persons of Anadarko.  Defendants filed their Motion to Dismiss, which has been fully briefed and is now ripe for decision.

## II.   **LEGAL STANDARDS FOR MOTION TO DISMISS § 10(b) CLAIMS**

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted.  *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).  The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true.  *Harrington*, 563

F.3d at 147.  The complaint must, however, contain sufficient factual allegations, as opposed to legal conclusions, to state a claim for relief that is "plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Patrick v. Wal-Mart, Inc.*, 681 F.3d 614, 617 (5th Cir. 2012).  A claim is "plausible on its face" when the plaintiff pleads sufficient facts to enable the court to draw the reasonable inference that the defendant is liable for the alleged misconduct.  *See Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 290 (5th Cir. 2019).  When there are well-pleaded factual allegations, a court should presume they are true, even if doubtful, and then determine whether they plausibly give rise to an entitlement to relief.  *Iqbal*, 556 U.S. at 679.

The basic elements of a § 10(b) claim involving publicly traded securities are: (1) a material misrepresentation or omission, (2) in connection with the purchase or sale of a security, (3) scienter by the defendant, (4) justifiable reliance by the plaintiff, (5) damages; and (6) a causal connection between the material misrepresentation and the loss, referred to a "loss causation."  *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238-39 (5th Cir. 2009).  The Private Securities Litigation Reform Act ("PSLRA") imposes a heightened pleading requirement for two elements of a § 10(b) claim – the misrepresentation and scienter elements.  *See Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (citing 15 U.S.C. § 78u-4; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007)).  Specifically, "the PSLRA requires a plaintiff

to identify each allegedly misleading statement with particularity and explain why it is misleading, the so-called 'particularity' requirement." *Lormand*, 565 F.3d at 239 (citing 15 U.S.C. § 78u-4(b)(1)).

Additionally, the PSLRA requires a plaintiff to allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).  To satisfy the pleading standard for the required "strong inference" of scienter, the allegations must create an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Owens*, 789 F.3d at 536 (quoting *Tellabs*, 551 U.S. at 324).  "[A] tie favors the plaintiff." *Id.* (quoting *Lormand*, 565 F.3d at 254).

## III.   ANALYSIS

In Count I of the Complaint, Plaintiff alleges that Defendants (a) engaged in a scheme to defraud; (b) "omitted to state one or more material facts necessary" to make statements "not misleading;" and (c) engaged in a fraudulent or deceptive act, practice, and course of business. *See* Complaint, ¶ 174; *see also* 17 C.F.R. § 240.10b-5(a)-(c).[2]

---

[2]     Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> (a)     To employ any device, scheme, or artifice to defraud,

> (continued...)

Defendants argue that Count I should be dismissed because Plaintiff did not adequately allege that Defendants omitted material facts that were necessary to make the cited statement not misleading. Specifically, Defendants argue that Plaintiff failed to allege with sufficient particularity how the cited statements about Shenandoah were misleading. Defendants argue also that Plaintiff failed to allege facts supporting a strong inference of scienter.

## A.     **Claim Based on a Scheme to Defraud – Rule 10b-5(a)**

In its Motion to Dismiss, Defendants do not address the Rule 10b-5(a) "scheme to defraud" aspect of Plaintiff's claim in Count I. In response to Plaintiff's assertion that Defendants were not seeking dismissal of this aspect of the claim, Defendants stated that the "Complaint presents a typical Rule 10b-5(b) suit, as it alleges that Defendants defrauded investors through misrepresentations in public filings." *See*

---

[2]     (...continued)

(b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. 240.10b-5.

Response, pp. 16-17. The United States Supreme Court has held, however, that the "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5." *Lorenzo v. Sec. & Exch. Comm'n*, __ U.S. __, 139 S. Ct. 1094 (2019).

