IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ELECTRICAL WORKERS PENSION FUND, LOCAL 103, I.B.E.W., on behalf of itself and all others similarly situated, | § § § § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-00201-P |
| | § | |
| SIX FLAGS ENTERTAINMENT CORPORATION, JAMES REID-ANDERSON, and MARSHALL BARBER, | § § § § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

This contentious lawsuit arises out of alleged misstatements and omissions pertaining to Six Flags's international park developments in China, the vitality of Riverside (Six Flags's partner in China), the parks' construction progress, projected park openings and future parks, and revenue recognition. Ultimately, the China parks failed to materialize as projected and Six Flags terminated its partnership with Riverside. Basing their claims on these circumstances and allegations of two anonymous, midlevel former Six Flags employees, Plaintiffs bring this securities fraud action alleging that Defendants made misstatements and omitted information which mislead Plaintiffs (investors) and resulted in massive losses to Plaintiffs from stock price declines.

Now before the Court is Defendants' Motion to Dismiss. ECF No. 51. Having considered the Motion, briefing, applicable caselaw, and docket entries, the Court finds that the motion should be and is hereby **GRANTED**.

## FACTUAL BACKGROUND

**A.     Six Flags and Its International Projects**

Founded in 1961, Six Flags ("Six Flags" or the "Company") is the world's largest regional theme park operator, with more than two dozen parks across North America. Am. Compl. at ¶ 33. Throughout its nearly 60-year history, Six Flags has primarily expanded through the acquisition of pre-existing regional parks. *Id*. Six Flags's focus has historically been the North American market, with only a short-lived expansion into Europe through the acquisition of several European parks in 1998. *Id*. The vast majority of the Company's revenue—**97%** in both 2018 and 2019—is derived from parks it owns and operates in North America. Motion at 2; Am. Compl. at ¶ 244.

 Throughout the 2000s, the Company experienced a significant decline in revenue and amassed over $1 billion in debt. *Id*. at ¶ 33. The Company sought to address its debt and decline by selling off parks throughout the 2000s, including the European parks in 2004. *Id*. Despite the sell-offs and changes to management throughout the decade, the Company was unable to reverse course, and the Company filed for Chapter 11 bankruptcy in 2009. *Id*. The Company exited bankruptcy on May 3, 2010, and reissued stock on the NYSE in June 2010. *Id*.

As part of its restructuring process, the Company put into place a series of strategic incentive plans, which entitled its top executives to significant equity awards if the

2

Company met its earnings before interest, taxes, depreciation, and amortization ("EBITDA") goals. *Id*. at ¶ 34. The incentive plan in place during the Putative Class Period[1] was called "Project 600," which would provide Defendants James Reid-Anderson (CEO) and Marshall Barber (CFO) equity compensation if the Company achieved approximately $600 million in "modified" EBITDA by year-end 2018. *Id*. at ¶ 3.

**B.     Six Flags Pursues International Licensing Agreements in China**

A component of the Company's business is its international licensing agreements, through which Six Flags-branded parks were to be developed and operated by third parties, with revenue being paid to the Company based on certain performance obligations. Motion at 2–3. The Company had three separate performance obligations under its international licensing agreements: brand licensing, project services, and management services. *Id*. at 3. The Company distinguished between "pre-opening services such as brand licensing, design and development of parks, management services, and post-opening sales and usage-based royalty payments." *Id*. (quoting Motion Appx. 55, ECF No. 52).

In 2014, the Company announced a partnership with Riverside Investment Group Co., Ltd. ("Riverside"), a Chinese real estate developer, to develop Six Flags-branded parks in China. Am. Compl. at ¶¶ 2, 43. Riverside, also known as Shanshui Wenyuan Investment Group Co., Ltd. or LVC Group, is a Chinese real-estate investment, development, and management company founded in 1986. *Id*. at ¶ 32. Riverside is led by its chairman and majority shareholder, Li Qi, or "Chairman Li" as referred to by the parties. *Id*. Under the

---

[1] Parties refer to this period as the "Class Period" in their pleadings and briefing, which lasted from April 24, 2018, to February 19, 2020.

agreement between the Company and Riverside, Riverside would pay the Company tens of millions of dollars in initial licensing fees for each agreed-upon park, and then more substantial licensing and management fees after the parks opened. *Id.* at ¶ 2. Six Flags expected to recognize high profit margins on the international revenue, with 80%–90% of the fees going to the Company's EBITDA. *Id.*

In January 2016, the Company announced that Riverside was breaking ground on a branded theme park, water park, and kid's park in Zhejiang, China, which were part of a larger mixed-use development project undertaken by Riverside. *Id.* at ¶¶ 47–49. At the beginning of the Putative Class Period, the Zhejiang water park was projected to open "towards the end of 2019," with the remaining parks expected in 2020. Motion at 3 (citing Motion Appx. at 32). In 2017, the Company and Riverside announced plans for parks in Chongqing, which were projected to open in 2020. Am. Compl. at ¶¶ 52–53. And on April 24, 2018—the first day of the Putative Class Period—additional planned parks in Nanjing were announced with projected openings in 2021. *Id.* at ¶¶ 54, 56. There were eleven parks planned in those three cities with each site having different financial arrangements and requiring approval from separate local governments. *Id.* at ¶ 177; Motion at 3 (citing Motion Appx. at 141).

Throughout 2019, Defendants kept investors apprised of the difficulties facing the China parks' development and Riverside while expressing optimistic opinions. In February 2019, the Company announced a negative revenue adjustment of $15 million caused by delays in the expected opening dates of certain parks in China. Am. Compl. at ¶ 109. These delays were attributed to macroeconomic issues in China, including lower

4

gross domestic product growth, new government policies making it more difficult for Riverside—a real estate developer—to liquidate real estate assets or obtain loans, and turnover of government officials requiring re-approval of plans for the Chongqing and Nanjing parks. Motion at 4–5; Am. Compl. at ¶ 272. In April 2019, Defendants disclosed that the parks in Chongqing and Nanjing were still waiting on government re-approval so were not generating revenue, and cautioned that "**it does feel like conditions are improving, but we'll know as time goes on**." Motion at 5 (quoting Motion Appx. at 212). Reid-Anderson optimistically opined that Riverside had traditionally been "very successful[] navigating the political and regulatory environment, and we're optimistic they'll continue to do so," but he warned that it was "**possible that international revenue will remain lumpy going forward[, e]specially if the timing of the park openings changes or broader macroeconomic issues persist**." Motion at 5; Am. Compl. at ¶ 126.

The Company informed investors in October 2019 that the Chinese market continued to be very challenging for Riverside and it was "**unrealistic to think**" that the timeline for the development of parks in China would remain the same. Am. Compl. at ¶ 138. Then on January 10, 2020, the Company disclosed that Riverside continued to face severe challenges causing Riverside to default on its payment obligations to the Company, and that the Company had issued formal notices of default to Riverside. *Id*. at ¶ 147. The Company announced on February 20, 2020, that it formally terminated its development agreements with Riverside. *Id*. at ¶ 153.

On March 7, 2019, the Company announced Reid-Anderson would retire from position as CEO by February 28, 2020, and that the Company would undergo a process to

5

evaluate candidates for the position of Chairman of the Board following Reid-Anderson's retirement. *Id*. at ¶ 258. However, the Company then announced that Reid-Anderson would step down as Chairman and CEO as of November 18, 2019. *Id*. The Company announced February 20, 2020, that Barber would be retiring from his position as CFO on February 24, 2020, and would retire from the Company entirely on August 31, 2020. *Id*. at ¶ 259.

## C.    Former Employee Allegations

Plaintiffs' securities fraud claims rest on the allegations of two confidential former Six Flags employees. Former Employee 1 ("FE1") was the Director of International Construction and Project Management for the Company beginning in May 2018. *Id*. at ¶ 8. In this position, FE1 was responsible for overseeing the construction of the China parks and reporting on their progress internally at the Company. *Id*. FE1 worked onsite at Zhejiang, but also traveled to the Chongqing site to perform site inspections and check its progress and met often with the Company and Riverside personnel in Beijing. *Id*. at ¶ 83. FE1 also prepared weekly presentations and periodic reports on the progress of construction at the Company's China parks for David McKillips—the former Senior Vice President of International Park Operations and President of Six Flags International until January 2020—who Plaintiffs allege presented the reports to Reid-Anderson. *Id*. at ¶¶ 8, 106. No specific dates, however, are provided for when the reports and presentations were created, when they were presented to McKillips, or when McKillips presented them to Reid-Anderson. The other confidential former employee ("FE2") served as the

Company's Account Manager beginning sometime in 2018 through the beginning of 2019." *Id.* at ¶¶ 100, 256.

According to FE1, Reid-Anderson and Barber made numerous misstatements and omitted the disclosure of information—detailed in the subsequent section of this Order—regarding Riverside's financial status and the state of construction and opening dates of the China parks. FE1 alleges Riverside also failed to make licensing payments to the Company. *Id.* at ¶ 101. From the beginning of FE1's tenure in May 2018, FE1 believed it was clear that the China parks were in serious jeopardy based on the lack of progress. *Id.* at ¶ 8. FE1 alleged that despite Defendants' statements of construction progressing, that construction was in fact at a "standstill" and that the park sites were largely "empty fields filled with weeds." *Id.* at ¶ 12. Plaintiffs rely on FE1's opinion that there was "absolutely no way" that the China parks would open on the schedule announced to the public. *Id.* at ¶ 84. As a former account manager with the Company, FE2's allegations are solely directed at revealing Riverside's missed licensing payments during his tenure with Six Flags. *Id.* at ¶ 100. FE2 alleges that Riverside missed licensing payments by at least August 2018 and that Riverside remained past due on licensing payments as of the time FE2 left the Company in early 2019. *Id.*

**D.     Defendants' Challenged Statements**

In bringing this securities fraud lawsuit, Plaintiffs allege Defendants made misstatements and omissions pertaining to numerous press releases, earnings calls, conference statements, and SEC filings.

1.    First-Quarter 2018 Financial Reporting and Earnings Call (April 24–25, 2018)

On April 24, 2018, Six Flags issued a press release, filed with a Form 8-K with the SEC announcing the Company's financial results for the first quarter of 2018. *Id*. at ¶ 163. This press release announced that "revenue for the first quarter of 2018 increased by $29 million or 30 percent from the first quarter of 2017 to a record-high $129 million," which Defendants represented, as alleged by Plaintiffs, resulted primarily from "the success of . . . the company's . . . international licensing program," *inter alia*. *Id*. The release quoted Reid-Anderson as stating that due in substantial part to "international licensing agreements," the Company was "poised to deliver another record year of financial performance in 2018," and that Defendants "remain[ed] laser-focused on exceeding $600 million of Modified EBITDA in 2018." *Id*.