Notwithstanding Defendants' characterization of the Complaint, Plaintiff clearly alleges "Defendants' Fraudulent Scheme" as the heading of the first substantive section. *See* Complaint, p. 9. In the Complaint, Plaintiff alleges a scheme to defraud that involved more than making misleading statements to the public. *See id.*, ¶ 3; ¶ 29 ("Defendants engaged in a fraudulent scheme through various means that operated as a deception on the investing public concerning the size and commercial viability of the Shenandoah project and a whistleblower complaint about Defendants' multi-billion dollar securities fraud as described herein"); ¶¶ 30-93. For example, Plaintiff alleges that, as part of the scheme to defraud, Anadarko retaliated "against employees who tried to stand up for the truth about Shenandoah." *Id.*, ¶ 3(h). Plaintiff alleges that Defendants concealed the scheme to defraud by "representing to employees that the [confidentiality agreement] prohibited them from disclosing to investors the truth about Shenandoah or any aspect of Defendants' scheme." *Id.*, ¶ 3(k).

Defendants did not move to dismiss and, in any event, Plaintiff adequately alleges, a Rule 10b-5(a) "scheme to defraud" claim in Count I of the Complaint.

**B.      Claim Based on Misleading Statements – § 10(b) and Rule 10b-5(b)**

***Pre-Class Period Statements.*–** In the Complaint, Plaintiff identifies statements to investors that were made prior to the Class Period (February 20, 2015 through May 2, 2017). *See id.*, ¶¶ 30-34. Defendants argue these statements cannot be considered because they were made outside the Class Period. Although it is clear that these statements were made prior to the Class Period, they are not an independent basis for liability under § 10(b). Instead, these statements are Anadarko's original statements regarding Shenandoah and they help inform the reasonable understanding of later statements made during the Class Period.

For example, Plaintiff alleges that on March 19, 2013, prior to the Class Period, Defendants issued a press release regarding the Shen 2 appraisal well, quoting Daniels's statements about the "successful Shenandoah-2 well" being "one of Anadarko's largest oil discoveries in the Gulf of Mexico, with more than 1,000 net feet of oil pay and reservoir rock and fluid properties of much higher quality than previously encountered . . .." *See id.*, ¶ 32. Later, on March 3, 2015, during the Class Period, Defendants stated that Shen 3 "was a very successful appraisal well." *See id.*, ¶ 102. The description of Shen 2 as a "successful Shenandoah-2 well" based on its

large oil pay made it reasonable for investors to understand that the "very successful appraisal well" Shen 3 also had a large oil pay. Yet Plaintiff alleges that Shen 3 was a dry hole.

Similarly, a slide presented by Anadarko at a March 4, 2014 conference, showed the Shenandoah basin as a "~$2 - $4 Billion Net Opportunity." *See id.*, ¶ 34. Although this was prior to the Class Period, it provides background and context for Class Period Statements regarding the Shenandoah project being "well within the range of expectation of what we had put out there" (*id.*, ¶ 110), and "we're right where we thought" (*id.*, ¶ 112). Therefore, the statements set forth in the Complaint that were made prior to the Class Period are relevant to an understanding of the statements made during the Class Period.

***Statements During Class Period.*** – As noted above, an essential element of a § 10(b) claim is that the defendant made a material statement that was false or misleading. *See Lormand*, 565 F.3d at 238. Defendants argue that Plaintiff's § 10(b) claim should be dismissed for failure to explain how the challenged statements made during the Class Period were misleading.

Plaintiff alleges that Defendants made multiple statements during the Class Period that were misleading because they failed to disclose material information necessary so the statements would not be misleading. Plaintiffs identify specifically

the challenged statements made during the Class Period, which include SEC filings, press releases, statements during conference calls with investors and analysts, and earnings calls. *See* Complaint, ¶¶ 97-140. Plaintiff in the Complaint also states specifically the material facts that Defendants omitted even though the facts were "necessary not to make their statements misleading." *See id.*, ¶ 95; ¶ 141 (for statements after April 2016).

As an example, Anadarko stated in its 2014 Form 10-K that the "Shenandoah-3 well confirmed the . . . excellent reservoir qualities [and] reduced the uncertainty of the resource range." *Id.*, ¶ 97. Similarly, in a March 3, 2015 conference call with investors and analysts, Daniels stated that Shen 3 "was a very successful appraisal well." *Id.*, ¶ 102. Significantly, Plaintiff alleges that Anadarko failed to disclose that Shen 3 was a dry hole, an omission which could have created "an impression of a state of affairs that differs in a material way from the one that actually exists." *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 541 (5th Cir. 2008).