In the Company's financial report for the first quarter of 2018, filed on Form 10-Q the next day, signed by Reid-Anderson and Barber, Six Flags reported that, "[d]uring the first three months of 2018, our park earnings before interest, taxes, depreciation and amortization ('Park EBITDA') increased primarily as a result of a 27% increase in attendance, and a 21% increase in sponsorship and international licensing revenue." *Id*. at ¶ 164.

Defendants also represented in the financial report that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States ('U.S. GAAP'[2])," and "[o]ur

---

[2]"Generally Accepted Accounting Principles."

accounting policies reflect industry practices and conform to U.S. GAAP." *Id*. at ¶ at 165. Consistent with their purported GAAP compliance, Defendants represented that Six Flags "recognize[d] revenue under these [international licensing] agreements over the relevant service period of each performance obligation based on its relative selling price, as determined by our best estimate of selling price," and that "[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year." *Id*.

That same day, during the Company's first-quarter 2018 earnings conference call with analysts and investors, in response to an analyst's question concerning "how much you—during the quarter you had in international licensing revenue," Barber responded, "We did not say, but it's about $9 million. It's just under $9 million for the quarter." *Id*. at ¶ 166.

Reid-Anderson also provided an update on the Company's international licensing business, including on the ten parks that Six Flags had announced were in progress in Zhejiang, Chongqing, and Nanjing, and remarked that the "3 new parks in [Nanjing] China are expected to begin opening in 2021." *Id*.

During the call, an analyst stated that he was "very encouraged by the parks that you announced in China," and asked Reid-Anderson, "Where are we as far as the Chinese expansion? Maybe what inning are we in? Or how many more opportunities do you think we're going to see there or that can be weighted towards just other regions of the world?" *Id*. at ¶ 169. Reid-Anderson responded optimistically about Riverside and the potential of future parks by stating:

> [W]hen we announced the initial Riverside deals, I said that the discussions with our partner, and we had had [sic] focused in on really being in the range of at least 10 parks within 10 years, and we're at 10 announced already. . . . We will not be stopping at 10 parks, I can assure you that, and our partner is very excited about being able to expand further with us.

*Id*. at ¶ 170.

During the call, an analyst also asked Reid-Anderson, "I guess just following up on China specifically there, we have seen some, I guess, news flow from the National Development and Reform Commission that they would maybe put more scrutiny on these kind of large-scale theme park developments. Any kind of color or commentary there, if that impacts you guys or how that can impact the industry overall?" *Id*. at ¶ 171. Reid-Anderson responded positively about Riverside, Riverside's past success, and with a positive outlook in dealings with Riverside:

> We obviously keep track of what's going on in all of the countries in which we operate. And I think the way to think about it is really as follows. You've heard me talk about our partners, an incredible partnership with Riverside. They are building 10 parks. They're on their way to building 10 parks. We've talked about building multiple parks. There is no ban on theme park development in China. There are a series of guidelines that were issued regarding theme park development. They're mostly focused on the real estate aspects of theme park development but also touched on enhanced park standards. They're not laws, but they do portend greater regulation of theme park development, in line with what we have in North America or Europe or around the world generally. Our partner has not only successfully navigated the regulatory environment in China before but will continue to do so going forward. And I think it's really good to have regulations that make sense. So right now, **barring some other decision that's made**, all our parks are progressing nicely towards their anticipated opening dates. And hence, we've announced 3 more parks. We're very confident.

*Id*. at ¶ 172 (emphasis added).

In addition, Reid-Anderson emphasized the importance of the multiple Six Flags China parks as a hedge against other developments:

> The international piece of this is going to continue to grow as we build our resources and expertise—we can run multiple projects annually. We're in this position where we've developed all these incremental parks, 12 parks coming, we've got a great pipeline of deals that provide a hedge against any one single deal or any one single market. China is the biggest of all, and the vision of both Six Flags and Riverside is to build multiple parks.

*Id.* at ¶ 173.

2.   Goldman Sachs Lodging, Gaming, Restaurant and Leisure Conference (June 5, 2018)

On June 5, 2018, Barber spoke at the Goldman Sachs Lodging, Gaming, Restaurant and Leisure Conference. During the conference, Barber opined about the potential success for the Company in China:

> So our partner in China has—we have 3 locations there now with 11 parks. He has said he wants to do 10 or 11, 10 to 20 locations, with multiple parks in each. Given that we're already at 11, I think 20 parks is possible. I think China could be larger. We could have more parks in China than we have in the U.S. for too many more years. So I think it's a great market for us. It's 4x the size of the United States with half the theme parks in it. So I think that's sort of China specifically.

*Id.* at ¶ 177.

3.   Oppenheimer Consumer Conference (June 20, 2018)

On June 20, 2018, Barber spoke at the Oppenheimer Consumer Conference. During the conference, Barber stated that "we have additional parks in China that our partner has said he wants to build[,] 10 parks—20 parks, 10 properties. He's been a very good partner for us." *Id.* at ¶ 179.

4.      Second-Quarter 2018 Financial Report and Earnings Call (July 25, 2018)

On July 25, 2018, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the second quarter of 2018. *Id*. at ¶ 181. In that release, Defendants announced "that revenue for the second quarter of 2018 increased $23 million or 5 percent from the second quarter of 2017 to $445 million," which Defendants represented "resulted primarily from . . . a 9 percent increase in sponsorship, international licensing and accommodations revenue." *Id*. The release quoted Reid-Anderson as attributing the Company's "continued strong momentum and execution in the quarter" to "expand[ing] our global footprint." *Id*. Moreover, in the release, Defendants stated that, "[f]or the first six months of 2018, revenue was $574 million, a 10 percent increase compared to the prior year period, driven primarily by . . . a 12 percent increase in sponsorship, international licensing and accommodations revenue." *Id*.

In the Company's financial report for the second quarter of 2018, filed on Form 10-Q on July 25, 2018, signed by Reid-Anderson and Barber, Six Flags reported that, "[d]uring the first six months of 2018, our park earnings before interest, taxes, depreciation and amortization ('Park EBITDA') increased primarily as a result of . . . a 12% increase in sponsorship, international licensing and accommodations revenues." *Id*. at ¶ 182. Further, Defendants reported in the second-quarter 2018 Form 10-Q that "[r]evenue for the three months ended June 30, 2018 totaled $445.4 million, an increase of $23 million, or 5%," compared to the second quarter of 2017, attributable in substantial part to "a 9% increase in sponsorship, international licensing and accommodations revenue." *Id*.

12

Defendants also represented in the financial report that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States ('U.S. GAAP')," and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP." *Id.* at ¶ 183. Consistent with their purported GAAP compliance, Defendants represented that Six Flags "recognize[d] revenue under these [international licensing] agreements over the relevant service period of each performance obligation based on its relative selling price, as determined by our best estimate of selling price," and that "[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year." *Id.*

That same day, during the Company's second-quarter 2018 earnings conference call with analysts and investors, Barber represented that, during the first half of 2018, "international licensing revenue was up $4.6 million or 24%." *Id.* at ¶ 184. In response to an analyst's question about "[i]nternational revenue and EBITDA contribution in Q2 versus the comp last year," Barber responded that "we had $14.7 million of revenue in the second quarter and the EBITDA margin is in the 80% range as well, as it has been." *Id.* In response to another analyst's question about if there was "any benefit from the Chinese park [i.e., Nanjing] announced in late June to the international piece," Barber responded optimistically about the Company's future financial performance based on the run rate:

> So we actually announced the park in China—or the parks in China, in April, I believe. But yes, in terms of the run rate, it's about $15 million in Q3. That will go up as we now have those 4 parks in China plus Saudi Arabia, we'll be in for a full quarter. And then, that'll pretty much be the run rate until they open or until we announce new parks.

*Id.* Reid-Anderson added, "[t]he revenue that we generated in Q2 for international is the highest in our history, and it's growing really nicely . . .  we're registering records and we believe we will continue to do that." *Id.* Further, in response to an analyst's question regarding how "the international contribution . . . ramps over time," Barber stated that "if you look at the $14.7 million, you add in a little bit for a full quarter for the 4 parks in China plus the one park in Saudi Arabia, I think you'll get to a pretty good run rate going forward until we start opening parks or until we sign more deals." *Id.*

Also during the July 25, 2018 earnings conference call, an analyst asked Barber and Reid-Anderson "is there any update on the opening timetable of the initial Chinese parks? I think it was 3 parks in late 2019 and another 4 in early 2020, if I'm right?" *Id.* at ¶ 186. Barber responded, "That's right." Reid-Anderson followed up on Barber's statement, and stated, "[t]he timing of the parks remains exactly the same as previously disclosed, there's no change on any of those." *Id.* at ¶ 187.

5.      Third-Quarter 2018 Financial Report and Earnings Call (October 24, 2018)

On October 24, 2018, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the third quarter of 2018. *Id.* at ¶ 190. In that release, Defendants announced "that revenue for the third quarter of 2018 increased $39 million or 7 percent from the third quarter of 2017 to $620 million," which Defendants represented "was primarily driven by . . . a 42 percent increase in sponsorship, international licensing and accommodations revenue." *Id.* The release quoted Reid-Anderson as attributing the Company's reported positive financial results to "[o]ur five key growth initiatives," including "pursuing additional Six Flags-branded international parks." *Id.*

14

Moreover, in the release, Defendants stated that, "[f]or the first nine months of 2018, revenue was $1.2 billion, an 8 percent increase compared to the prior-year period, driven primarily by . . . a 23 percent increase in sponsorship, international licensing and accommodations revenue." *Id*.

In the Company's financial report for the third quarter of 2018, filed on Form 10-Q on the same day, signed by Defendants Reid-Anderson and Barber, the Company reported sponsorship, international agreements and accommodations revenue of $35.891 million and $85.182 million for the third quarter of 2018 and the first nine months of 2018, respectively. *Id*. at ¶ 191. Defendants represented that, "[d]uring the first nine months of 2018, our park earnings before interest, taxes, depreciation and amortization ('Park EBITDA') increased primarily as a result of . . . a 23% increase in sponsorship, international licensing and accommodations revenues." *Id*. Further, Defendants reported that "[r]evenue for the three months ended September 30, 2018 totaled $619.8 million, an increase of $39.4 million, or 7%," compared to the third quarter of 2017, attributable in substantial part to "a 42% increase in sponsorship, international licensing and accommodations revenue." *Id*.