Although Plaintiff does not individually tie each challenged statement to a specific omitted fact, it explains clearly its position that the cited statements regarding the future commercial viability of Shenandoah were rendered misleading by the omission of information demonstrating that Anadarko and the Individual Defendants

already knew that the original projections required significant downward adjustment.

*See, e.g.*, Complaint, ¶¶ 36; 58; 67.  Plaintiff adequately alleges in the Complaint why

it believes the omitted information renders the cited statements misleading.

***Forward-Looking Statements.*** – Defendants argue that certain statements by

Walker, Gwin and Daniels are protected by the PSLRA's Safe Harbor clause as

forward-looking.

Under the Safe Harbor clause, a forward-looking statement is not actionable if:

(1) it is identified as forward-looking and is accompanied by "meaningful cautionary

statements identifying important factors that could cause actual results to differ

materially;" (2) it is immaterial; or (3) the plaintiff fails to plead that the

forward-looking statement was made with actual knowledge that it was false or

misleading.  *See Lormand*, 565 F.3d at 243 (citing 15 U.S.C. § 78u-5(c)(1)(A), (B);

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 371-72 (5th Cir.

2004)).  "Whether or not a statement is forward-looking is governed by the nature of

the statement, not a litigant's allegations about the statement."  *KB Partners I, L.P. v.

Pain Therapeutics, Inc.*, 2015 WL 7760201, *10 (W.D. Tex. Dec. 1, 2015).

As an initial matter, Defendants have failed to establish that each forward-

looking statement was identified as forward-looking and was accompanied by

meaningful cautionary statements.  Plaintiff alleges that many of the statements at

issue "were not identified" as forward-looking by Defendants. *See* Complaint, ¶ 162.

Plaintiff alleges also that the statements were not accompanied by meaningful

cautionary language. "When risks have already begun to materialize, it is no longer

sufficient to generally warn of the possibility of these risks in the future." *Marcus v.

J.C. Penney Co., Inc.*, 2015 WL 5766870, *3 (E.D. Tex. Sept. 29, 2015). "When

cautionary language is glossed over as a future risk rather than the certain dangers that

had already begun to materialize then the warnings are no longer meaningful." *Id.*

(internal quotations and ellipsis omitted). In this case, Plaintiff alleges that by the

time Defendants made "forward-looking" statements during the Class Period

regarding Shenandoah, Defendants already knew that the potential for Shenandoah

was being exaggerated and needed "a significant downward adjustment." *See, e.g.*,

Complaint, ¶ 6. As a result, Plaintiff has adequately alleged that the Safe Harbor

provision does not apply to protect the "forward-looking" statements Defendants

assert exist.

Additionally, many courts have held that the Safe Harbor clause does not

protect statements when the plaintiff adequately alleges that the defendant knew his

statements were misleading when made. *See, e.g., Lormand*, 565 F.3d at 244

("Because the plaintiff adequately alleges that the defendants actually knew that their

statements were misleading at the time they were made, the safe harbor provision is

inapplicable to all alleged misrepresentations."); *Marcus*, 2015 WL 5766870 at \*2. Plaintiff in this case clearly alleges that at the time each statement was made, "the speaker knew the [statement] was misleading" and the statement "was authorized and/or approved by an executive director of Anadarko who knew that the [statement] was misleading." Complaint, ¶ 164.

Plaintiff adequately alleges facts that, if proven, would preclude application of the Safe Harbor provision to the challenged statements. As a result, the Court denies the Motion to Dismiss to the extent it is based on the Safe Harbor provision.

***Conclusion Regarding Misleading Statements.*–** Plaintiff has adequately alleged with particularity the factual basis for the misleading statements which form the basis for the § 10(b) and Rule 10b-5(b) claim in Count I.