Defendants further represented in the financial report that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States ('U.S. GAAP')," and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP." *Id*. at ¶ 192. Consistent with their purported GAAP compliance, Defendants represented that Six Flags "recognize[d] revenue under our international [licensing] agreements over the

relevant service period of each performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price," and that "[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year." *Id*.

That same day, during the Company's third-quarter 2018 earnings conference call with analysts and investors, Reid-Anderson stated that Six Flags "continue[d] to grow through our international agreements," and as a result, "our quarterly run rate for revenue has increased more than 50%." *Id*. at ¶ 193. Barber represented that in the third quarter of 2018, "year-over-year total revenue increased $39 million or 7% as a result of a 5% increase in attendance and an $11 million or 42% growth in sponsorship, international licensing and accommodations revenue" and, "[o]n a year-to-date basis, revenue was up $92 million or 8%, driven primarily by a 6% increase in attendance and a 23% increase in sponsorship, international licensing and accommodations revenue." *Id*. In response to an analyst's question about "growth in international revenue during the quarter," Barber reiterated, "it's $40 million. It's a growth of 40% over prior year, year-to-date." *Id*. The analyst asked for confirmation whether "that's specifically just international," and Barber responded, "That is international." *Id*.

In addition, during the October 24, 2018 earnings conference call, an analyst asked for information regarding the Company's Dubai park-opening date, "whether we should be pushing that back," and for an update on the "3 Chinese parks that were expected to open in the fourth quarter of next year as well." *Id*. at ¶ 195. Reid-Anderson disclosed that the Company's Dubai park was delayed and asked Barber to "go through all the other parks

16

which are on time." In response, Barber gave a projected timeline for the China parks. Specifically, Barber responded:

> So you mentioned the Chinese parks. We—those start to come online in Zhejiang, the theme park, water park and kids' park are early 2020. The Chongqing parks are during 2020. That's a theme park, a water park, a kids' park and an adventure park. Those are mid-2020. And then Nanjing, those will start to open in 2021. The water park, Kids World first, the adventure park in 2021 as well in Nanjing. And then the Nanjing Theme Park will actually open up in 2022 midyear.

*Id.* at ¶ 196.

The analyst also asked Barber "to clarify" whether "the first round of Chinese parks," the Zhejiang parks, were "pushed back" from "late [2019]." *Id.* at ¶ 197. Barber responded, "They have it's—technically, it's the first of 2020. I think ultimately—earlier we were saying late 2019, which was in the fourth quarter. So it—really the shift is [a] month or 2. It's not much." *Id.*

6.   Fourth-Quarter and Full Year 2018 Financial Report and Earnings Call (February 14, 2019)

On February 14, 2019, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for fourth-quarter and full-year 2018. *Id.* at ¶ 200. In that release, Defendants announced that, for the year 2018, "revenue increased $105 million or 8 percent to $1.5 billion," driven in substantial part by "a 7 percent increase in sponsorship, international agreements and accommodations revenue." *Id.*

That same day, during the Company's fourth-quarter and full-year 2018 earnings conference call with analysts and investors, Reid-Anderson stated that in 2018, Six Flags "increased revenue from our international agreements by 10%," and that "[o]ur

international agreements continue to be a significant contributor to revenue growth as revenue approached $42 million in 2018." *Id.* at ¶ 201. Barber represented that the reported increase in the Company's revenues for 2018 over 2017 was driven by, among other factors, "a $4 million increase in international agreements revenue." *Id.*

In the Company's financial report for fourth-quarter and full-year 2018, filed on Form 10-K on February 20, 2019, signed by Defendants Reid-Anderson and Barber, among others, Six Flags reported sponsorship, international agreements, and accommodations revenue  of $100.116 million for the year ended December 31, 2018, and represented that the Company's increase in reported revenues over 2017 was "primarily driven by . . . a 7% increase in sponsorship, international agreements and accommodations revenue." *Id.* at ¶ 202.

The financial report contained a report by Six Flags's outside auditor, KPMG LLP, providing the auditor's opinion that "the consolidated financial statements referred to [in the report] present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, . . . in conformity with U.S. generally accepted accounting principles." *Id.* at 203. Consistent with their purported GAAP compliance, Defendants represented that Six Flags "recognize[d] revenue under our international [licensing] agreements over the relevant service period of each performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price," and that "[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year." *Id.*

In addition, during the February 14, 2019 earnings conference call, Reid-Anderson announced that Six Flags "performed a comprehensive review of our project timelines jointly with our partner" and "now expect our [Zhejiang] parks to begin opening in mid-to late 2020 versus 2019, our Chongqing parks to begin opening in mid to late 2021 versus 2020, and Nanjing to begin opening in late 2022," but "our partner in China remains fully committed to developing and opening these parks, and construction is continuing." *Id*. at ¶ 205. An analyst wanted to know "how healthy [is Riverside] right now," and asked Defendants to "talk about the financing behind some of these projects," and if there were "any potential issues as far as having enough funds to continue to do construction." *Id*. at ¶ 206. In response, Reid-Anderson stated, "We are continuing to build those parks, and they are still progressing. And they're not just parks. They are—there's much more beyond that. They're entertainment centers, housing developments all around the park. So that is ongoing as we speak." *Id*.

Barber also responded to the analyst's question and stated that "[Riverside] has a lot of assets." *Id*. at ¶ 207. Barber continued, assuring the analyst of Riverside's liquidity before Reid-Anderson interjected:

> Barber: [Liquidity] has been tougher for other companies. But [Chairman Li]'s in great shape. There's some gap . . .
>
> Reid-Anderson: He continues to pay.

*Id*. Barber clarified that Riverside "continued to pay us, and that's important," was "providing the funding for the development of the parks," had "the ability to source

additional funding," and was "excited about the fact that [Chairman Li]'s in pretty good shape, **although in a tough environment**." *Id.* at ¶ 208 (emphasis added).

Reid-Anderson and Barber were also asked by an analyst if "the financing for each park in China [is] entirely in place" or if it still "need[s] to be secured." *Id.* at ¶ 209. Barber responded with an explanation of the source of funding for the China parks and Riverside's continued funding of the parks:

> [T]he financing comes from many sources, including the federal government and the local governments [a]nd our partner as well. So what I'd say is that the—there's—that Riverside is providing the funding for the development of the parks. They have the—also have the ability to source additional funding from other lenders and equity investors as well as the government. So as these parks progress on from announcement going forward, their dollars will be—will come as they're committed, and they'll come as the parks are being built.

*Id.* Reid-Anderson responded and stated "[s]o the financing is in place, and the financing then gets expanded as time goes on and parts are—parks are added on." *Id.*

7.    First-Quarter 2019 Financial Report and Earnings Call (April 23–24, 2019)

On April 23, 2019, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the first quarter of 2019. *Id.* at ¶ 214. In that release, Defendants announced that, for the first quarter of 2019, reported revenue of $128 million "declined $1 million or 1 percent from the first quarter of 2018," driven by a decrease in the number of guests visiting Six Flags parks, which decrease "was almost entirely offset by a 5 percent increase in total guest spending per capita and an increase in revenue from international agreements." *Id.* at ¶ 214.

In the Company's financial report for the first quarter of 2019, filed on Form 10-Q the next day, signed by Defendants Reid-Anderson and Barber, Six Flags reported

sponsorship, international agreements and accommodations revenue of $23.135 million for the first quarter of 2019, and represented that the Company's reported revenue decline "mostly offset by . . . a 13% increase in sponsorship, international agreements and accommodations revenue." *Id.* at ¶ 215.

Defendants also represented in the financial report that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States ('U.S. GAAP')," and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP." *Id.* at ¶ 216. Consistent with their purported GAAP compliance, Defendants represented that Six Flags "recognize[d] revenue under our international [licensing] agreements over the relevant service period of each performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price," and that "[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year." *Id.*

That same day, during the Company's first-quarter 2019 earnings conference call with analysts and investors, Reid-Anderson stated that for the first quarter of 2019, "[d]espite the decrease in attendance . . . total revenue in the quarter was down less than $1 million, primarily a result of . . . an increase in revenue from international agreements." *Id.* at ¶ 217. In response to an analyst's request for "international revenue and EBITDA numbers" and "which parks, exactly, are contributing to that," Barber represented that "[t]he first quarter revenue was $11.4 million of international," "EBITDA was little over

$9 million of EBITDA for international," and that those revenues were attributed to "Saudi and Haiyan [i.e., Zhejiang] as well as the Dubai." *Id.*

During the call, Reid-Anderson also stated that "[w]e continue to work with our international partner in China, meeting government officials for each of our 3 park complexes, and we believe conditions in China have slowly begun to improve" and "we should not lose sight of the fact that these short-term delays and lumpy revenue patterns are not material in the context of the long-term opportunity." *Id.* at ¶ 219. Reid- Anderson further stated, "**We're cautiously optimistic**, but the situation in China is improving. And as I said earlier, our partner Riverside remains very committed to developing Six Flags parks. There's ongoing building going on. But **it's just going to take a little while longer toopen these parks**, and we're working very closely with local governments to ensure that happens." *Id.* (emphasis added).

Reid-Anderson further addressed the Chongqing and Nanjing parks and stated, "the dates that we had described on the last call and still hold now really reflect awaiting government approval." *Id.* at ¶ 220. Reid-Anderson was asked by an analyst whether "there is any . . . new incremental delays to any of the parks that we should be aware of or you foresee coming in the sort of near term." *Id.* at ¶ 221. Reid-Anderson stated, "No . . . . There are no delays that we're aware of on any of the parks. The same timing as we outlined on the fourth quarter call." *Id.*

During the call, Barber also stated that "in terms of what parks contributed to Q1 it's the [Zhejiang] parks because they're progressing nicely. I think those—the 2 parks,

[Zhejiang] and Saudi Arabia, will be contributing as they'll be progressing nicely in the future." *Id*. at ¶ 222.

### 8. B. Riley FBR Institutional Investor Conference (May 22, 2019)

On May 22, 2019, Barber spoke at the B. Riley FBR Institutional Investor Conference. *Id*. at ¶ 227. During the conference, Barber stated, "[T]here's been struggles over the last 4 or 5 years that we've been working with [Riverside] that they've always managed to get through . . . [a]nd we're optimistic that [they] can get through this." *Id*.