## D.   Claim Based on Deceptive Business Practices – Rule 10b-5(c)

As with the Rule 10b-5(a) claim in Count I, Defendants did not address Rule 10b-5(c) in their Motion to Dismiss. To establish liability under Rule 10b-5(c) for deceptive business practices, the plaintiff must prove that "the defendant . . . engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *S.E.C. v. Farmer*, 2015 WL 5838867, \*14 (S.D. Tex. Oct. 7, 2015). A cause of action exists under Rule 10b-5(c) "for behavior that constitutes participation in a fraudulent scheme, even absent a

fraudulent statement by the defendant." *Id.* (quoting *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335-36 (S.D.N.Y. 2004)).  There can be, however, significant overlap among the theories of liability under Rule 10b-5. *See Lorenzo*, 139 S. Ct. at 1102 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983)).

Plaintiff alleges that Anadarko and the Individual Defendants engaged in a "course of conduct to conceal adverse material information."  Complaint, ¶ 176. Other deceptive business acts or practices alleged include "directing employees to use outdated, misleading maps that made Shenandoah seem more commercially viable that it really was so as to ensure that Anadarko's partners could not expose the truth." *Id.*, ¶ 3(g).  Plaintiff alleges that Defendants knew by the end of 2014 that there was substantial doubt about Shenandoah's value and economic viability, yet failed to disclose this in the Forms 10-K and 10-Q SEC filings. *Id.*, ¶ 142.  Plaintiff alleges that Defendants engaged in a deceptive business practice by failing to disclose complete information necessary to understand Anadarko's "financial condition, changes in financial condition and results of operations" in violation of SEC Regulation S-K Item 303 ("Item 303"). *Id.*, ¶ 143.  Plaintiff alleges that the Item 303 requirement is "intended to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management." *Id.*  Plaintiff alleges that "Defendants understood that investors were

keenly interested in the Shenandoah project, as evidenced by the fact that the project's ongoing status was repeatedly discussed during Company presentations and earnings conference calls with investors and security analysts." *Id.*, ¶ 144.

Defendants did not move to dismiss, and Plaintiff adequately alleges, a Rule 10b-5(c) "deceptive business practices" claim in Count I of the Complaint.

## E.    **Allegations of Scienter**

Scienter is an element of Plaintiff's claims.  In the Fifth Circuit, "[t]he required state of mind for scienter is an intent to deceive, manipulate, or defraud or severe recklessness." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014).  "[Severe recklessness is] limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003)).

Circumstantial evidence can support a strong inference of scienter, but "allegations of motive and opportunity standing alone will not suffice." *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir.

2008). "Appropriate motive and opportunity allegations may, however, meaningfully enhance the strength of the inference of scienter." *Id.*

The Court employs a three-step process to evaluate allegations of scienter: (1) the Court accepts the factual allegations in the Complaint as true; (2) the Court considers the entire Complaint as a whole; and (3) the Court considers "plausible inferences supporting as well as opposing a strong inference of scienter." *See Neiman v. Bulmahn*, 854 F.3d 741, 747 (5th Cir. 2017). "When analyzing a complaint for scienter, a court must 'assess all the allegations holistically,' not in isolation." *Owens*, 789 F.3d at 536 (quoting *Tellabs*, 551 U.S. at 326). The allegations in the Complaint must create an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (quoting *Tellabs*, 551 U.S. at 324). "[A] tie favors the plaintiff." *Id.* (quoting *Lormand*, 565 F.3d at 254).

***Allegations of Knowledge.*–** Plaintiff has alleged that Defendants each "knew or were severely reckless in disregarding that material facts were being concealed from investors." Complaint, ¶ 146. Plaintiff alleges further that Defendants each "had actual knowledge of the misleading statements they made and/or acted in severe reckless disregard of the truth at the time they spoke." *Id.*, ¶ 147. Although these

general allegations are against "Defendants" as a group, the specific allegations discussed below are tied to specific Individual Defendants.[3]

Plaintiff alleges that Defendants knew their statements were misleading because Frye repeatedly told them.  Plaintiff alleges that in January 2014, "Defendants tasked Frye with evaluating Shenandoah and analyzing the available scientific data to assess whether the project should move forward to production."  *Id.*, ¶ 41.  "Specifically, Frye was asked to focus on Shenandoah's perceived value and any risks to that perceived value."  *Id*.  Plaintiff alleges that the objective was to use Frye's "economic model to assist the Executive Committee in establishing budgets for the following year."  *Id*.  Walker, Gwin and Daniels were on the Executive Committee.  *Id*.  Plaintiff alleges that by February 2014, "Frye had assembled and presented undeniable evidence that Anadarko was exaggerating Shenandoah's potential to the market."  *Id.*, ¶ 6.  Plaintiff alleges that on February 19, 2014, Frye attended a meeting about Shenandoah at which Leyendecker was present.  *Id*., ¶ 42.  Plaintiff alleges that on or about August 18, 2014, Leyendecker "insisted Frye and other scientists conceal maps