### 9. Second-Quarter 2019 Financial Report and Earnings Call (July 24, 2019)

On July 24, 2019, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the second quarter of 2019. *Id*. at 229. In that release, Defendants announced that "revenue for the second quarter of 2019 increased $32 million or 7 percent from the second quarter of 2018 to $477 million," and that "[t]he revenue growth resulted primarily from . . . a 14 percent increase in sponsorship, international agreements and accommodations revenue, which included a $7.5 million settlement related to the company's discontinued project in Dubai." *Id*. Defendants further reported that "[n]et income for the quarter increased $5 million or 7 percent, and diluted earnings per share increased 7 percent to $0.94, primarily due to . . . the company's international agreements," and "[f]or the first six months of 2019, revenue was $605 million, a 5 percent increase compared to the prior year period, driven primarily by . . . a 14 percent increase in sponsorship, international agreements and accommodations revenue." *Id*.

In the Company's financial report for the second quarter of 2019, filed on Form 10-Q on the same day, signed by Reid-Anderson and Barber, Six Flags reported sponsorship, international agreements and accommodations revenue of $33.047 million for the second quarter of 2019 and sponsorship, international agreements, and accommodations revenue of $56.182 million for the first half of 2019, and represented that the Company's revenue was "primarily derived from . . . sponsorship, international agreements and accommodations, including revenue earned under international development contracts." *Id*. at ¶ 230. Defendants further reported that "[d]uring the first six months of 2019, our park earnings before interest, taxes, depreciation and amortization ('Park EBITDA') decreased relative to the comparable period in prior year," but that "[t]hese decreases were partially offset by . . . a 14% increase in sponsorship, international agreements and accommodations revenue" and, similarly, that "[d]uring the three month period ended June 30, 2019, Park EBITDA increased over prior year primarily as a result of . . . a 14% increase in sponsorship, international agreements and accommodations revenue." *Id*. In addition, Defendants reported that "[r]evenue for the three months ended June 30, 2019 totaled $477.2 million, an increase of $31.8 million, or 7%," and "[r]evenue for the six months ended June 30, 2019 totaled 605.4 million, an increase of $31.0 million, or 5% . . . a 14% increase in sponsorship, international agreements and accommodations revenue," and that Six Flags's reported year-over-year decline in total revenue per capita for the second quarter of 2019 was "partially offset by . . . the increase in sponsorship, international agreements and accommodations revenue." *Id*.

24

Defendants also represented in the financial report that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States ('U.S. GAAP')," and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP." *Id.* at ¶ 231. Consistent with their purported GAAP compliance, Defendants represented that Six Flags "recognize[d] revenue under our international [licensing] agreements over the relevant service period of each performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price," and that "[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year." *Id.*

That same day, during the Company's second-quarter 2019 earnings conference call with analysts and investors, Barber stated that "second quarter [2019] revenue was up 7%" and "[r]evenue in the first half of the year was up 5%," both "driven" in party by "a 14% increase in sponsorship, international agreements and accommodations revenue." *Id.* at ¶ 232. Further, Barber represented that "[i]nternational agreements revenue was up $7.5 million or 32% in the first 6 months of 2019, with revenue of $20 million in the second quarter," which "included a $7.5 million settlement related to the termination of our contract in Dubai, and a cumulative catch up revenue adjustment related to Chongqing." *Id.* Moreover, Barber represented that "international revenue will remain lumpy going forward." In response to an analyst's request for information on revenues attributable to the China parks, Barber clarified that the revenue figure included the three parks in Zhejiang,

the four parks in Chongqing, and the park in Saudi Arabia, but did not include the park in Nanjing. *Id*.

During the call, Reid-Anderson stated the Riverside continued to make progress with local government support in Chongqing, that construction continued in Zhejiang and Chongqing, and that the Company was "cautiously optimistic" that the Zhejiang and Chongqing parks would remain on schedule:

> And in China, our partner continues to make progress obtaining local government support for our Chongqing parks. Construction in both [Zhejiang] and Chongqing continues.

> Though our partner has ongoing negotiations concerning the full integrated resort in Chongqing, we are pleased with their consistent progress and are **cautiously optimistic** that both [Zhejiang] and Chongqing will remain on schedule.

> We have 8 parks in 3 locations under construction and are working to restart construction on 4 additional parks in Nanjing, China. Our pipeline remains robust, and we are optimistic that we will be able to announce new locations in the coming years.

*Id*. at ¶ 234.

Barber provided additional information on the status of the Chongqing park. *Id*. at ¶ 235. Barber stated, "[O]ur partners have been progressing with the government approval process and construction has continued. This adjustment brings us in line with the park opening schedule that was announced in our Q4 2018 earnings call. Going forward, we expect to continue recognizing revenue for Chongqing and are hopeful to resume development and revenue recognition for Nanjing later in the year or early next year." *Id*.

Reid-Anderson also was asked for an "update on construction" for the Zhejiang and Chongqing parks. *Id*. at ¶ 236. Reid-Anderson stated that "I can tell you that the parks that

we've talked about, both in [Zhejiang] and Chongqing, the construction has continued there. And the timing that we had given you—I think Marshall [Barber] referred to this as being on the fourth quarter call, those hold.  At this time, if there's ever an update, I promise you, we will give you an update. But we are progressing at both of those parks." *Id*.

Reid-Anderson was asked to provide more specific clarification on the timeline. *Id*. at 237. An analyst asked, "[s]o broadly, when you look at China collectively, would you say the timeline overall has improved, stayed the same, or slipped a little since 90 days ago?" *Id*. Reid-Anderson responded that, "I think the timeline that we described 180 days ago still holds right now, Tim, and the same as it was 90 days ago." *Id*.

      10.   <u>Third-Quarter 2019 Financial Report and Earnings Call (October 22–23, 2019)</u>

On October 22, 2019, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the third quarter of 2019. *Id*. at ¶ 241. In that release, Defendants announced that "revenue was $621 million for the third quarter of 2019, a $1 million increase over the same period in 2018," which "was partially offset by . . . an expected 26 percent decrease in sponsorship, international agreements and accommodations revenue." *Id*. Defendants further reported that, "[f]or the first nine months of 2019, revenue was $1.2 billion, a 3 percent increase compared to the prior year period," which was "partially offset by . . . a 3 percent decrease in sponsorship, international agreements and accommodations revenue." *Id*.

In the Company's financial report for the third quarter of 2019, filed on Form 10-Q on October 23, 2019, signed by Reid-Anderson and Barber, Six Flags reported sponsorship,

international agreements and accommodations revenue of $26.457 million for the third quarter of 2019 and sponsorship, international agreements and accommodations revenue of $82.639 million for the first nine months of 2019, and represented that the Company's revenue was "primarily derived from . . . sponsorship, international agreements and accommodations, including revenue earned under international development contracts." *Id*. at ¶ 242. Defendants further reported that "[d]uring the first nine months of 2019, our park earnings before interest, taxes, depreciation and amortization ('Park EBITDA') decreased relative to the comparable period in prior year," and that "[d]uring the three month period ended September 30, 2019, Park EBITDA increased over the prior year," which "increase was partially offset by an expected 26% decrease in sponsorship, international agreements and accommodations revenue." *Id*. In addition, Defendants reported that "[r]evenue for the three months ended September 30, 2019 totaled $621.2 million, an increase of $1.4 million," which increase was "offset by a 26% reduction in sponsorship, international agreements and accommodations revenue," and "[r]evenue for the nine months ended September 30, 2019 totaled $1,226.6 million, an increase of $32.4 million, or 3%," partially offset by "a 3% decrease in sponsorship, international agreements and accommodations revenue." *Id*.

Also, Defendants represented in the financial report that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States ('U.S. GAAP')," and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP." *Id*. at ¶ 243. Consistent with their purported GAAP compliance, Defendants represented that Six Flags

"recognize[d] revenue under our international [licensing] agreements over the relevant service period of each performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price," and that "[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year." *Id.*

That same day, during the Company's third-quarter 2019 earnings conference call with analysts and investors, Reid-Anderson represented that "international development projects . . . represent about 3% of our annual company revenue," and that although "the Chinese market remains difficult . . . **we are likely to continue to recognize lumpy international agreements revenue**," and that "[o]n a year-to-date basis, total revenue was up $32 million or 3%," offset by, among other things, "a 3% decrease in sponsorship, international agreements and accommodations revenue." *Id.* at ¶ 244. In response to an analyst question for "the third quarter international revenue, what was recognized in that sponsorship in international line," Barber stated that "[t]he Q3 revenue was $8.3 million." *Id.* During the call, in response to an analyst question, Barber denied that there was "any material change in the timeline of China over the last 90 days." *Id.* at ¶ 246.

## PROCEDURAL HISTORY

Plaintiffs Electrical Workers Pension Fund, Local 103, I.B.E.W., on behalf of itself and all others similarly situated, filed the underlying Original Complaint on February 12, 2020, in the Northern District of Texas, Dallas Division against Six Flags Entertainment Corporation, James Reid-Anderson, and Marshall Barber alleging securities fraud. ECF No. 1. On March 2, 2020, the Dallas court ordered the consolidation of Case

No. 3:20-cv-00460-K with 3:20-cv-00346-K. ECF No. 6. That same day, the Dallas court transferred the case to the Fort Worth Division of the Northern District of Texas which was reassigned case number 4:20-cv-00201-P. ECF Nos. 7–8. After transfer to the undersigned, Plaintiffs filed a First Amended Complaint and then a Second Amended Complaint, which is Plaintiffs' live pleading. ECF Nos. 25, 50.

On August 3, 2020, Defendants filed a Motion to Dismiss both counts in Plaintiffs' Second Amended Complaint: section 10(b) of the Exchange Act and SEC Rule 10b-5, and section 20(a) of the Exchange Act. ECF No. 51. Plaintiffs filed their Response on September 2, 2020, and Defendants filed their Reply on September 16, 2020. ECF Nos. 54, 56. The Motion to Dismiss is now ripe for review.

## LEGAL STANDARDS

### A.      Rule 12(b)(6) Standard

To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

## B.  Rule 9(b) Standard

Because Plaintiffs allege securities fraud, their amended complaint must also satisfy Federal Rule of Civil Procedure 9(b), which requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake." *Mun. Empls.' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 429 (5th Cir. 2019). Under Rule 9(b), "a plaintiff must 'identify the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby.'" *Id.* (citing *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 899 (5th Cir. 2018)) (cleaned up).