---

[3]   Defendants argue that the allegations in the Complaint lack specifics.  Plaintiff notes that its investigation is ongoing, that many of the relevant facts are within Defendants' exclusive control.  *See* Complaint, p. 1 n.1.  Plaintiff alleges also that Defendants have intimidated and threatened employees if they disclose "any aspect of Defendants' fraudulent scheme."  *Id*., ¶ 5(l).  Plaintiff notes further that Frye's "whistleblower materials" were sealed until recently and remain heavily redacted.  *See id.* at 1 n.1; ¶ 55.

revealing the existence of faulting and instead use false maps of Shenandoah," maps that had been manipulated "by recalibrating." *Id.*, ¶ 60. Plaintiff alleges that on February 1, 2016, Frye met with Walker, Gwin, Daniels, and others to discuss the proposal for Shen 5. *See id.*, ¶ 70. Plaintiff alleges that "the attendees discussed the Shenandoah project at large, and Defendants appeared to be familiar with and well-versed in the subject." *Id.* Plaintiff alleges that in late April 2016, Frye provided to Defendants "a detailed 20-page letter previewing much of the same information she intended to submit to the SEC." *Id.*, ¶ 73. Plaintiff alleges that in the summer of 2016, Frye "met with lawyers for Anadarko's Audit Committee" over two occasions, during which "she provided additional detailed information regarding the scheme." *See id.*, ¶ 78.

Plaintiff alleges that Anadarko's RCT also informed Defendants that they should revise downward the assessment of Shenandoah. *See id.*, ¶ 65. "Anadarko's RCT served an internal audit function by reviewing the exploration team's methods for reporting on resources to prevent 'salesmanship and overly optimistic evaluations of exploration prospects.'" *Id.*, ¶ 66. Plaintiff alleges that the RCT examined "the Shenandoah project and more specifically its size." *Id.*, ¶ 67. Plaintiff alleges that while the RCT was evaluating Shen 4, which was drilled in 2015, "it became increasingly apparent to the development team that the exploration team was

selectively ignoring relevant data." *Id.* Plaintiff alleges that the RCT "confirmed that the resource claims made by exploration executives needed a significant downward adjustment." *Id.*

Plaintiff alleges that others at Anadarko believed the statements about Shenandoah were incorrect. Plaintiff alleges that Anadarko geologist Paul Chandler "pointed out numerous errors in the exploration team's methodology and stated that their resource statements were incorrect." *See id.*, ¶ 46. Plaintiff alleges that Chandler presented this information to Executive Committee members Darrell Hollek and/or Jim Kleckner. *See id.* Plaintiff alleges that in February 2017, Project Reservoir Engineer Doug Shotts had prepared a presentation that "included information about the geologic uncertainty surrounding Shenandoah," and "included an honest assessment of the size of the Shenandoah resource and the economic obstacles to its profit potential." *Id.*, ¶ 47. Plaintiff alleges that Leyendecker "abruptly canceled" the scheduled presentation because he "did not want the truth about the uncertainty in size and value of the resource to get out." *Id.*

Defendants argue that none of these allegations raise a strong inference of scienter because the inference cannot arise from the Individual Defendants' assignment to the Executive Committee and their presence at meetings during which the Shenandoah project was discussed. The allegations described above raise an

inference of scienter that is at least as strong as the alternative inference that Walker, Gwin, and Daniels attended meetings but failed to pay attention and that these individuals received company reports but failed to read them. As to Leyendecker, the inference of scienter is at least as strong as the inference that Leyendecker simply chose not to believe Frye, the RCT, and others at Anadarko who had studied the Shenandoah project. Allegations that a defendant ignored significant red flags, supported by allegations of motive and opportunity, is enough to give rise to a strong inference of scienter on the part of that defendant. *See In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 712 (W.D. Tex. 2010) (citing *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1359 (S.D. Fla. 2005)).