## C.  Pleading Standard Under 15 U.S.C. § 78u–4(b) the "PSLRA"

Pleadings in federal securities fraud actions must also comply with the strictures imposed by the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u–

4(b). "The PSLRA has raised the pleading bar even higher and enhances Rule 9(b)'s particularity requirement for pleading fraud in two ways." *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017) (quoting *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016)). "First, the plaintiff must specify each statement alleged to have been misleading." *Id.* (internal quotation marks and citation omitted); *see also* 15 U.S.C. § 78u–4(b)(1). "Second, for each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." *Id.* (internal quotation marks and citation omitted); *see also* 15 U.S.C. § 78u–4(b)(2)(A).

## ANALYSIS

### A. The Court will consider Plaintiffs' confidential witness allegations through a discounted lens as required by the Fifth Circuit.

The Court must first address the weight given to the former employees—FE1 and FE2. As required by the Fifth Circuit, "'courts must discount allegations from confidential sources.'" *Pier 1 Imports*, 935 F.3d at 433 (quoting *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008)). At the very least, such sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded . . . ." *Shaw*, 537 F.3d at 535 (citations omitted); *see also Local 731 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*, 67 F. Supp. 3d 782, 788 (E.D. Tex. 2014) ("The Fifth Circuit cautions against reliance on confidential witnesses, even at the pleading stage." (citing *Shaw*, 537 F.3d at 535)). To establish the reliability of confidential witness

statements, some courts require a plaintiff's allegations include "particular job descriptions, individual responsibilities, and specific employment dates for the witnesses." *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 839 (S.D. Tex. 2016) (citing *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 552 (5th Cir. 2007)). But even if described "with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded," the Court still discounts allegations based on confidential witnesses. *Id.* (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002)).

This case rests on allegations by confidential witnesses FE1 and FE2. Plaintiffs rely on FE1 far more than FE2, as FE2 provided very little information and primarily made allegations regarding Riverside's missed licensing payments. As a result, Plaintiffs described FE1 in far greater detail. According to Plaintiffs, FE1 began working at Six Flags in May 2018 and held the title of Six Flags's Director of International Construction and Project Management. Am. Compl. at ¶ 8. In this position, FE1 was responsible for overseeing the construction of the China parks and reporting on their progress internally at Six Flags. *Id.* FE1 worked onsite at Zhejiang, but also traveled to the Chongqing site to perform site inspections, check its progress, and meet often with Six Flags and Riverside personnel in Beijing. *Id.* at ¶ 83. FE1 also prepared weekly presentations and periodic reports on the progress of construction at the Six Flags China parks for the former Senior Vice President of International Park Operations and President of Six Flags International until January 2020. *Id.* at ¶¶ 8, 106. However, Plaintiffs fail to sufficiently allege FE1 had personal knowledge of Riverside's financial condition. Based on Plaintiffs' description of

FE1, the Court finds that FE1's witness allegations should be considered but discounted generally and significantly discounted as to allegations pertaining to Riverside's financial condition.

According to Plaintiffs, FE2 served as Six Flags's Account Manager beginning sometime "throughout 2018" through the "beginning of 2019," and is only mentioned in the Amended Complaint three times in total. *Id.* at ¶¶ 100, 256. Plaintiffs provide little information as to FE2. Therefore, the Court finds that FE2's allegations should be considered but shall be discounted significantly.

**B.    Plaintiffs fail to plead a violation of § 10(b) and Rule 10b-5 because they fail to sufficiently plead an actionable misstatement or omission.**

To state a claim under § 10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter (a wrongful state of mind); (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation (causal connection between the material misrepresentation and the loss). *Pier 1 Imports*, 935 F.3d at 429 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

To impute liability to Reid-Anderson and Barber—the alleged "control persons" of Six Flags under § 20(a) of the Exchange Act—the investors have to show a "primary violation" under § 10(b): If the § 10(b) claim is inadequate, then so is the § 20(a) claim. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004). Allegations under § 10(b) and Rule 10b-5 must comply with the PSLRA, which requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons

why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." *Pier 1 Imports*, 935 F.3d at 429 (quoting 15 U.S.C. § 78u–4(b)(1)).

    1.   <u>Plaintiffs waived challenges to the inactionability of numerous statements.</u>

In their Response, Plaintiffs fail to challenge the inactionability of numerous statements. <u>See</u> Reply at 4 n.8. "Failure to respond to arguments made in a motion to dismiss results in waiver of opposition." *Morris v. City of Fort Worth*, No. 4:19-CV-638-A, 2020 WL 870228, at *3 (N.D. Tex. Feb. 21, 2020) (McBryde, J.). The Court finds Judge McBryde's opinion persuasive and applicable to the Motion before the Court. However, even if Plaintiffs' Response could be construed as addressing whether these statements were inactionable, the challenged statements fail on other grounds stated herein. The Court finds Plaintiffs fail to rebut, therefore waive: (1) that forward-looking statements related to revenue recognition (Am. Compl. at ¶¶ 184, 232, 244) and Riverside's future performance (*id*. at ¶¶ 172, 207–209, 219, 227) are protected under the PSLRA (Motion at 15); (2) that statements concerning Riverside's quality as a partner (Am. Compl. at ¶ 176), Riverside's ability to work through issues (*id.*), Riverside's financial condition and government relationships (*id*. at ¶¶ 172, 207–209, 219, 227), and prospects for future parks (*id*. at ¶¶ 170, 172–173, 175, 177, 179), are all inactionable puffery (Motion at 16); and (3) that numerous opinions (Am. Compl. at ¶¶ 168, 173, 177, 179, 219, 222, 227, 232, 235–236, 244, 246) are inactionable (Motion at 17).[3]

---

[3]After the Motion became ripe, Plaintiffs filed a Motion for Leave to File Supplemental Authority. ECF No. 66. Having reviewed the Motion for Leave, Defendant's Response, Plaintiffs'

  2. <u>Plaintiffs fail to plead any statement was affirmatively false or misleading when made.</u>

Defendants have organized the alleged false and misleading statements into four categories as follows: (1) Riverside's financial condition and quality as a partner, (2) Construction progress, (3) Projected park openings and future parks, and (4) Revenue recognition. The Court finds this organization appropriate and useful and will therefore address the statements in this manner.

   *a.* *Riverside's Financial Condition, Quality as a Partner, and Ability*[4]

Plaintiffs allege Reid-Anderson and Barber made false or misleading statements regarding Riverside's financial condition, quality as a partner, and its ability to develop and operate the China parks. Resp. at 13. FE1's allegations as to these statements are discounted since Plaintiffs fail to plead with specificity why or how FE1 would have personal knowledge of Riverside's financial condition. Plaintiffs point to statements regarding Riverside's financial condition made by Barber and Reid-Anderson on February 14, 2019, during the 2018 Fourth-Quarter Earnings Call ("2019 February Earnings Call") that Riverside was in "great shape" or "pretty good shape" and "continues

---

Reply, and the case presented by Plaintiffs (*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, No. CV H-20-0576, 2021 WL 182316, at *2 (S.D. Tex. Jan. 19, 2021)), the Court finds *Anadarko* neither persuasive nor analogous. *Anadarko* involved a named witness who personally presented information to numerous defendants that contradicted their public statements. *Anadarko*, 2021 WL 182316. Further, a defendant personally instructed the witness to conceal maps revealing the existence of contradictory facts and to use false maps. *Id*. at *8. Here, we have unidentified witnesses who never personally presented their concerns to Defendants. Accordingly, Plaintiffs' Motion for Leave is **<u>DENIED</u>**.

  [4]This section addresses statements Defendants challenge in Amended Complaint at ¶¶ 172, 207–09, 213, 219, 227.

to pay us." Am. Compl. at ¶¶ 207, 213. As to Riverside's "shape," Plaintiffs rely on allegations by FE1 that Riverside's financial condition "had already deteriorated to the point that it was unable to pay its employees, its park design firm, its licensing payments to Six Flags, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing and Six Flags Nanjing projects." *Id.* at ¶ 213. Plaintiffs also dispute that Riverside "continue[d] to pay [Six Flags]" relying on FE2's allegations that Riverside missed licensing payments and FE1's allegation that "during his time in China, Riverside failed to make licensing payments." *Id.* at ¶¶ 100–04.

The Complaint fails to plead any of these statements about Riverside were false when made. In considering these statements, the Court significantly discounts FE1's allegations because Plaintiffs fail to plead that FE1 had personal knowledge of Riverside's internal finances, access to funding, or relationships with the Chinese government despite his preparation of regular reports from an outsider's view into Riverside.

The crux of Plaintiffs' argument as to contemporaneous falsity is FE2's allegations that Riverside missed licensing payments of an unspecified amount which were past due until an unspecified point in "early 2019." Resp. at 15; see also Reply at 2. This argument is too vague to demonstrate Riverside had not paid the licensing fees before Defendants' February 14, 2019 comments. FE1 even admitted that Riverside did make licensing payments during his tenure. Am. Compl. at ¶ 101. Plaintiffs also argue that when Barber stated there was "some gap," that he was referring to a gap in Riverside's licensing payments. Resp. at 13. This argument fails, however, as a desperate reach and conclusory allegation.

Additional challenged statements from the February 2019 Earnings Call include statements that Riverside had "a lot of assets," and was "providing the funding." Am. Compl. at ¶¶ 207–208. Simply restating unrelated business setbacks is insufficient to establish contemporaneous falsity of these statements. Reply at 2 n.3. Further, Plaintiffs fail to plead that Riverside did not have substantial assets, but instead plead that that Riverside was selling assets to obtain funds. Am. Compl. at ¶104. Just because Riverside may have sold assets does not mean that it was failing. Companies liquidate assets for many reasons, some of which may not support Plaintiffs' inference that Riverside was failing. Therefore, Plaintiffs fail to adequately plead that the remaining Riverside statements[5] were false when made and concede that each is inactionable as a matter of law.

b.    *The Construction Progress of the China Parks*[6]

Plaintiffs challenge statements that construction in Haiyan (i.e. Zhejiang), Chongqing, and Nanjing was progressing, claiming that these statements were false because "construction was at a standstill." *Id.* at ¶ 238. Because Plaintiffs rely on conclusory allegations, Plaintiffs fail to plead actionable statements pertaining to the China parks' construction progress.

---

[5]Am. Compl. at ¶¶ 172, 207–09, 219, 227.