Plaintiff alleges also that the Individual Defendants "monitored and/or oversaw the Shenandoah project" and were able to speak about the project at conference calls and meetings with investors. *See id.*, ¶ 149. On many occasions, the challenged statements were made during conference calls or at meetings during which more than one Individual Defendant was present. For example, Plaintiff alleges that Walker and Gwin were both present and making statements during an earnings call on October 28, 2015. *See id.*, ¶ 110. Similarly, Plaintiff alleges that Walker and Daniels were present and making statements during an earnings call on May 3, 2016. *See id.*, ¶ 121. Whenever a defendant "voluntarily chooses to speak publicly, he or she has a duty to

tell the whole truth," and must disclose material, adverse facts that affect the validity or plausibility of his statement. *In re ArthroCare*, 726 F. Supp. 2d at 716. The fact that only one of the Individual Defendants may have made a challenged statement to the public does not preclude an inference of scienter on the part of another Individual Defendant who was present and had the opportunity to correct the speaker at the time the inaccurate and misleading statements were made to the investing public. *See id.* (citing *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir. 2005)). "[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements." *Barrie*, 397 F.3d at 262.

*Allegations of Motivation.*– Plaintiff has alleged also that Defendants were motivated to provide misleading information to investors and to conceal the scheme to defraud. *See* Complaint, ¶ 150. Plaintiff alleges that Defendants knew that disclosure of the adverse information about Shenandoah would "at least cost them their jobs," would have reduced the share price of Anadarko stock, and would prevent them from receiving "over $100 million in golden parachute payments." *Id*.

Each Individual Defendant was receiving a large salary. Plaintiff alleges that during "fiscal years 2015-2017, Walker received over $52 million in total executive compensation." *Id*., ¶ 17. Plaintiff alleges that during that same time period, Gwin

received $20.6 million in total executive compensation. *Id.*, ¶ 18. Plaintiff alleges that during 2015, Daniels received $6.5 million in total executive compensation and "engaged in insider sales of Anadarko common stock during the Class Period at inflated prices from which he received proceeds of $3.1 million." *Id.*, ¶ 19. Plaintiff alleges that Leyendecker received in excess of $4 million during fiscal years 2015-2017. *Id.*, ¶ 20.

*Conclusion Regarding Scienter.–* The Court has viewed all the factual allegations in the Complaint holistically and not in isolation. The Court has considered the allegations regarding motive and opportunity to enhance the strong inference of scienter raised by Plaintiff's allegations of Defendants' knowledge. Accepting the factual allegations in the Complaint as true, and considering inferences supporting as well as opposing scienter, the Court finds that Plaintiff has alleged with adequate particularity that each Defendant acted with the requisite scienter.

## F.   Control Person Liability – § 20(a)

Under § 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). A plaintiff who fails to state a claim for a violation of the

Exchange Act similarly fails to state a claim under § 20(a). *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004).

Individual Defendants argue that the § 20(a) control person liability claim must be dismissed because Plaintiff has failed to allege a primary claim under § 10(b) and Rule 10b-5. As explained above, however, Plaintiff has adequately alleged the primary claim. Therefore, the § 20(a) claim is not subject to dismissal.

## VI.    CONCLUSION AND ORDER

The sole issue before the Court at this time is whether the claims in Plaintiff's Complaint are adequately *alleged*, not whether the claims are likely to survive a motion for summary judgment following discovery. As discussed above, Plaintiff has adequately alleged their Exchange Act claims against Defendants. Accordingly, it is hereby

**ORDERED** that Defendants' Motion to Dismiss [Doc. # 60] is **DENIED**. It is further

**ORDERED** that the parties may begin to conduct discovery. It is further

**ORDERED** that by **February 5, 2021**, the parties shall submit to the Court proposed deadlines for Defendants to file their Answer to the Amended Complaint and for initial disclosures, and proposed date(s) for an initial scheduling conference.

SIGNED at Houston, Texas, this **19th** day of **January, 2021**.