[6]This section concerns statements in Amended Complaint ¶¶ 205–06, 219, 222, 225, and 234–36.

The challenged statements were made during the February 2019 Earnings Call,[7] April 2019 Earnings Call,[8] and July 2019 Earnings Call.[9] In support of these challenges, Plaintiffs rely on FE1's allegations that construction was "stalled" and that the parks could not open in time "even if everything was in [their] hands right now." *Id.* at ¶¶ 82–96, 102–05. Plaintiffs further allege that photographs of the Zhejiang site showed a "barren expanse" within nineteen months from the opening date, that ride orders were cancelled due to Riverside's failure to pay vendors for key features, and that Riverside failed to make licensing payments to Six Flags. *Id.* at ¶¶ 86, 90–92, 101–02. However, as Defendants note, the Complaint admits construction was ongoing at Zhejiang and Chongqing, and there was no allegation about construction in Nanjing, but Plaintiffs simply relied on a conclusory assertion that "material" construction had not started. Motion at 11 n.10 (citing Am. Compl. at ¶¶ 94, 105, 107, 238).

"It is not sufficient to simply allege certain facts that support a final conclusion, when those 'facts' themselves are conclusory; the PSLRA is satisfied only by facts, not

---

[7]Statements challenged during this call include representations that "construction is continuing," "we are continuing to build those parks and they are still progressing," and that "[development of entertainment centers and housing developments around the parks] . . . is ongoing as we speak." *Id.* at ¶¶ 205–06, 212.

[8]Statements challenged during this call include representations that "[w]e continue to work with our international partner in China, meeting government officials for each of our [three] park complexes," "[t]here's ongoing building going on," and "the [Haiyan] parks . . . [are] progressing nicely." *Id.* at ¶¶ 219, 222, 225.

[9]Statements challenged during this call include representations that "[c]onstruction in both Haiyan and Chongqing continues," "[w]e have eight parks in three locations under construction and are working to restart construction on four additional parks in Nanjing," "construction has continued," "construction has continued [in Haiyan and Chongqing] . . . and we're progressing at both of those parks." *Id.* at ¶¶ 234–36, 238.

conclusory allegations." *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 550 (N.D. Tex. 2003) (Lindsay, J.). Plaintiffs rely on conclusory statements—mere opinions— by a confidential witness. The Court finds these conclusory statements insufficient to overcome a motion to dismiss. Plaintiffs also admit that construction was ongoing, just not the "kind of 'progress'" understood by Plaintiffs. Resp. at 10. The Court disagrees with Plaintiffs' challenge of the statements claiming construction was "continuing" or "ongoing." At the time, either construction was "continuing" or "ongoing," or it was not. In this case, Plaintiffs concede that it was—even if it was slower than FE1 or Plaintiffs expected. Lastly, during the February 2019 Earnings Call, Reid-Anderson even disclosed that the Zhejiang, Chongqing, and Nanjing parks would be delayed. Am. Compl. at ¶ 205. For the forgoing reasons, Plaintiffs fail to plead the construction statements were false or misleading.

c.    <em>Projected Park Openings and Future Parks</em>[10]

Next, Plaintiffs allege that Six Flags's projected park-opening dates and plans for future parks were materially misleading. Plaintiffs base their allegations on lack of support from local governments, lack of construction progress, and lack of financing. Am. Compl. at ¶ 187. The Court disagrees because Plaintiffs fail to plead specific facts showing how or why the projected park openings were impossible to meet.

---

[10]The projected park-opening statements are found in Amended Complaint at ¶¶ 168, 172, 187, 196–97, 205, 220–21, 235–237, and 246, and the future park-plans statements are found in Amended Complaint at ¶¶ 170, 172–73, 177, and 179.

Plaintiffs allege Defendants falsely represented that the China parks were on track to open on Defendants' stated timelines. As Plaintiffs stated in their Response, the "projected parks openings" and "construction progress" categories of statements are inextricable. Resp. at 9 n.5. Both categories rest on the construction progress, which, in this section, is examined to determine whether Plaintiffs plead sufficient facts establishing that the parks would not open as planned. Defendants urge the Court to adopt the holding from *Juniper*, which requires the Amended Complaint to "'plead specific facts that show how . . . problems and difficulties necessarily precluded'" Riverside from hitting the projected park openings or developing future parks. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (quoting *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001)). Although not controlling, the Court finds the analysis and reasoning in *Juniper* persuasive and instructive.

In their Response, Plaintiffs argue that *Juniper* is distinguishable because, in that case, the "plaintiffs did not allege how problems precluded the company from reaching projected targets." Resp. at 11 n.8. The Court, however, agrees with Defendants that the deficiency in *Juniper* is precisely the issue here. For example, in *Juniper*, a confidential witness reported that Juniper lacked the trained sales personnel required to sell its routers in the volumes required to meet the company's goals. 880 F. Supp. 2d at 1064. As part of its analysis, that court found that the plaintiffs failed to allege facts explaining how the described setbacks necessarily precluded the financial projections published by the defendants. *Id*. That is the exact deficiency in this case. Plaintiffs fail to plead any specific facts showing how or why the projected park openings were impossible to meet. Plaintiffs'

argument rests on FE1's conclusory assertion that there was "absolutely no way" Six Flags could meet its projections. Am. Compl. at ¶ 84. As discussed in the previous section, conclusory allegations such as this are insufficient, and Plaintiffs plead construction actually was continuing. *Capstead*, 258 F. Supp. 2d at 550. Therefore, the Court finds Plaintiffs fail to plead that the projected park openings were impossible to meet when disclosed.

d.     *Revenue Recognition*[11]

Plaintiffs allege that Six Flags's revenue from its international licensing agreements with Riverside was false and did not comply with GAAP. The Court finds that Plaintiffs fail to state an accounting fraud claim because they fail to plead with sufficient specificity.

It has been held in this district that, in order to state an accounting claim under the heightened pleading standards set forth by the PSLRA, the plaintiffs must allege specifically how much revenue was overstated, how that amount was determined, and why the defendants were required to report revenue differently. *Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 465–66 (N.D. Tex. 2018); *Capstead*, 258 F. Supp. 2d at 550. Defendants argue that Plaintiffs fail to specify the amount of revenue Plaintiffs allege was improperly recognized and further fail to plead with specificity which service periods or performance obligations are not met, and why that would have required different reporting. Motion at 13–14 (citing Am. Compl. at ¶ 233). The Court agrees. Therefore, because

---

[11]This section addresses statements found in Amended Complaint at ¶¶ 163–66, 181–84, 190–93, 200–01, 203, 214–17, 229–32, 241–44.

Plaintiffs' failure to plead with greater specificity, the Court finds Plaintiffs fail to state an accounting fraud claim.

 3.   Plaintiffs fail to plead any actionable omissions.

Plaintiffs allege Defendants had a duty to disclose issues related to Riverside's performance but failed to disclose such information. The Court disagrees, however, and finds no actionable omissions because Plaintiffs fail to plead that Riverside or Six Flags took any steps to terminate their relationship prior to the January 10, 2020 disclosure.

There is no general duty to disclose and corporations have no duty to disclose a fact "merely because a reasonable investor might really like to know that fact." *Berger v. Beletic*, 248 F. Supp. 2d 597, 603 (N.D. Tex. 2003) (citing *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000)). Section 10(b) requires disclosure "when silence would make other statements misleading or false." *Id.* But, "[w]here an outcome is merely speculative, the duty to disclose does not attach." *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *11 (S.D.N.Y. Aug. 1, 2017) (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995)). When "publicly hyp[ing] the importance of [a contractual] relationship," companies must disclose issues that have matured to the point that one party seeks to terminate. *Id.* at *12–13. But companies need not disclose mere "disagreements in the course of a contract's performance," or even "fail[ures] to perform," *Nasyrova v. Immunomedics, Inc.*, No. 14–1269(SRC), 2015 WL 382846, at *6–8 (D. N.J. Jan. 28, 2015).

Plaintiffs' argument on this issue can be summed up to an allegation that, whenever Defendants made statements regarding the China parks, they misled investors by failing to

disclose—as Plaintiffs allege—negative information about Riverside. According to Plaintiffs, Defendants should have disclosed that Riverside allegedly "lost financing from and the support of the local Chinese governments" or "was unable to pay its employees, its park design firm, its licensing payments to Six Flags," or vendors. Am. Compl. at ¶ 226.

Plaintiffs cite *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013), suggesting that "[a] corporation has a duty to disclose a major . . . uncertainty that exists in an important business relationship where the company publicly touts that specific relationship and the uncertainty may significantly affect the corporation's financial success" because, "[g]iven the investing public's knowledge of the relationship, such uncertainty significantly alters the total mix of information available." Resp. at 14 (quoting 2013 WL 6233561, at *13). Defendants retort that the court in that case actually held that a duty to disclose issues in a contractual relationship arose only after one party had formally issued notices of termination. Reply at 4 n.7 (citing *Hi-Crush*, 2013 WL 6233561, at *13–14).

The Court agrees with Defendants' analysis of *Hi-Crush* and finds that court's analysis instructive here. Plaintiffs fail to plead that Riverside or Six Flags took any steps to terminate their relationship prior to January 10, 2020, at which time Six Flags accurately disclosed that it had issued notices of default to Riverside. Am. Compl. at ¶¶ 145, 147. Indeed, Plaintiffs fail to allege any definitive statement that Six Flags or Riverside no longer intended to do business with each other until January 10, 2020, when Six Flags disclosed that it had issued notices of default to Riverside. Therefore, the Court finds no actionable omissions.

4.    Many of the challenged statements are inactionable as a matter of law.

Defendants argue that many of Reid-Anderson and Barbers's statements are protected by the PSLRA's safe harbor provision as forward-looking statements, and as corporate optimism and puffery. The Court agrees.

a.    *Forward-Looking Statements*

Plaintiffs argue that the projected park openings are not entitled to safe harbor protection because Defendants' statements were not accompanied by meaningful cautionary language. Resp. at 11.

In their Motion, Defendants argue that these alleged false statements regarding Riverside in paragraph 172 and many others[12] in the Amended Complaint constitute "forward-looking statements" protected by the PSLRA's safe harbor provision. 15 U.S.C. § 78u–5(c)(1)(A). A forward-looking statement, which can be either written or oral, is defined under 15 U.S.C. § 77z–2(i)(1) as:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission . . . .

---

[12]Am. Compl. at ¶¶ 207–09, 219, 227.

To evade safe harbor, plaintiffs must plead facts demonstrating that the statement was made with actual knowledge of its falsity. 15 U.S.C. 78u–5(c)(1)(B); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 409 (5th Cir. 2001).

The safe harbor has two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind. *Southland*, 365 F.3d at 371 (citing 15 U.S.C. §§ 77z–2(c)(1)(A), 78u–5(c)(1)(A); 15 U.S.C. §§ 77z–2(c)(1)(B), 78u–5(c)(1)(B)). Under the first prong, there is no liability if the statement is: (1) identified as a forward-looking statement and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement, or (2) immaterial. *Id*. (citing 15 U.S.C. §§ 77z–2(c)(1)(A), 78u–5(c)(1)(A)). Under the second prong, there is no liability if the plaintiff fails to prove that the statement (i) if made by a natural person, was made with actual knowledge that the statement was false or misleading, or (ii) if made by a business entity, was made by or with the approval of an executive officer of that entity with actual knowledge by that officer that the statement was false or misleading. *Id*. at 371–72 (citing 15 U.S.C. §§ 77z–2(c)(1)(B), 78u–5(c)(1)(B)). Meaningful cautions require "'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Id*. at 372 (quoting H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 31, 44 (1995)).

Oral statements can qualify for the safe harbor if (i) the statement is accompanied by a cautionary statement that the "particular" oral statement is forward-looking and that actual results could differ materially (essentially a formality as to the form of the

statement); (ii) the statement is accompanied by an oral statement that additional information that could cause actual results to differ materially is contained in a readily-available written document; (iii) the statement identifies the document or portion thereof containing the additional information; and (iv) the identified document itself contains appropriate cautionary language. *Id.* (citing 15 U.S.C. §§ 77z–2(c)(2), 78u–5(c)(2)). Readily available written documents for this purpose include documents filed with the SEC or generally disseminated. *Id.* (citing 15 U.S.C. §§ 77z–2(c)(3), 78u–5(c)(3)).

Defendants allege that investors were aware of Riverside's alleged difficulties before and throughout the Putative Class Period because Defendants warned, *inter alia*, that Riverside "may face difficulties" and that Defendants also disclosed that "Riverside was in fact facing difficulties throughout the [Putative] Class Period." Motion at 7–8. The alleged difficulties described in each Form 10-K prior to and during the Putative Class Period contain general warnings such as:

> We may not be able to realize the benefits of our international licensing agreements. Various external factors, including difficult economic and political conditions throughout the world, could negatively affect the progress of our initiatives to develop new Six Flags-branded theme parks outside of North America. These initiatives could be delayed and the ultimate success of such parks may be uncertain.

Motion Appx. at 19, 172.

> Each earnings call contained similar general warnings beginning with the following:

> Our comments will include forward-looking statements within the meaning of the federal securities laws. These statements are subject to risks and uncertainties that could cause actual results to differ materially from those described in such statements. And the company undertakes no obligation to update or revise these statements . . . .

*Id.* at 22, 59, 87, 112, 140, 184, 210, 241.

The quoted 10-K and earnings call warnings are too generic to constitute meaningful cautionary language. *Plotkin v. IP Axess, Inc.,* 407 F.3d 690, 694 (5th Cir. 2005) (concluding the following broad disclaimer found in a company's press releases to constitute boilerplate cautionary language: "These forward-looking statements involve numerous risks, uncertainties and assumptions, and actual results could differ materially from anticipated results").

However, the 10-Ks also contained more specific relevant company-specific language based on the risks associated with the China parks, including references to licensing agreements which applies to Riverside. The February 2018 and February 2019 10-Ks both contained the following language specific to third parties and licensing agreements: "[D]ifficult economic conditions throughout the world could impact . . . the ability of third parties to meet their obligations to us, including, for example, . . . payment by our international licensing partners . . . ." Motion Appx. at 14, 171, 347, 351. The January 2020 8-K then informed shareholders that Six Flags had issued Riverside notices of default. *Id.* at 278.

The earnings calls contained company-specific statements as follows:

- April 2018 Earnings Call: "[international deals] sometimes take a long time to come to fruition"[13];

- July 2018 Earnings Call: "[international contribution] has been lumpy historically, and what makes it lumpy is opening dates . . ."[14];

---

[13]Motion Appx. at 76, 348. This statement was in response to an analyst's question as to whether there had been any kind of change or strategy after noting the big pickup in international licensing activity.

[14]*Id.* at 106, 349.

- February 2019 Earnings Call: "delays in some of the China parks opening schedules caused by recent macroeconomic events that many companies are experiencing, and from which [Riverside] is not immune"[15] and explained three main areas of issues effecting the progress of the China parks[16];

- April 2019 Earnings Call: opening delays[17] and issues that faced Six Flags and other companies in China[18];

- July 2019 Earnings Call: the possibility of "international revenue remain[ing] lumpy going forward . . . ."[19]; and

- October 2019 Earnings Call: "the Chinese market remains difficult and we are likely going to continue to recognize lumpy international agreements revenue until we see progress from the macroeconomic, real estate and trade perspective."[20]

The Court finds that Defendants' forward-looking statements containing appropriately specific cautionary language are protected under the safe harbor and are, therefore, inactionable.

---

[15]*Id*. at 141, 349.

[16]*Id*. at 141, 349.

[17]*Id*. at 195, 353.

[18]*Id*. at 202, 353.

[19]*Id*. at 212, 354.

[20]*Id*. at 242, 354.

b.     *Inactionable Corporate Optimism and Puffery*

Defendants argue that many of Defendants' statements regarding Riverside's financial condition and government relationships,[21] the prospect of future parks,[22] and construction progress[23] are inactionable as corporate optimism or puffery. Resp. at 16. The Court agrees.

Statements "are non-actionable puffery [if] they are 'of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation.'" *Southland*, 365 F.3d at 372 (quoting *Lain v. Evans*, 123 F. Supp. 2d 344, 348 (N.D. Tex. 2002)). "Generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial." *Id.* (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003)).

Plaintiffs' claims are based on such vague, optimistic statements. For example, the "parks are progressing nicely" (Am. Compl. at ¶ 172), Six Flags "will not be stopping at 10 parks" in China (*id.* at ¶ 175), Six Flags had an "incredible partnership with Riverside" (*id.* at ¶ 176), or the prediction that Riverside "not only successfully navigated the regulatory environment in China before but will continue to do so going forward" (*id.*). These fall squarely in the category of corporate optimism or puffery that is insufficient to state a

---

[21]Am. Compl. at ¶¶ 172, 207–09, 219, 227.

[22]*Id.* at ¶¶ 170, 172–73, 177, 179.

[23]*Id.* at ¶¶ 205–06, 219, 222, 234–36.

PSLRA claim. *See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13 (2d Cir. 2019) (stating that contractual relationship was "great" or "very, very solid" is inactionable puffery); *see also Halliburton Co.*, 359 F. Supp. 3d at 461 (stating defendant "has 'plenty of' or 'considerable' liquidity" is inactionable puffery); *see also In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 757 (S.D. Tex. 2012) ("[G]eneral 'progress' is simply too illusory a metric from the start. Such statements, therefore, are not actionable."). Therefore, the Court finds these statements regarding Riverside, construction progress, and park openings constitute inactionable puffery and corporate optimism.

**C.      Plaintiffs fail to sufficiently plead inference of scienter as required by § 10(b) and Rule 10b-5.**

Plaintiffs contend that their Amended Complaint details numerous allegations that, taken together, demonstrate that Reid-Anderson and Barber knew, or were severely reckless in disregarding, that the China projects were not progressing and would not meet Defendants' publicly disclosed timeline. Resp. at 18. The Court, however, disagrees and finds that Plaintiffs fail to plead motive and, assessed holistically, Plaintiffs' allegations fail to support a strong inference of scienter.

Even assuming that the Amended Complaint properly alleges that Defendants made materially false or misleading statements or omissions, Plaintiffs must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Pier 1 Imports*, 935 F.3d at 429 (quoting 15 U.S.C. § 78u–4(b)(2)(A)). Scienter is a "'mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Both intent and "severe recklessness" are sufficient. *Nathenson*, 267 F.3d at 408–09. Plaintiffs properly plead scienter when they allege that a company knowingly or recklessly made statements to the market while aware of facts that, if not disclosed, would render those statements misleading. *See Plotkin*, 407 F.3d at 696–97. Allegations of "simple or even inexcusable negligence" are insufficient; instead, Plaintiffs must adequately plead "highly unreasonable" conduct representing "an extreme departure from the standards of ordinary care." *Rosenzweig*, 332 F.3d at 866. Plaintiffs' theory of fraud must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

### 1.   Plaintiffs fail to plead motive.

"To demonstrate motive, plaintiffs must show 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" *Shaw*, 537 F.3d at 543 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999)). Motive is a critical—though not essential—aspect of a successful claim for securities fraud: "'[A]llegations of motive . . . may enhance an inference of scienter[.]'" *Pier 1 Imports*, 935 F.3d at 431 (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002)).

Plaintiffs' sole theory of motive is that Defendants wanted to hit the Project 600 target. However, such allegations are typically "not the types of motive that support a strong inference of scienter." *Abrams*, 292 F.3d at 434. Incentive compensation "can hardly be the basis for which an allegation of fraud is predicated" because if the Court were to hold otherwise, "the executives of virtually every corporation in the United States would

be subject to fraud allegations." *Id.* However, "in a limited set of circumstances—when the potential bonus is extremely high and other allegations support an inference of scienter—performance-based compensation can establish motive." *Pier 1 Imports*, 935 F.3d at 431 (citing *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261 (5th Cir. 2005)).

If the Project 600 target was reached, Reid-Anderson would have received 600% of his base salary and Barber nearly 300%. Am. Compl. at ¶ 265. Plaintiffs rely on *Barrie*, which found a bonus exceeding "175% of [defendant's] annual salary" established motive. Resp. at 21 (quoting *Barrie*, 397 F.3d at 261). But in that case, the defendant actually received his bonus because the targeted revenues were reached. *Barrie*, 397 F.3d at 261. Plaintiffs also rely on *Pier 1 Imports*, in which the defendants had performance-based incentives reaching as high as 200% and 288% of their base salaries, but unlike in *Barrie*, the revenue target was never reached. Resp. at 23 n.26 (citing *Pier 1 Imports*, 935 F.3d at 432). The court further found that the performance-based bonuses proved to be "well out of reach" and, therefore, the motive allegations failed to create *any* inference of scienter. *Pier 1 Imports*, 935 F.3d at 431.

Here, Plaintiffs allege that "Six Flags fell far short" of the 2017 Project 600 target, and that for 2018, the Company "would have successfully met the Project 600 target" if Defendants had not announced a downward revenue adjustment in February 2019 related to delays in China park openings. Am. Compl. at ¶ 269. The target was never reached and Defendants were never paid the bonuses because the Company disclosed negative revenue adjustments—which cut against Reid-Anderson and Barbers's monetary interests—caused

by park opening delays in China. Therefore, the Court finds that Plaintiffs fail to plead facts to support a showing that Defendants had a motive to deceive.

2.    Circumstantial allegations of conscious misbehavior or reckless conduct fail.

A failure to show motive means that "'the strength of [the] circumstantial evidence of scienter must be correspondingly greater.'" *Neiman*, 854 F.3d at 748 (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005)). When evaluating a complaint's scienter allegations, a court must "assess all the allegations holistically." *Diodes*, 810 F.3d at 956–57 (5th Cir. 2016) (quoting *Tellabs*, 551 U.S. at 326). A three-step framework guides this holistic evaluation. *Id*. *First*, the factual allegations in the pleadings must be accepted as true. *Shaw*, 537 F.3d at 533 (citing *Tellabs*, 551 U.S. at 322). *Second*, the court must consider the entire complaint, including documents incorporated into the complaint by reference and matters subject to judicial notice. *Id. Third*, the court must consider plausible inferences supporting as well as opposing a strong inference of scienter. *Id.* (citing *Tellabs*, 551 U.S. at 323). In order to create an inference of scienter, the allegations in the complaint must be "cogent and compelling," not simply "reasonable," or "permissible." *Id.* A court may employ a "two-step method" by first assessing each allegation individually and then considering the allegations as a whole. *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015).

a.    *FE1 and FE2's allegations fail to support scienter.*

Plaintiffs' allegations derive from confidential sources which further detracts from their weight in the scienter analysis. *Shaw*, 537 F.3d at 535. As previously explained, this Court "must discount allegations from confidential sources." *Id.* (citing *Higginbotham v.*

54

*Baxter Int'l Inc.,* 495 F.3d 753, 756–57 (7th Cir. 2007)). Confidential sources "afford no basis for drawing the plausible competing inferences required by *Tellabs.*" *Shaw*, 537 F.3d at 535 (citing *Higginbotham*, 495 F.3d at 757 ("*Tellabs* requires judges to weigh the strength of plaintiffs' favored inference in comparison to other possible inferences; anonymity frustrates that process.")).

As addressed above, FE1's allegations are discounted significantly since Plaintiffs fail to plead with specificity why or how FE1 would have personal knowledge of Riverside's financial condition. Plaintiffs do not even allege that FE1 ever had any contact with Defendants. Lastly, Plaintiffs failed to dispute that the "opinions of confidential witnesses add nothing to scienter analysis."[24] Therefore, Plaintiffs fail to sufficiently allege FE1's allegations provide a strong inference of scienter.

> b.    *Plaintiffs' reference to internal reports fail to support scienter.*

In addition to FE1's allegations, Plaintiffs rely on internal reports to support scienter. Defendants argue the *Neiman* elements apply to the internal reports in this case, which is inappropriate. Motion at 21. As Plaintiffs' argue in their Response, the only evidence of scienter in *Neiman* was the reports, which is not the case here. Resp. at 22 (citing *Neiman*, 854 F.3d at 748). Nonetheless, the internal reports fail to support a strong inference of scienter.

 Plaintiffs allege Defendants were aware of alleged issues based on reports prepared by FE1 for Mark Kane and David McKillips—not Reid-Anderson or Barber. Am. Compl.

---

[24]Motion at 21 (quoting *Budde v. Glob. Power Equip. Grp., Inc.*, 2017 WL 6621540, at *3); Reply at 8.

at ¶ 250. Plaintiffs simply assume that these reports—created by a confidential witness, submitted to individuals not named as defendants—were presented to Reid-Anderson without stating when the reports were created, when they were presented to Defendants, or whether Defendants actually saw the reports. Am. Compl. at ¶¶ 106, 250; Resp. at 15; Reply at 7. Reliance on the internal reports is particularly weak as to Barber since there is no pled allegation that the reports were presented to Barber or that he ever reviewed them. *Huang v. EZCorp, Inc.*, No. A-15-CA-00608-SS, 2016 WL 6092717, at *9 (W.D. Tex. Oct. 18, 2016) (finding a confidential witness's statement that a report was "sent to senior management" but did not state whether a certain defendant was part of the "senior management" too vague to permit an inference of scienter).

Therefore, the Court finds allegations based on these internal reports insufficient to support a strong inference of scienter.

> ### c.    *Plaintiffs' core operations theory fails to support scienter.*

Next, Plaintiffs rely on the core operations theory that facts critical to the Company's core business must have been known by key executives. Am. Compl. at ¶¶ 257, 262–264. The Fifth Circuit and other courts have been reluctant to apply this limited exception. *See Rosenzweig*, 332 F.3d at 867–68 (rejecting the plaintiffs' argument that "the failure of Azurix's core business—water privatization projects—supports the inference that defendants knew, or recklessly disregarded, Azurix's prospects for success" and holding that the plaintiffs must "identify exactly who supplied the information or when they knew the information"). The Fifth Circuit reiterated that such circumstances may include: (1) a small company in which corporate executives are more likely to be familiar

with day-to-day operations; (2) transactions "critical to the company's continued vitality"; (3) misrepresented or omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent. *Diodes*, 810 F.3d at 959. None of these considerations are present here.

*First*, Plaintiffs do not dispute Six Flags is a large company. Six Flags is the largest regional theme park operator in the world with over 2,400 full-time employees and approximately 48,000 seasonal employees. Am. Compl. at ¶ 33; Motion at 2 (citing Motion Appx. at 37, 293). Plaintiffs concede this point by failing to rebut it in their Response and improperly claiming the company need not be small. Resp. at 23 n.25. *Second*, Plaintiffs do not allege the China parks were "critical to the company's continued vitality." Plaintiffs do not plead that failure of the China parks would jeopardize Six Flags's existence. *Diodes*, 810 F.3d at 959. Indeed, the China parks were just a portion of Six Flags's international licensing program, which accounts for about **3%** of Six Flags's revenue. Motion at 23 (citing Motion Appx. at 242); Am. Compl. at ¶ 244. *Third*, Plaintiffs fail to sufficiently plead the allegedly withheld or misrepresented information was readily apparent to Defendants, but merely rely on the opinions of confidential witness FE1 who never came in contact with Defendants. *Fourth*, Plaintiffs fail to identify any internally inconsistent statements.

There are rare circumstances where the core operations doctrine is applicable, and this is not one of those cases. Therefore, the Court finds none of the exceptions set forth in *Diodes* applies in this case.

> d.    *Plaintiffs' reliance on executive departures fails to support scienter.*

Lastly, Plaintiffs allege that the departures of Reid-Anderson, Barber, and certain other non-parties are indicative of scienter. Am. Compl. at ¶¶ 258–61. The Court, however, disagrees and finds Plaintiffs fail to plead these departures support a strong inference of scienter.

These "sudden" resignations of Reid-Anderson, Barber, and other Six Flags employees—Plaintiffs argue—were suspiciously close to the disclosure of the alleged truth about the China projects. Resp. 19–20. On March 7, 2019, Six Flags announced Reid-Anderson would retire from his position as CEO by February 28, 2020, and that the Company would undergo a process to evaluate candidates for the position of Chairman of the Board following Reid-Anderson's retirement. Am. Compl. at ¶ 258. However, Six Flags then announced that Reid-Anderson would step down as Chairman and CEO as of November 18, 2019. *Id.* Six Flags announced February 20, 2020—the same day announcing it had terminated its relationship with Riverside—that Barber would be retiring from his position as CFO on February 24, 2020, and would retire from Six Flags entirely on August 31, 2020. *Id.* at ¶ 259. Other senior management announced plans to retire, including Executive Vice President Lance Balk and McKillips—who was responsible for negotiating with Chinese officials and to whom FE1 reported his concerns about the China parks. *Id.* at ¶ 260.

The Court is not persuaded by Plaintiffs' vague and circumstantial allegations which fail to adequately link the departures to the alleged fraud. Plaintiffs plead simply that Reid-Anderson and Barber departed after the disclosure of bad news but fail to plead specific

evidence linking their departures to securities fraud. *See Rosenzweig*, 332 F.3d at 867. Plaintiffs recognize that the departures were voluntary as they plead that Reid-Anderson "step[ped] down" from his position as CEO and "resign[ed]" from his position as director, and that Barber "retire[d]" from his position. *Id.* at ¶ 258–59. If anything, Defendants' resignations indicate that the Company was struggling and no longer had faith in its executives "which does not raise a strong inference of scienter." *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 891 (S.D. Tex. 2002), *aff'd sub. nom Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003); *Rosenzweig*, 332 F.3d at 867 ("[T]he successive resignations of key officials, as the district court stated, is more likely probative only of the fact that the company was failing."). Therefore, the Court finds Plaintiffs fail to plead these departures support a strong inference of scienter.

**D.      Plaintiffs fail to plead a violation of § 20(a).**

In addition to the section 10(b) and Rule 10b–5 claims, Plaintiffs allege that Reid-Anderson and Barber are liable as control persons under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Am. Compl. at ¶¶ 300–01. Under section 20(a), "Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." 15 U.S.C. § 78t(a). When a primary violation by the "controlled person" has not been adequately pled, the court should dismiss the section 20(a) claim. *Southland*, 365 F.3d at 383 ("Control person liability is secondary only and cannot exist in the absence of a primary violation.").

Because Plaintiffs fail to adequately plead an underlying violation of the Exchange Act, the Court must dismiss the section 20(a) claim. *Hopson v. MetroPCS Commc'ns, Inc.*, No. 3:09-CV-2392-G, 2011 WL 1119727, at *21 (N.D. Tex. Mar. 25, 2011) (citing *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 168–69 (N.D. Tex. 2007)). Therefore, the Court finds that Plaintiffs fail to plead a violation under section 20(a).

## CONCLUSION

For the foregoing reasons, the Court finds that Six Flags's Motion to Dismiss (ECF No. 51) should be and is hereby **GRANTED**. Accordingly, Plaintiffs' case is **DISMISSED with prejudice**.

**SO ORDERED** on this **3rd day** of **March, 2021.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE