# Exhibit A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

|  |  |
|---|---|
| *In re Six Flags Entertainment Corp. Securities Litigation* | Civil Action No. 4:20-cv-00201-P<br><br>CLASS ACTION<br><br><br>JURY TRIAL DEMANDED |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

JURISDICTION AND VENUE ......................................................................................... 9

PARTIES ........................................................................................................................... 9

    A.    Lead Plaintiffs.................................................................................................. 9

    B.    Defendants ..................................................................................................... 10

    C.    Relevant Non-Party....................................................................................... 11

SUBSTANTIVE ALLEGATIONS ................................................................................... 12

    A.    Background On Six Flags And Project 600............................................... 12

    B.    International Development Was Key To Six Flags' Prospects And To
        The Individual Defendants' Receipt Of Millions Of Dollars In Bonuses ............ 13

    C.    Prior To The Class Period, Defendants Announced Three Theme Park
        Projects In China And Purportedly Began Design, Development, And
        Construction For 2019, 2020, And 2021 Openings ............................................... 16

        1.    Six Flags Zhejiang ..................................................................... 17

        2.    Six Flags Chongqing................................................................... 19

        3.    Six Flags Nanjing....................................................................... 19

    D.    Six Flags Could Only Recognize International Licensing Fee Revenue
        If Riverside Showed Progress On The Parks And Made Its Licensing
        Payments To Six Flags.........................................................................................20

    E.    Construction Of Six Flags' Multibillion-Dollar Chinese Theme Parks
        Would Take An Enormous Amount Of Time, Manpower, And Capital.............. 23

    F.    Before The Class Period Started, The Six Flags China Projects Lost
        Necessary Government Financing ........................................................................ 25

    G.    In April 2018, The Class Period Began As Six Flags Misled Investors
        About Riverside's Ability To Navigate Regulations, And Falsely
        Claimed Parks Would Open On Time .................................................................. 26

    H.    By April 2018, Riverside Failed To Make Payments To Employees And
        Vendors, And Defendants Were Aware The Parks Would Not Open On
        Time ..................................................................................................................... 30

1.  From The Beginning Of The Class Period, It Was Apparent To Six Flags That The Six Flags China Parks Would Not Be Constructed In Time For Their Publicized Start Dates ............................. 31

2.  Riverside Did Not Invest In The Basic Building Blocks Of A Theme Park, So There Was No Way The Parks Would Be Built On Time .................................................................................................... 34

3.  Riverside's Financial Situation Only Deteriorated Further Over The Course Of 2018 ............................................................................................ 36

4.  Defendants Knew That There Was No Progress At The Six Flags China Parks And That They Could Not Open On Time ........................... 39

I.  On February 14, 2019, Six Flags Announced A $15 Million Downward Revenue Adjustment For The Fourth Quarter Of 2018 But Falsely Reassured Investors That "Construction Is Continuing" ...................................... 40

J.  On April 23-24, 2019, Six Flags Denied Any Additional Delays And Falsely Represented That "China Is Improving" And "There's Ongoing Building Going On" ...................................................................................... 46

K.  Between May And July 2019, Six Flags Continued To Falsely Claim That Delays Were "Temporary" And Construction On The China Parks Remained Ongoing ........................................................................................ 48

L.  On October 22-23, 2019, Defendants Reported Cutting Back On Revenue Recognition For International Licenses And Again Blamed Macroeconomic Conditions ................................................................................................... 51

M.  On January 10, 2020, Six Flags Disclosed Riverside's Default On Payments And The Potential Termination Of All Six Flags China Projects ........ 54

N.  On February 20, 2020, Six Flags Disclosed The Termination Of Its Riverside Agreements And A Resulting $10 Million Quarterly Revenue Decrease ................................................................................................... 57

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSED SUBSTANTIAL LOSSES TO INVESTORS ................................................................................. 59

A.  First-Quarter 2018 Financial Reporting And Earnings Call (April 24-25, 2018) ...................................................................................... 59

B.  Goldman Sachs Lodging, Gaming, Restaurant And Leisure Conference (June 5, 2018) .............................................................................................. 64

C.  Oppenheimer Consumer Conference (June 20, 2018) ......................................... 64

ii

D.      Second-Quarter 2018 Financial Report And Earnings Call
        (July 25, 2018) ..................................................................................... 65

E.      Third-Quarter 2018 Financial Report And Earnings Call
        (October 24, 2018) .............................................................................. 69

F.      Fourth-Quarter And Full Year 2018 Financial Report And Earnings Call
        (February 14, 2019) ............................................................................. 74

G.      First-Quarter 2019 Financial Report And Earnings Call
        (April 23-24, 2019) ............................................................................. 80

H.      B. Riley FBR Institutional Investor Conference
        (May 22, 2019).................................................................................... 85

I.      Second-Quarter 2019 Financial Report And Earnings Call
        (July 24, 2019) .................................................................................... 86

J.      Third-Quarter 2019 Financial Report And Earnings Call
        (October 22-23, 2019)......................................................................... 92

SUMMARY OF SCIENTER ALLEGATIONS ........................................................ 96

LOSS CAUSATION................................................................................................. 108

CLASS ACTION ALLEGATIONS ......................................................................... 113

INAPPLICABILITY OF STATUTORY SAFE HARBOR ..................................... 114

PRESUMPTION OF RELIANCE............................................................................ 114

COUNT I .................................................................................................................. 116

COUNT II ................................................................................................................. 117

PRAYER FOR RELIEF ........................................................................................... 118

JURY DEMAND....................................................................................................... 118

Lead Plaintiffs Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") and Electrical Workers Pension Fund, Local 103, I.B.E.W. ("Local 103," and with Oklahoma Firefighters, "Lead Plaintiffs"), by and through their counsel, bring this action individually and on behalf of all persons and entities who purchased the publicly traded common stock of Six Flags Entertainment Corporation ("Six Flags" or the "Company") between April 24, 2018 and February 19, 2020, inclusive (the "Class Period") and were damaged thereby. Lead Plaintiffs allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which Lead Plaintiffs allege upon personal knowledge. Lead Plaintiffs' information and belief are based upon Lead Counsel's investigation, which included review and analysis of, *inter alia*: (i) regulatory filings made by Six Flags with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and public statements by Six Flags; (iii) analyst reports concerning Six Flags; (iv) interviews with former employees of Six Flags and Riverside Investment Group Co. Ltd. (defined below, together with its subsidiaries, as "Riverside"); and (v) other publicly available information regarding the Company. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## **INTRODUCTION**

1. This federal securities class action arises from Defendants' materially false and misleading statements and omissions concerning the development of several multibillion-dollar Six Flags-branded parks in China, which Defendants publicly represented were scheduled to begin opening in 2019. Defendants, including Six Flags' CEO and CFO (described below), expressly and repeatedly assured investors throughout the Class Period that Six Flags' China parks were on

track to begin opening in 2019 and, indeed, that the "*timing of the parks*" "*remain[ed] exactly the same as previously disclosed*."[1]   In reality, construction on the parks was at a standstill and Defendants knew that the Six Flags China parks could not possibly open on time.  As investors gradually learned the extent to which Defendants had misled the market, the price of Six Flags' common stock plummeted and Six Flags lost billions of dollars in shareholder value.

2.      By the outset of the Class Period, Defendants had been touting for years Six Flags' agreement with Riverside Investment Group, a Chinese real estate developer, to build multiple Six Flags-branded theme parks in China.  Under the agreement, Riverside would pay Six Flags tens of millions of dollars in initial licensing fees for each agreed-upon park, and then even more substantial licensing and management fees after the parks opened.  These parks were highly material to investors because, unlike Six Flags' core domestic theme park business, Six Flags would recognize incredibly high profit margins on what the international licensing revenue would be, with 80%-90% of the fees going to Six Flags' earnings before interest, taxes, depreciation and amortization ("EBITDA").

3.      This high-margin revenue—which Six Flags would start receiving after it signed licensing deals, and without any significant capital investment on its part—was particularly important to Six Flags' executives in 2017.  In addition to a standard salary and bonus incentive structure, Six Flags had put into place an incredibly lucrative incentive plan called Project 600, pursuant to which Defendants James Reid-Anderson (CEO) and Marshall Barber (CFO) would receive millions of dollars in equity compensation if Six Flags achieved approximately $600 million in "modified" EBITDA by year-end 2018.  Given the Company's stagnating growth heading into the Class Period, Defendants knew that they would need to find a quick way to record

_____

[1] Throughout this Complaint, all emphasis in quoted material is added unless otherwise noted.

2

a substantial amount of modified EBITDA in 2018 in order to obtain these enormous incentive payments.

4.    The China parks offered just such an opportunity.  Between 2014 and 2017, Six Flags had agreed to open just two parks with Riverside.  But in 2017, Six Flags launched into an intense round of licensing activity with Riverside.  Between February 2017 and May 2018, the Company rushed to enter into *nine* additional agreements with Riverside, bringing the total number of planned China parks from two to *eleven* (grouped into three park centers) in just over a year.  Each of those additional parks could add millions of dollars to the Company's annual modified EBITDA, without regard for the long-term success of the contracts.  As such, these parks could help add up to 15% of the modified EBITDA that Defendants Reid-Anderson and Barber needed to be able to pocket their incentive payments.

5.    Six Flags announced that the first park center, Six Flags Zhejiang, would open in 2019 and would include an elaborate theme park, water park, and children's park.  The other two equally elaborate multi-park centers—Six Flags Chongqing and Six Flags Nanjing—were scheduled to open in 2020 and 2021, respectively.

6.    Throughout 2018, there was intense market focus on these massive Chinese developments and their progress.  Indeed, securities analysts questioned Defendants Reid-Anderson and Barber closely at every opportunity about whether these massive Chinese developments were on track to open on the schedule previously announced.  In response, Defendants stated firmly and repeatedly that the parks were on schedule and expected to begin opening in 2019—consistent with their previously announced schedule.

7.      In stark contrast to their assurances to investors, Defendants Reid-Anderson and Barber knew by the beginning of the Class Period that construction of Six Flags' China parks was not making any meaningful progress at all.

8.      Six Flags International's Director of International Construction and Project Management (referred to below as "Former Employee 1" or "FE 1"), who was responsible for overseeing the construction of the China parks and reporting on their progress internally at Six Flags, has confirmed the utter lack of progress developing the China parks, as well as Defendants' knowledge of those failures.  Indeed, FE 1 reported that, from the beginning of his tenure in May 2018, it was clear that the Six Flags parks were in serious jeopardy.[2]

9.      FE 1 recounted that it was obvious that the parks would not open anywhere near on schedule.  First, Riverside refused to fund (or was unable to fund) the most basic of theme park features—the roller coasters and other rides that attract visitors and drive revenue.  Although Riverside had, before the Class Period, initiated contracts with dozens of the world's major ride manufacturers, by the beginning of the Class Period, Riverside had ceased payments to those critical vendors.  Furious, the ride manufacturers cut their losses and ceased construction or sold the rides to other third parties by June 2018.  This situation led to "bad blood" between Six Flags and many of the world's foremost ride manufacturers, its key business partners.  FE 1 told multiple Six Flags executives to sue Riverside—but they declined to do so.

10.      Second, by the time FE 1 started in May 2018—when Six Flags Zhejiang was supposedly just 19 months from opening and should have had substantial construction completed—Riverside had not even commissioned basic construction drawings (or blueprints).

---

[2] For ease of readability while preserving their anonymity, the Complaint uses the terms "he" and "his" in connection with each of the Former Employees discussed in this Complaint, regardless of the Former Employees' gender.

Because Riverside did not have the funds to pay for those fundamental and critical tools, Riverside could not engage in any actual construction at all. At most, it could clear some land based on "design drawings" that were mere conceptual guidance—not actual plans from which park elements could be built.

11. Indeed, over the course of 2018, Riverside continued to default on its obligations to multiple outside vendors and to lose employees at a shockingly high rate, simply because it did not have the funds to pay them. In 2018, Riverside stopped paying Six Flags the licensing fees it owed Six Flags, notwithstanding the fact that Six Flags had met all of its obligations.

12. The fact that the Six Flags China parks were not progressing and would not be constructed on schedule (or anywhere near on schedule) was reported to Defendants Reid-Anderson and Barber, who were fully informed about Riverside's failures. They (along with the Six Flags Board of Directors) received regular reporting, including from FE 1's direct supervisor through presentations that FE 1 prepared, which included photographs and analyses demonstrating that construction was at a standstill and the park sites were largely empty fields filled with weeds. Simply put, these Defendants knew that construction had stopped entirely, and unequivocally understood that their publicly announced timetable for opening could not be met. But, because this information would have had devastating consequences for their incentive payments and, indeed, they had staked their careers on success, they lied to investors about the progress being made. Indeed, FE 1 later loudly resigned from Six Flags, making it clear in a letter than was widely circulated among the executives at Six Flags that "*from the very first day I landed in China, it was obvious to me (as well as my coworkers) that the word "mess" only began to describe the state this project was in*. . . . My initial perception of the Six Flags company has forever been

5

altered, as I now feel the company cares more about its quarterly fiscal reports than it does this project, or any of its employees tied to it in the field."

13.     By early 2019, as construction in China came to a standstill, investors remained in the dark as to the true, derelict state of the Six Flags-branded developments in China.  Indeed, in January 2019, securities analysts maintained their prior ratings for the Company and reported that they "*d[id] NOT see any material risk to SIX's China developments*" while continuing to parrot Six Flags' public statements that each China park would contribute tens of millions of dollars of revenue per year to the Company's coffers.  Investors were about to begin to learn, however, that the rosy picture Defendants represented was not accurate—all while Defendants persisted in touting the China parks' purported "continuing" development, keeping the full truth concealed.

14.     On February 14, 2019, Defendants surprised investors by announcing a negative revenue adjustment of $15 million arising from supposedly modest delays in the expected opening dates of certain of the China parks.  But rather than come clean—and disclose among other things that Riverside lacked critical funding and could not pay its vendors, causing construction to grind to a halt—Defendants doubled down and falsely claimed for another year that their public timeline for the parks' opening was substantially on track, and any delays were caused only by a "tough" macroeconomic environment that was affecting all private companies in China.  Although the price of Six Flags stock dropped by over 14% on news of the Company's write-down, the stock remained artificially inflated as Defendants reassured the market that the Company had "*a first-class partner in China with Riverside*" that had "*a lot of assets*" and was in "*great shape*" with "*the ability to source additional funding*."  Investors relied on those positive statements, believing Defendants that Six Flags and Riverside were "*continuing to build those parks*."

6

15.    Throughout 2019 and into 2020, Defendants repeatedly made similar false, positive statements about the Company's purported "*compelling*" "*international expansion opportunities*," while also representing that "*the situation in China is improving*," "*[t]here's ongoing building going on*," and any "*short-term delays . . . [we]re not material*." In sharp contrast to Defendants' representations that the China parks "*remain[ed] on schedule*," Riverside's financial condition was severely impaired and it failed to make any meaningful construction progress, all while laying off over 90% of its workforce and becoming mired in litigation with key vendors.

16.    By late 2019, there was no possibility for the China parks to open even on the delayed schedule, given how much construction remained to be done on the parks. Indeed, among other things, construction had not even begun on critical elements including roller coasters, Riverside owed payments to vendors and employees that it could not make, and the construction sites were barren and littered with stray water pipes and bricks.

17.    In October 2019, Defendants announced Six Flags' financial results for the third quarter of 2019, reporting an expected 26% decrease in revenues from its international agreements while disclosing "a very high likelihood going forward that we will see changes in the timing of park openings." Defendants further announced that Defendant Reid-Anderson was leaving the Company on an accelerated timetable from what they had previously represented. Analysts were surprised, calling the Company's disclosures "especially disappointing." In response to those disclosures, Six Flags stock declined more than 12%. Defendants falsely reassured investors again, however, denying that there was "any material change in the time line of China," thereby maintaining artificial inflation in the stock.

18.    In a series of disclosures on January 10 and February 20, 2020, investors finally learned the full truth.  On January 10, Defendants disclosed among other things that Riverside had defaulted on its payment obligations to Six Flags, the Company was holding Riverside in default, and it was possible that all of Six Flags' China projects would be terminated.  Six Flags stock declined nearly 18% in response as analysts expressed shock, especially because "*management continued to tell anybody that would listen until very recently that incremental projects (and revenues) in China were likely*."  Investors learned on January 10 that, rather than "the next step in the evolution of Six Flags' international strategy" and the "significant growth represented by the international opportunity" that Defendants had repeatedly stated, there was now "uncertainty about whether these parks will ever open"—but were nevertheless again reassured by Defendants' representations about the possibility of "the continuation of one or more projects" in China.

19.    Finally, on February 20, 2020, investors learned the full truth—that Six Flags' China parks would not be completed, and that the Company's revenues and growth were and would continue to be substantially lower as a result.  That day, Defendants disclosed that the Company had terminated its development agreements with Riverside and admitted that Six Flags would not recognize *any* revenues or income from the development of Six Flags-branded parks in China.  Defendants also announced the sudden departure of CFO Defendant Barber.

20.    Analysts were stunned, reporting that they "Didn't Think It Could Get Worse . . . But It Just Did," and that the "Second Shoe Finally Drop[ped]."  In response, Six Flags stock declined more than 16% to close at $31.89 per share, less than half of its Class Period high and the Company's lowest stock price in over seven years.

21.    Defendants' false and misleading statements and omissions about the progress of the Six Flags China parks have caused substantial damages to Lead Plaintiffs and the other

8

members of the Class. As a result of the fraud alleged in this Complaint, Six Flags lost over *$2.4 billion* in shareholder value. Investors are now entitled to recover against the individuals and entities responsible for their losses.

## JURISDICTION AND VENUE

22.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Six Flags maintains its corporate headquarters in Grand Prairie, Texas, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.

25.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A.     Lead Plaintiffs

26.     Lead Plaintiff Oklahoma Firefighters is a public pension fund headquartered in Oklahoma City, Oklahoma that was founded in 1980 to provide retirement, disability and survivor benefit programs to active and retired firefighters in the State of Oklahoma. Oklahoma Firefighters

is responsible for the retirement income of these employees and their beneficiaries. Oklahoma Firefighters manages more than $3 billion in assets for the benefit of over 25,000 members and beneficiaries. As stated in its previously filed Certification (ECF No. 28-2), Oklahoma Firefighters purchased a significant amount of Six Flags common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this action.

27.     Lead Plaintiff Local 103 is a pension fund headquartered in Dorchester, Massachusetts that was founded in 1958 to provide retirement benefits to active and retired electrical workers in Eastern Massachusetts. Local 103 manages approximately $1 billion in assets and provides a monthly benefit to over 2,500 retired participants. As indicated in its previously filed Certification (ECF No. 28-2), Local 103 purchased a significant amount of Six Flags common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this action.

## B.     Defendants

28.     Defendant Six Flags is a Delaware corporation based in Texas and maintains its corporate headquarters at 924 Avenue J East, Grand Prairie, Texas. The Company's common stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "SIX." As of February 20, 2020, Six Flags had over 84 million shares of common stock outstanding.

29.     Defendant James Reid-Anderson ("Reid-Anderson") served as Six Flags' Chairman, President, and Chief Executive Officer ("CEO") from August 2010 until his departure in February 2016. From February 2016 to July 2017, Reid-Anderson served as Executive Chairman of Six Flags. In July 2017, Reid-Anderson was re-appointed Chairman, President and CEO, and served in those positions until his departure on November 18, 2019.

30.     Defendant Marshall Barber ("Barber") served as Six Flags' Chief Financial Officer from February 2016 until February 24, 2020.  Defendant Barber joined the Company in 1996 and previously held the position of Vice President of Business Planning from July 2006 to February 2016.

31.     Defendants Reid-Anderson and Barber are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions within Six Flags, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  One or more of the Individual Defendants also spoke at or attended the relevant conferences and conference calls referenced herein, during which one or more of the Individual Defendants made statements that are alleged herein to be materially false or misleading.  Because of their positions and access to material nonpublic information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

C.     **Relevant Non-Party**

32.     Riverside Investment Group, also known as Shanshui Wenyuan Investment Group Co., Ltd. or LVC Group, is a Chinese real-estate investment, development, and management company founded in 1986.  Riverside Investment Group is led by its chairman and majority shareholder, Li Qi (or Li Zhe, and referred to below as "Chairman Li").  Prior to partnering with Six Flags in 2015, Riverside Investment Group's primary business was the development and

11

management of high-end residential real estate and resorts in Beijing and the surrounding area. Riverside Investment Group operates through multiple affiliates and subsidiaries, including LVC Kaiya Real Estate Development Co., Ltd., Haiyan Shanshui Tourism Theme Park Development Co. Ltd., Chongqing Shanshui Theme Town Cultural Tourism Development Co., Ltd., and Shanshui Cultural Park Group (collectively, with Riverside Investment Group, "Riverside").

## SUBSTANTIVE ALLEGATIONS

### A.    Background On Six Flags And Project 600

33.    Founded in 1961, Six Flags is the world's largest regional theme park operator, with more than two dozen parks across North America.  Throughout its nearly 60-year history, Six Flags has primarily expanded through the acquisition of pre-existing regional parks.  Six Flags' focus has historically been the North American market, with only a short-lived expansion into Europe through the acquisition of several European parks in 1998.  Throughout the 2000s, Six Flags experienced a significant decline in revenue and had amassed over $1 billion in debt.  Six Flags sought to address its debt and decline by selling off parks throughout the 2000s, including the European parks in 2004.  Despite the sell-offs and changes to management throughout the decade, Six Flags was unable to reverse course, and the Company filed for Chapter 11 bankruptcy in 2009.  Six Flags exited bankruptcy on May 3, 2010 and reissued stock on the NYSE in June 2010.

34.    As part of its restructuring process, the Company put into place a series of strategic incentive plans, which entitled its top executives to significant equity awards if the Company met its EBITDA goals.  These plans were referred to as "Project 350" (with the goal of $350 million adjusted EBITDA by end of fiscal year 2011) and "Project 500" (with the goal of $500 million modified EBITDA by end of fiscal year 2015).  The Company met both of these goals in 2011 and 2015, achieving, on average, 10.6% annual EBITDA growth during the five-year period.

35.    The Company's executives were handsomely rewarded for this success.  Defendant Reid-Anderson received a $34.5 million payout for achieving the Project 350 goals, and a further $47.9 million when the Company achieved the Project 500 goals.

36.    Due to the success of the Project 350 and Project 500 incentive plans, the Company disclosed a "Project 600" plan in October 2014.  Project 600 entitled the Company's top executives and senior management, including Defendants Reid-Anderson and Barber, to additional significant equity awards if the Company posted over $600 million modified EBITDA by fiscal year 2017, or 50% of the award if the Company achieved it in fiscal year 2018.

37.    The Company posted modified EBITDA of $477 million for fiscal year 2014 and would need to increase earnings by approximately 25% by fiscal year 2018 in order for the Company's top executives to receive the "late achievement" award for Project 600.

**B.    International Development Was Key To Six Flags' Prospects And To The Individual Defendants' Receipt Of Millions Of Dollars In Bonuses**

38.    The Company's top executives, including Defendants Reid-Anderson and Barber, were aware that international development was key to reaching the Project 600 targets. Accordingly, Six Flags began to increase its focus on licensing efforts in international markets, which the Company repeatedly told investors was one of its five "key growth drivers" and part of a "five-pillar" strategy for growth.  In pursuit of that goal, Six Flags entered into licensing agreements with various international partners in China, the United Arab Emirates, Saudi Arabia, and Vietnam between 2014 and 2018.  Pursuant to those agreements, the Company would receive initial fees from their international partners during the planning, design and development phase of each park, and then would receive substantial continuing licensing and management fees once the parks opened.

13

39.     As Defendants repeatedly represented to investors, Six Flags depended on international licensing fees to drive present and future revenues and growth, because the profit margins the Company stood to realize from its international licensing agreements were far greater than profit margins derived from other revenue sources.  For example, during the September 28, 2017 B. Riley Consumer Conference, an analyst asked, "what's the opportunity at this point" for international licensing, including from Six Flags' "partner in China."  Defendant Reid-Anderson directed the question to the Company's Senior Vice President of Investor Relations and Treasurer Stephen Purtell, whom Reid-Anderson called "the initial driver of our international expansion."  Purtell then responded:

> Yes.  So ***international licensing is one of the biggest opportunities we have out there***, and it's still at the very early stages.  ***It requires no capital investment on our part*** . . . . [B]ecause it's a licensing model, ***it's very high-margin revenue, 80% to 90% EBITDA margins***.  And it's actually growing quite nicely.  And we've got 5 parks that are under development right now, ***4 in China*** and 1 in Dubai.  And we know that our partner in China intends to build multiple parks over the next decade . . . .

40.     In contrast to the high profit margins that Six Flags' international licensing agreements represented, the Company's margins on operating revenues for its core domestic theme park business were far lower.  For example, the Company reported for fiscal year 2017 net operating cash of $445 million, derived from total revenue of $1.359 billion, or a 32.7% margin.  The 80% to 90% EBITDA margin that Defendants stated the international licensing agreements represented was approximately 2-3 times greater than the Company's margins on its operating revenues.  Moreover, Defendant Reid-Anderson represented that international licensing revenue for 2017 exceeded $38 million—at a 90% EBITDA margin, this represented approximately 8% of the Company's net operating cash.

41.     Two months before the start of the Class Period, during Defendants' February 20, 2018 earnings call with investors and analysts, Defendant Barber specifically identified an

14

"increase in high-margin international licensing revenue" as a key reason that Six Flags' reported "modified EBITDA margin was up 242 basis points in the quarter compared to prior year." Investors credited and relied on those representations. As analyst firm Wedbush later reported in February 2020, "Six Flags has been trading at a sizable premium to the rest of [its peer] group for years, *which we attributed primarily to the significant growth represented by the international opportunity*."

42.     Although the Company did not break out the source for its international licensing revenue by park, it is clear that the vast bulk of the international licensing fees Six Flags recorded during the Class Period was attributable to the China parks. For example, during Defendants' February 20, 2018 earnings call, Defendant Reid-Anderson told investors that "[i]nternational licensing continues to gain momentum as revenue for the year exceeded $38 million." At the time, Six Flags had entered into international licensing agreements for seven parks in China and a single park in Dubai. Defendant Reid-Anderson later clarified during an October 24, 2018 call that Dubai was "our smallest park" and "at the lower end" of the range of a $5-10 million EBITDA per-park contribution. Given the 80%-90% EBITDA margin that applied to the Company's international licensing agreements, the Company recognized approximately $6 million in revenue in 2017 for its Dubai licensing agreement. Accordingly, of the $38 million in revenue that Six Flags recognized in 2017 in connection with all its international licensing agreements, approximately $32 million was attributable to the Zhejiang and Chongqing developments, or 84% of Six Flags' international licensing revenue. This did not change during the Class Period, when 11 of the 13 parks under development (discussed below) were located in China.

15

**C.** **Prior To The Class Period, Defendants Announced Three Theme Park Projects In China And Purportedly Began Design, Development, And Construction For 2019, 2020, And 2021 Openings**

43.     As discussed above, Six Flags planned its most ambitious international expansion in China.  In late-June 2014, Six Flags announced the signing of an agreement with a Chinese real estate developer, Riverside, to build multiple Six Flags-branded theme parks in China.  Six Flags' agreements with Riverside to develop parks in China represented the largest potential source of new revenue in its international licensing pillar.  Ultimately, from 2016 to the first quarter of 2018, Six Flags recorded $70 million in revenue from its announced international parks, including those in China.  Although the Company did not announce the number of parks that it planned on licensing, the Company later disclosed that Riverside was interested in developing "*20 parks, 10 properties*."

44.     Pursuant to Defendants' agreement with Riverside, Riverside would provide the capital investment for Six Flags developments in China.  Riverside would pay Six Flags consulting and licensing fees during the development period of each park, and then licensing and management fees once the parks opened.  While the Company did not disclose the detailed terms of the arrangement with Riverside, Six Flags represented that each "theme park" to be built in China would contribute $5 million to $10 million annually to EBITDA pre-opening, and $10 million to $20 million annually post-opening. The Company also stated that smaller park concepts for China, including "water park[s]," "kid's park[s]," and "adventure park[s]," would each earn "$2 million to $4 million of EBITDA" before they open, and would "double[] to $4 million to $8 million" EBITDA after opening.  Under the approach announced for the multi-park developments discussed below, which each included a theme park and multiple smaller parks, the EBITDA contribution from ten properties with twenty parks could be upwards of $140 million yearly pre-opening, and $280 million yearly post-opening.  According to these earnings projections, the three announced

properties, Six Flags Zhejiang, Chongqing, and Nanjing, were projected to contribute, at minimum, $60 million yearly post-opening and could contribute upwards of $120 million.

45.    These potential earnings would have been astronomical relative to the Company's total earnings.  According to Six Flags' above-referenced EBITDA calculations, its partnership with Riverside could increase Six Flags' EBITDA from $519 million in 2017 to nearly $800 million if Riverside developed 20 parks across 10 properties—an increase of over 50%.

46.    In the years before the Class Period, Six Flags and Riverside announced plans for three multibillion-dollar park projects, totaling 11 parks, to be built in three major population centers in China.

### 1.  Six Flags Zhejiang

47.    On October 20, 2015, Six Flags announced the first of the three park projects, which it stated would be built near Shanghai in Haiyan county, Zhejiang province ("Six Flags Zhejiang").[3]  Six Flags and Riverside claimed that Six Flags Zhejiang would be the anchor for a 30 billion yuan (USD $4.6 billion) mixed-use real-estate development along the Yangtze River Delta known as the "Zhejiang Riverside Themed Town."  Six Flags promoted it as "one of the most desired residential and retail communities in all of China, with the first-ever Six Flags branded theme parks serving as the centerpiece."

48.    In a December 19, 2016 press release, Six Flags described the ambitious plans for the first two parks—a theme park and a "Hurricane Harbor" water park—as follows:

> Six Flags Zhejiang will be home to some of the most incredible roller coasters, rides and attractions in the world.  The park will also feature elaborately-themed sections celebrating time-honored Chinese traditions, live shows and seasonal events along with a wide variety of culinary offerings and retail locations.  Six Flags Hurricane

---

[3] Throughout the Class Period, Defendants interchangeably referred to Six Flags Zhejiang as the "Haiyan" parks, because the parks were located in Haiyan County in Zhejiang province.  Bracketed references to "Zhejiang" throughout the Complaint replace "Haiyan."

17

Harbor will feature thrilling water slides, a massive wave pool, a relaxing Lazy River and an intricately designed children's water play area.

49.    Six Flags ultimately announced on October 26, 2017, that, in addition to the theme park and the Hurricane Harbor water park, Six Flags Zhejiang would include a Six Flags Kids World park, which Six Flags stated in an October 19, 2017 press "will feature junior-sized versions of the company's world famous, record[]-breaking roller coasters, rides and attractions." Six Flags announced that the park would include multiple themed sections specific to its Chinese parks, including Garfield, Tuzki Rabbit, and "Super Wings" themed rides and attractions.

50.    Six Flags announced that Riverside "broke ground" on Six Flags Zhejiang in January 2016. Six Flags claimed that "construction [was] officially underway" by December 19, 2016. In July 2016, Six Flags announced that Six Flags Zhejiang was expected to open in 2019.

51.    The designs for Six Flags Zhejiang, scheduled to open in 2019, were elaborate:



## 2. Six Flags Chongqing

52.    On February 21, 2017, Six Flags announced that it had entered into definitive agreements with Riverside to build a second park complex, in Bishan, a district of the city of Chongqing ("Six Flags Chongqing") in Western China with a surrounding population of 120 million people.  Six Flags announced that Six Flags Chongqing would include four parks: the Company announced a theme park and water park on February 21, 2017, and announced a Six Flags Kids World and a Six Flags Adventure Park on October 26, 2017.  Six Flags described the Six Flags Adventure Park as follows:

> For the more daring enthusiasts, Six Flags Adventure Park will be the ultimate in high adrenaline, action-packed thrills.  From motocross bicycle races along rugged terrain, to whitewater rafting to zip lining or rock climbing hundreds of feet above the ground, guests will have the opportunity to reach beyond their comfort zone and safely push the boundaries of self-discovery in a beautiful, natural environment.

53.    In that same February 21, 2017 announcement, the Company stated that Six Flags Chongqing was scheduled to open in 2020, which timeline Six Flags repeated in the October 26, 2017 announcement.

## 3. Six Flags Nanjing

54.    On April 24, 2018, the first day of the Class Period, Six Flags announced that it would be partnering with Riverside to build a third park complex, in Nanjing, Jiangsu province ("Six Flags Nanjing"), the second largest city in Eastern China.  The Company announced three parks on April 24, 2018: a theme park, waterpark, and a Six Flags Adventure Park.  In an April 24, 2018 press release, the Company announced that:

> The theme park and waterpark will boast state-of-the-art roller coasters, rides, waterslides and attractions along with elaborately-themed sections celebrating time-honored Chinese and American traditions.  The theme park will also feature live performances along with exclusive, limited time only special events.  Both parks will offer an extensive collection of culinary and retail locations.

55.     On May 29, 2018, Six Flags announced that Six Flags Nanjing would also include a Six Flags Kids World, resulting in eleven planned parks for development in China across the three locations.

56.     In that same announcement, Six Flags stated that Six Flags Nanjing was scheduled to open in 2021.

**D.     Six Flags Could Only Recognize International Licensing Fee Revenue If Riverside Showed Progress On The Parks And Made Its Licensing Payments To Six Flags**

57.     Under U.S. Generally Accepted Accounting Principles ("GAAP"), Six Flags could recognize revenues in connection with its international licensing agreements if, among other things set forth in GAAP, it was probable that the Company would actually receive those revenues.

58.     GAAP constitutes the framework of guidelines for financial accounting used by accountants to prepare financial statements.  The SEC has the statutory authority to codify GAAP and has delegated that authority to the Financial Accounting Standards Board ("FASB").  The FASB has codified GAAP in its Accounting Standards Codification ("ASC").  As Defendants explained in Six Flags' periodic financial reports filed with the SEC on Forms 10-Q and 10-K, including, for example, the Company's quarterly report for the first quarter of 2018 filed on April 25, 2018, Defendants adopted FASB ASC 606, *Revenue from Contracts with Customers*, as well as the FASB's Accounting Standards Update ("ASU") Nos. 2016-08 and 2016-10, *Revenue from Contracts with Customers (Topic 606)* and *Principal versus Agent Considerations and Identifying Performance Obligations and Licensing*, respectively.  Both ASU 2016-08 and 2016-10 explain in turn that:

> The core principle of the guidance in Topic 606 is that an entity should recognize revenue to depict the transfer of promised good or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services.

20

Among other things ASU 2016-08 and 2016-10 require that a company may recognize revenue under Topic 606 only "*when (or as) the entity satisfies a performance obligation*."

59.     The GAAP provisions discussed in the preceding paragraphs governed Defendants' recognition of international licensing revenues throughout the Class Period.  In Class Period filings including the Company's first-quarter 2018 Form 10-Q filed at the start of the Class Period on April 25, 2018, Defendants purported to recognize revenue derived from Six Flags' licensing agreements with Riverside consistent with those governing requirements:

> We have entered into multiple agreements to assist third parties in the planning, design, development and operation of Six Flags-branded theme parks outside of North America.  Pursuant to these agreements, we provide exclusivity, brand licensing, and other services to assist in the design, development and project management of Six Flags-branded theme parks, as well as initial and ongoing management services.  Each significant deliverable qualifies as a separate unit of accounting.  *We recognize revenue under these agreements over the relevant service period of each unit of accounting [i.e., each park] based on its relative selling price, as determined by our best estimate of selling price.*  Our best estimate of selling price is established consistent with our overall pricing strategy and includes, but is not limited to, consideration of current market conditions, various risk factors and our required return and profit objectives.  We review the service period of each unit of accounting on an ongoing basis and revise it as necessary throughout the year.  Revisions to the relevant service periods of the units of accounting may result in revisions to revenue in future periods and are recognized in the period in which the change is identified.

60.     On the Company's February 14, 2019 conference call with analysts to discuss fourth-quarter 2018 earnings, Defendant Reid-Anderson explained, consistent with those practices, that "we recognize revenue for each park ratably over the development period."

61.     In other words, Defendants recognized revenue for the China parks based on projected future revenues under the terms of the Company's partnership agreements with Riverside.  During the period that the parks were purportedly under development and construction, the Company recognized pro rata amounts as revenue each quarter.

21

62.    As Six Flags' outside auditor KPMG explains in its *Revenue Recognition Handbook*,[4] under Topic 606, the intellectual property for which Six Flags would recognize revenue under its licensing agreements with international partners such as Riverside was considered "symbolic," rather than "functional," as the intellectual property that Six Flags licensed "does not have significant stand-alone functionality, and substantially all of the customer's benefit is derived from its association with the licensor's ongoing activities—e.g. brands, trade names and franchise rights."    Importantly, for symbolic intellectual property, "*[r]evenue is generally recognized over the license period using a measure of progress that reflects the licensor's progress toward completion of its performance obligation*."

63.    Accordingly, Defendants could not properly recognize revenue derived from its international licensing agreements with Riverside, under GAAP and consistent with the Company's representations to investors, if during the same period, Riverside failed to make "progress toward completion of its performance obligation[s]"—i.e., making licensing payments to Six Flags as the contracts with Six Flags required and making progress in developing the China parks on the agreed-upon timetable.    Any failure by Riverside to make licensing payments as required under the contracts with Six Flags or to make progress on the parks would represent a significantly reduced expectation of revenue or a longer time horizon over which the revenues would be recognized, such as due to delays in development timelines, and should be represented in a reduction in recognized revenue, under GAAP, to recognize that previously recorded revenues would have exceeded that amount earned based on the new timetable.    Conversely, to the extent that the Company continued its ratable revenue recognition in connection with the China parks, it

---

[4] KPMG, *Revenue Recognition Handbook*, *available at* https://frv.kpmg.us/content/dam/frv/en/pdfs/2017/revenue-recognition-handbook.pdf.

represented to investors that the expected timelines and future revenues from those parks had not changed. Indeed, as discussed below, later in the Class Period when Six Flags was forced to disclose some (but not all) of the delays in the China parks, the Company admitted that it could not continue to recognize the full amount of licensing revenue at the rate it had previously recorded.

**E.    Construction Of Six Flags' Multibillion-Dollar Chinese Theme Parks Would Take An Enormous Amount Of Time, Manpower, And Capital**

64.    Theme park construction is a capital-, labor-, and time-intensive process. As Six Flags' own disclosures recognize, in the United States, it would cost a competitor "$500 million to $700 million" and "a minimum of four years to construct" a "regional theme park" that would be "comparable to one of [the] major Six Flags-branded theme parks." The Six Flags China projects were not, however, planned to be "comparable" to Six Flags parks in the United States, but rather were planned as expansive multibillion-dollar resorts that would more closely resemble the USD $5.5 billion Disney Shanghai Resort and the currently in-progress USD $6.5 billion Universal Studios Beijing Resort. Six Flags Zhejiang and the Zhejiang Riverside Themed Town, for example, cost USD $4.6 billion to develop.

65.    The construction of even a basic theme park requires multiple outside designers, consultants, engineers, and ride vendors. A company needs to identify the land, obtain necessary approvals, and raise significant investment. It must work with the multiple designers and consultants to develop a "master plan" that sets out the rough concept for the park, with the basic themed areas and plans for future expansion. After the master plan is in place, the company, designer, and its consultants must draft more detailed design documents, including architectural drawings, interior designs, signage, and attraction designs. Those, in turn, are used to generate specific construction drawings or blueprints for contractors and construction workers to plan and

rely on during the on-site construction process.  Because of the numerous essential steps and costs involved, even small parks or park expansions can easily take over four years and cost hundreds of millions of dollars.

66.     One of the most time-intensive and expensive aspects of theme park development is the design, development, and construction of the rides.  A wooden rollercoaster can be built in eight months, a steel rollercoaster in 18 months, and a themed coaster—for example, Garfield or Tuzki themed rides—can take three to five years to be completed.  The cost of a ride ranges between $1 million for a basic wooden rollercoaster and $30 million or more for a themed "dark ride," such as the Tuzki-themed dark rides announced for Six Flags Zhejiang and Chongqing. Rides require entire engineering teams, including project engineers for design and layout, electrical and design engineers for the control systems, structural engineers to ensure the safety and soundness of the ride, and mechanical engineers to construct and install the structures.

67.     To put it in perspective, one of Six Flags China's would-be competitor theme parks, Disney Shanghai Resort, received land approval in November 2009 and officially opened in June 2016.  Disney Shanghai broke ground and started major construction in April 2011.  ***100,000*** workers were estimated to have worked on the park's construction, with upwards of ***11,000*** working on the park at any given time, and thousands more working on the resort infrastructure. A year before opening, its iconic Enchanted Storybook Castle was well under construction. Universal Beijing Resort, which broke ground in October 2016 and is planned to open in May 2021, had ***15,000*** workers on site as of April 2020, approximately one year before opening, and rides and "theming" are now in place.

68.     As discussed below, in stark contrast and unbeknownst to investors, a year before the opening date, Six Flags Zhejiang had no more than ***several hundred*** workers on site, and that

already inadequate number dwindled into the double and single digits as workers went unpaid. The theme park's rides had not been paid for or delivered. Six Flags had only ***nine*** employees in China supposedly overseeing the design, development, and construction of 11 parks.

**F.      Before The Class Period Started, The Six Flags China Projects Lost Necessary Government Financing**

69.      Unbeknownst to the market, the Six Flags China projects were already encountering significant financial setbacks before the Class Period began, as a result of the Chinese government's decision to stop or withhold funding from the projects. Due to the scale and expense of the projects—over $4 billion USD each—each Six Flags China park involved partnerships with different local Chinese governments. Six Flags and Riverside partnered with, and required funding and approval from, the Zhejiang provincial government for Six Flags Zhejiang, the Bishan District government for Six Flags Chongqing, and the Lishui District government for Six Flags Nanjing.

70.      On April 9, 2018, the Chinese national government, through China's National Development and Reform Commission ("NDRC"), announced plans to more tightly regulate the country's theme-park industry. The plan was intended to curb "local debt risks"—such as the risks taken by Six Flags' and Riverside's local and provincial government partners—and to reduce the construction of low-quality parks with poor construction standards. The NDRC's foremost target was "mega theme parks," which it defined as theme parks with investment of approximately USD $800 million or greater. In light of the significant debt risk that theme parks of that size posed for local governments, the NDRC announced that future "mega theme parks" would require the NDRC's approval, rather than approval only by provincial-level governments. Although the NDRC's policy did not apply to the Six Flags China projects because the agreements and approvals pre-dated the NDRC's policy change, the NDRC's announcement signaled to local government

25

officials that they should be more cautious in how they approve and fund theme park construction projects.

71.    By at least April 2018, the Chinese government began to reevaluate its funding of the Six Flags China projects and its relationship with Riverside—and more specifically, Riverside's Chairman Li.

72.    Shortly thereafter, Six Flags hired FE 1, who began work as Six Flags International's Director of International Construction and Project Management in May 2018, with responsibility for overseeing the construction of the China parks and reporting on their progress internally at Six Flags.  FE 1 has worked designing and developing theme parks and attractions for industry leaders since 1991, including more than a decade spent working for Disney.

73.    FE 1 recounted that the Chinese government did not want to fund Li Qi's projects anymore, and that decision had occurred before he arrived.  Consequently, Mark Kane, General Manager and Park President of Six Flags Zhejiang, and David McKillips, Senior Vice President of International Park Operations and President of Six Flags International (who reported directly to Defendant Reid-Anderson), met with the Chinese officials in an attempt to keep the projects funded.  Nonetheless, the local government that had approved and partnered to fund Six Flags Zhejiang withheld the funding and was no longer interested in working with Riverside and Chairman Li.  FE 1 recounted that Riverside received no funding from its partners in the Chinese government for its Zhejiang development after April 2018.

**G.      In April 2018, The Class Period Began As Six Flags Misled Investors About Riverside's Ability To Navigate Regulations, And Falsely Claimed Parks Would Open On Time**

74.    Six Flags' April 24, 2018 announcement of Six Flags Nanjing, on the heels of Six Flags announcing three new parks in Zhejiang and Chongqing, sparked numerous questions from analysts concerning the status of the Six Flags China projects.  On April 25, 2018, during the

26

Company's first-quarter 2018 earnings call, a senior analyst from Oppenheimer & Co. Inc. noted, "[we are] also very encouraged by the parks that you announced in China" and asked, "[w]here are we as far as the Chinese expansion?  Maybe what inning are we in?  Or how many more opportunities do you think we're going to see there or that can be weighted towards just other regions of the world?"  Defendant Reid-Anderson responded:

> [W]hen we announced the initial Riverside deals . . . we had focused in on being in the range of at least 10 parks within 10 years, and we're at 10 announced already. So when you look at the market itself, it's so encouraging because we've announced these 3 new parks. . . . *And we will not be stopping at 10 parks, I can assure you that, and our partner is very excited about being able to expand further with us*.

75.     On the same call, an analyst from William Blair & Company L.L.C. asked about the NDRC's announcement "that they would maybe put more scrutiny on these kind of large-scale theme park developments" and asked for any "kind of color or commentary there, if that impacts you guys or how that can impact the industry overall[.]"  Reid-Anderson reassured investors that nothing had impacted the progress of the parks toward their scheduled opening dates, and touted Riverside's strength.  Reid-Anderson informed investors that:

> You've heard me talk about our partners, *an incredible partnership with Riverside. They are building 10 parks.  They're on their way to building 10 parks*.  We've talked about building multiple parks.  There is no ban on theme park development in China.  There are a series of guidelines that were issued regarding theme park developments.  They're mostly focused on the real estate aspects of theme park development but also touched on enhanced theme park standards.

76.     Defendant Reid-Anderson further stated outright that:

> Our partner has not only successfully navigated the regulatory environment in China before but will continue to do so going forward. . . . *So right now, barring some other decision that's made, all our parks are progressing nicely towards their anticipating opening dates.  And hence, we've announced 3 more parks. We're very confident*.

77.     Analysts credited Defendant Reid-Anderson's statements.  J.J.B. Hilliard, W.L. Lyons, LLC's April 26, 2018 report remarked that "international demand seems strong based on

27

recent development deals under a licensing structure," and "[t]here have been no delays or cost increases related to U.S./China trade relations [and] Management cited its expectation for no ban or prohibitions on its amusement park development in China, which is being spearheaded by a Beijing-based development company." J.J.B. Hilliard rated the Company's stock as a Long-term Buy.

78. Defendants Reid-Anderson and Barber continued to mislead investors throughout 2018. On June 20, 2018, Defendant Barber attended the Oppenheimer Consumer Conference and discussed Riverside's and Six Flags' plans for theme parks in China. In response to an analyst question regarding "what do you think as far as the white space out there for international expansion," Barber stated, "we had a lot of [parks] signed in the last few months but *the pipeline is fantastic. I mean it's—we have additional parks in China that our partner has said he wants to build 10 park—20 parks, 10 properties. He's been a very good partner for us*."

79. Analysts specifically credited Barber's June 20, 2018 statement regarding Riverside's intent to build 20 parks in China. In a July 25, 2018 update, Oppenheimer wrote that "[m]anagement notes potential to expand to 10-20 multi-park locations in China." Oppenheimer rated the Company's stock as Outperform relative to the market.

80. The Company and Defendants Reid-Anderson and Barber remained adamant throughout the summer and fall of 2018 that the progress of the China parks remained unchanged. During the Company's July 25, 2018 earnings call for the second quarter of 2018, Barber stated, "that's right" when asked by an analyst whether the "opening timetable of the initial Chinese parks" remained "3 parks in late 2019 and another 4 in early 2020." Reid-Anderson went further and stated, *"[t]he timing of the parks remains exactly the same as previously disclosed, there's no change on any of those*. And so if you need more details off-line, we're happy to take you

through that timing by park.  Okay?"  On the same call, Reid-Anderson stated that Six Flags' upcoming international parks should "super charge revenue growth," and that the international deals made Six Flags "the ultimate growth and yield stock."  Barber added that "revenue from international licensing should accelerate further, as we continue to add new licensing arrangements and over the long term begin opening new parks."

81.    Analysts credited Defendants' statements that the timeline for opening the Six Flags China parks remained unchanged.  In a July 26, 2018 analyst report, Wedbush Securities wrote that "[m]anagement stated that international licensing will accelerate in the future with the announcement of new deals as well as the incremental contribution that comes with the eventual opening of the new parks.  To that end, there is no change/setback in the expected openings of the initial international parks in late 2019 and early 2020."  Wedbush maintained its "Neutral" rating.

82.    Defendants Reid-Anderson and Barber continued to deny any significant delays during the Company's October 24, 2018 earnings call for the third quarter of 2018.  During the call, the Company disclosed that issues with its Dubai partner "makes on-time opening in 2019 unlikely" for Six Flags Dubai.  In response to a request from a Wedbush securities analyst for an "update" on the China parks' construction, Defendant Reid-Anderson drew a distinction with the Dubai park, which was delayed, and asked Barber to "go through all the other parks which *are* on time."  Barber provided a specific timetable for the China parks:

> So you mentioned the Chinese parks.  We–those start to come online in Zhejiang, the theme park, water park and kids' park are early 2020.  The Chongqing parks are during 2020.  That's a theme park, a water park, a kids' park and an adventure park.  Those are mid-2020.  And then Nanjing, those will start to open up in 2021.  The water park, Kids World first, the adventure park in 2021 as well as in Nanjing.  And then the Nanjing Theme Park will actually open up in 2022 midyear.

The Wedbush analyst immediately seized on the apparent change in opening dates, asking, "just to clarify, I thought the first round of Chinese parks were originally slated for late next year.  Did

29

I get that wrong? Or did those get pushed back?" Defendant Barber clarified that there was a minor "shift" in the opening date for Six Flags Zhejiang: "technically, it's the first of 2020 . . . earlier we were saying late 2019, which was in the fourth quarter. So it—really the shift is [a] month or 2. It's not much."

83. Analysts credited Reid-Anderson's statements that the "other parks [] are on time." In an October 24, 2018 report, SunTrust Robinson Humphrey noted that, despite announced delays in the development of Six Flags Dubai, "[t]he remainder of SIX's international projects remain on track." SunTrust Robinson Humphrey maintained its "Buy" rating.

**H.    By April 2018, Riverside Failed To Make Payments To Employees And Vendors, And Defendants Were Aware The Parks Would Not Open On Time**

84. By the beginning April 2018, it was clear to Defendants that, in reality, the Six Flags China projects were not "progressing nicely towards their anticipated opening dates," that the "timing of the parks" did not "remain[] exactly the same as previously disclosed," Riverside was not an "incredible partner[]" that was "building 10 parks," or "on their way to building 10 parks," and Riverside was not capable of building "20 parks" at "10 properties." Rather, as Defendants were aware, construction on the parks was not progressing and the Six Flags China parks could not possibly open on time. Riverside lacked the multibillion-dollar financing required to build even a single park complex.

85. In May 2018, Six Flags International's former Director of International Construction and Project Management, FE 1, arrived in China to manage the construction of the Six Flags China parks. Immediately before joining Six Flags, FE 1 was responsible for overseeing the construction of one of the most ambitious and well-known new attractions in the world, built by one of Six Flags' main competitors. In his role at Six Flags, FE 1 was responsible for protecting Six Flags' brand by overseeing the construction of the Six Flags' China parks and ensuring that

30

Riverside was building the parks correctly and safely. FE 1 worked onsite at Zhejiang, but also traveled to the Chongqing site to perform site inspections and check its progress, and met often with Six Flags and Riverside personnel in Beijing. There was a Riverside team onsite in FE 1's building, and FE 1 interacted with those Riverside employees on a day-to-day basis.

86. FE 1 confirmed that, when he joined in May 2018, design development was complete for Zhejiang and mostly complete for Chongqing, and he was to oversee Riverside's building of those parks. Although Six Flags had announced that it broke ground on Zhejiang in January 2016—which would make sense for a park to open in 2019—in reality it was just starting.

87. As discussed below, FE 1 immediately recognized from the beginning of his tenure at Six Flags what was apparent to everyone involved in the Six Flags China parks, namely: (1) there was absolutely no way that Six Flags could complete the construction of the Chinese parks on the schedule announced to the public, and (2) far from "progressing nicely," construction was effectively at a standstill, because Riverside had largely ceased funding the parks' development before the Class Period began. FE 1 has confirmed that, upon his arrival in China, he learned right away that Riverside could not pay for the basic requirements to construct a theme parks, and was not paying employees across functions, including design and creative teams and even food-service workers. In fact, FE 1 told the senior executives at Six Flags almost immediately upon his arrival in May 2018 that the Company should declare Riverside "in breach of contract" and abandon the relationship due to Riverside's obvious failures to meet the terms of the contract. Six Flags officials refused.

**1. From The Beginning Of The Class Period, It Was Apparent To Six Flags That The Six Flags China Parks Would Not Be Constructed In Time For Their Publicized Start Dates**

88. As discussed above, Six Flags Zhejiang was to be Six Flags' flagship park in China, opening in 2019. However, from well before the Class Period and certainly by the first day of the

31

Class Period, it was clear that construction was well behind schedule and there was no way Riverside would be able to meet the schedule announced by Six Flags to investors.

89.     Below is a photo of Six Flags Zhejiang from April 2018, shortly before the Class Period began, demonstrating that, as of April 2018, almost no progress had been made on the enormous, $4.6 billion development that was supposed to open its doors within 19 months:



90.    In stark contrast, 24 months before Shanghai Disneyland opened, the Disney park was well on its way to completion:



91.    Indeed, FE 1 stated that he recognized that the projects were in jeopardy from the moment he arrived.  Six Flags had sent only nine Six Flags employees to manage the development and construction of 11 parks throughout China, with a "complete lack of monetary support."  FE 1 contrasted that number with Disney, which he stated sent 10,000 people to China to build Shanghai Disneyland.  It was "common knowledge basically right away" at Six Flags when FE 1 arrived that the parks "wouldn't hit" the "[opening] dates provided to the media."  The Six Flags China team met regularly with Mark Kane, General Manager and Park President of Six Flags Zhejiang, and would ask Kane "why [the Company is] saying we'll hit this [opening] date."  FE 1 and the Six Flags China team informed Kane that they "[couldn't] build [Zhejiang] in 18 months" or open on time "even if everything was in [their] hands right now."  As discussed below, the

33

necessary materials were decidedly *not* in their hands at the time.  During this time, Defendants Reid-Anderson and Barber continued to tell investors that the parks were on schedule.

**2. Riverside Did Not Invest In The Basic Building Blocks Of A Theme Park, So There Was No Way The Parks Would Be Built On Time**

92.     FE 1 confirmed that, as of May 2018 and through his departure in September 2019, Riverside lacked the funding to make any meaningful progress on the Six Flags China parks and it was clear that the parks would not open on time.  FE 1 identified two principal obstacles to the parks' construction that were the result of Riverside's lack of funding—obstacles that were apparent and well known within the highest levels of Six Flags.

93.     <u>First</u>, as Six Flags knew, Riverside had not paid and was unable to pay the major vendors who were supposedly constructing the primary features of the parks—roller coasters and other rides.  As a result, construction of the rides had been cancelled or they had been sold to other parks.  Without rides, the Six Flags China parks could not complete construction and certainly could not open.

94.     As discussed above, theme park construction relies heavily on outside vendors to construct rides that are made to order and require years of lead time and planning.  In particular, themed rides, like the Tuzki Rabbit-themed rides intended for Six Flags Zhejiang and Six Flags Chongqing, are custom-constructed and require years after ordering to deliver.  FE 1 learned from "day one" in May 2018 that Riverside was unable to pay the vendors to complete and deliver the rides.  Riverside's inability to pay the ride vendors had been an issue before FE 1 even joined the project, and had been raised in earlier reports to Six Flags' management.

95.     FE 1 recalled that nearly every major ride manufacturer was involved in the project (approximately 40 ride manufacturers), and every single one of those outside manufacturers had begun to construct rides for Six Flags and then had to cease construction or find another buyer.  As

a result, there was "bad blood" between Six Flags and its major ride partners for some time. FE 1 recounted attending trade shows in Hong Kong and Shanghai in 2018 and 2019 and talking to vendors who were irate because Riverside had placed orders for numerous rides, but had not paid for any of them. According to FE 1, "vendors were all over us, saying is this guy [Chairman Li] gonna pay or what?" As a result, every theme park ride order that Riverside placed ultimately was cancelled because it was unable to pay for the rides to be built or shipped.

96.    Second, Riverside was unable to fund the significant construction work necessary to prepare the parks to be ready for the installation of rides, if Riverside ever obtained any. Under FE 1's oversight, Riverside was supposed to be constructing the infrastructure for the parks, such as roads, canals, pavilions, and the elaborate buildings that are a part of any theme park.

97.    As of May 2018, Riverside only had "design drawings" for the Six Flags Zhejiang and Six Flags Chongqing parks from FORREC, a Canadian entertainment design company. However, to begin construction, Riverside needed to commission the creation of the basic and indispensable construction drawings, which construction crews rely on for construction specifications and instructions.

98.    As reported in the *Los Angeles Times* in 2015, "Contracts to complete concept drawings for Chinese theme parks bring in $500,000 to $7 million apiece, with more detailed construction plans priced at up to $15 million[.]" But Riverside did not have the funding to commission these fundamental blueprints.

99.    In or around May 2018, FE 1 attended a meeting in Beijing with senior members of the Six Flags China team, including Six Flags China Park Presidents Mark Kane and Will Edwards, and they informed FE 1 that Riverside did not have the money to pay for the additional construction drawings and the process had "stalled out."

35

**3. Riverside's Financial Situation Only Deteriorated Further Over The Course Of 2018**

100.    By May 2018, Riverside had attempted to start construction on Six Flags Zhejiang based solely on the design drawings, a process that was unsafe, counterproductive, and resulted in no meaningful progress on the parks.  Construction workers hired by Riverside dug holes and installed certain "pile foundations" intended to support the rides for which Riverside had not paid. In at least one instance, construction workers needed to tear out and re-install the pile foundations because they had been installed incorrectly due to being based on design drawings rather than the construction drawings they needed but did not have.  The construction sites would have large open holes, some "over 100 feet deep" with "no protection."

101.    FE 1 raised these issues with Riverside and informed them that the construction work was putting peoples' lives in danger, and Riverside would "just laugh about it."  FE 1 described Six Flags' contract with Riverside as "worthless" and "the most ridiculous thing" because it did not give Six Flags any way to force Riverside to make progress on construction or to meaningfully enforce the contract at all.

102.    Accordingly, construction progress was minimal.  As FE 1 warned Six Flags, it had chosen a business partner that "will not be successful in building a safe and reliable theme park."

103.    By August 2018, Riverside also had fallen behind on its licensing payments to Six Flags.  According to FE 2, a former Account Manager at Six Flags throughout 2018, Brett Petit, Senior Vice President of Marketing and Sales (who reported directly to Defendant Reid-Anderson), as well as numerous employees in Six Flags' Marketing Department and International Department, discussed Riverside missing licensing payments by at least August 2018.  The Marketing Department was working on the Six Flags China parks because the parks needed to follow Six Flags' branding requirements, but they questioned why they were doing marketing

36

work for the parks when Riverside was unable to pay. The issue was worsening over time. According to FE 2, Riverside remained past due on licensing payments as of the time he left the Company at the beginning of 2019, and it was apparent to the Six Flags employees that it was just a matter of how long Six Flags would wait before deciding to "pull the plug."

104.    FE 1 similarly confirmed that during his time in China, Riverside failed to make licensing payments to Six Flags, which Six Flags management told FE 1 prevented the Company from purchasing critical items for FE 1's work, including a printer and larger screen to assist in reviewing drawings. Six Flags' response to FE 1 was simply that "Riverside owe[s] us money, so we need to wait for it to come in." But even when Riverside did make payments to Six Flags, the Six Flags China team "never got funding for a damn thing." Six Flags' employees in Beijing informed FE 1 that Six Flags was owed $18 million by Riverside, about which Six Flags executives were going to have a conversation with Chairman Li.

105.    By the end of August 2018, Riverside already was unable or unwilling to make even relatively small payments that it owed to its vendors and partners. For example, Chinese court records show that Riverside owed a $7 million yuan (approximately USD $1 million) payment due August 30, 2018 to Guangdong Aofei Theme Cultural Technology Co., pursuant to an intellectual property licensing agreement that allowed Riverside to use the "Super Wings" cartoon IP in connection with the Six Flags Zhejiang kids' park. This amount was miniscule in comparison to the $30 billion yuan (USD $4.6 billion) project development cost that had been announced for the entire Zhejiang Riverside Themed Town project, but Riverside was unable to pay it. Instead, Riverside proposed to Guangdong Aofei that Riverside pay $3 million and $4 million yuan (approximately USD $420,000 to $560,000) installments in December 2018 and March 2019, respectively, only to miss those payment dates as well.

37

106.    Riverside's financial condition worsened as time went on.  As reported by citizen journalists in China, significant layoffs at Riverside occurred in August 2018, and Riverside was not paying severance owed to those former employees under severance agreements.[5]  FE 1 confirmed that, throughout his time in China from May 2018 to September 2019, Riverside "laid off people constantly," and that "you'd have a floor in Beijing with 100 people and two weeks later there would be nobody there because Riverside dumped them."  There was "huge turnover" due to Riverside employees "constantly being unpaid."  FE 1 stated that it was "the biggest turnover I've ever seen, it was constant, it never stopped."

107.    During the Class Period, in an attempt to address the lack of financing, Riverside sold the residential development associated with Six Flags Zhejiang to another real estate company, Sunac China Holdings Limited.  The proceeds from that sale were insufficient to address Riverside's significant financing shortfall.  By early 2019, the limited construction that had been occurring at Six Flags Zhejiang slowed to a "complete trickle."  The retail component of Six Flags Zhejiang was deserted and all construction on it had stopped.  Riverside could not even afford to pay cafeteria workers, who were threatening to leave.  FE 1 remarked that "you couldn't even get toilet paper," and it was "just insane."

108.    FE 1 recounted that by February 2019, "there were already weeds growing" in the theme park portion of the Zhejiang park because there were no rides and no capital to move forward with construction. FE 1 confirmed he was just "sitting on the job site watching grass grow taller than [him]" because "nothing else was getting done" at Zhejiang other than some "busy work," such as workers assembling tubing for the waterpark.  The waterslides "were just tubes and

---

[5] *The Fall of Riverside Group*, hetunwenlv (Dec. 17, 2019), https://mp.weixin.qq.com/s/Mm1lHIrgMdS5c-RrwEUsjw.

easy to do.  The other attractions, the only thing that got done was driving pile foundations into the ground, nothing.  It was the same situation in Chongqing, they didn't have the rides."

### 4.    Defendants Knew That There Was No Progress At The Six Flags China Parks And That They Could Not Open On Time

109.    Defendant Reid-Anderson was aware of these significant problems and that the parks would not open on time.  FE 1 prepared weekly presentations and periodic reports on the progress of construction at the Six Flags China parks for David McKillips, former Senior Vice President of International Park Operations and President of Six Flags International until January 2020.  In that capacity, FE 1 and McKillips had weekly or biweekly meetings with the entire Six Flags team in China, which McKillips oversaw.  McKillips in turn presented the presentations and reports by FE 1 to Defendant Reid-Anderson and to the Six Flags Board of Directors.  Kane and McKillips expressly informed FE 1 that the presentations were to be presented to the Board of Directors.   This presentation of information was consistent with the Board of Directors' governance of the Company.  According to Six Flags' proxy statements, the Board of Directors was "advised of the Company's business through discussions with the Chief Executive Officer and other members of management, by reviewing reports, analyses and materials provided to them." According to the Company's proxy statements for 2018 and 2019, the Board met six times in 2018 and eight times in 2019, during which the Board reviewed "significant developments affecting the Company."   The presentations and reports showed that there was only minimal construction progress during the Class Period and that there were vendor payment and safety issues, including missed payments by Riverside to vendors and designers.

110.    FE 1 stated that the reports showed that almost "nothing happened" and that there was "no progress" on the parks.  The only work that was being done was on the Zhejiang and Chongqing water parks because they had "already bought the tubes," but Riverside could not even

afford the water pumps or machinery needed to run water slides. Despite this obvious lack of progress, Defendants Reid-Anderson and Barber continued to claim throughout 2018 that the China parks were "on time"—although, as FE 1 has recounted, "it was pretty much common knowledge" that "the timelines were just way too aggressive."

111. Despite these massive and worsening problems—which Six Flags' senior management, including the Individual Defendants, were aware of—Defendants continued to mislead investors, while Riverside continued to fail to meet its obligations. Indeed, investors credited Defendants' false representations that the China parks were proceeding on schedule. For example, in a January 17, 2019 analyst report, Wells Fargo "reiterate[d] our Market Perform rating" and stated that Six Flags was "Fairly Valued," stressing that

> We view the sizable scale developments in China with partner Riverside Investment Group, as critical to the international component of the SIX story. ***We do NOT see any material risk to SIX's China developments*** from current trade/tariff issues nor slowing Chinese economy.

(Emphasis in original). Wells Fargo further reported that "Each international park is expected to contribute $5MM-$10MM/year to EBITDA pre-opening, and $10MM-$20MM/year post-opening."

### I.    On February 14, 2019, Six Flags Announced A $15 Million Downward Revenue Adjustment For The Fourth Quarter Of 2018 But Falsely Reassured Investors That "Construction Is Continuing"

112. On February 14, 2019, before the market opened, Defendants surprised investors by announcing that the opening dates of the Six Flags China parks would be delayed by several months. As a result, the Company was forced to take a negative revenue adjustment of $15 million for the fourth quarter of 2018. Rather than admitting the truth—which was that Riverside had made *no* material progress on the parks and was unable to fund completion of the projects—the Company falsely blamed delays on "a challenging macroeconomic environment" that "many

40

companies [we]re experiencing," while falsely reassuring investors that "construction [wa]s continuing."

113.    In a Form 8-K and press release announcing its financial results for fourth-quarter and full-year 2018, the Company announced "an unfavorable revenue adjustment of $15 million related to the company's international agreements due to delays in the expected opening dates of some of the parks in China caused by a challenging macroeconomic environment," which "resulted in a 38 percent decline in sponsorship, international agreements and accommodations revenue compared to the fourth quarter of 2017."  Similarly, in an earnings conference call that same day, February 14, 2019, Defendant Reid-Anderson disclosed that the Company's revenue growth "would have been approximately $15 million higher if not for our fourth quarter adjustment to reflect delays in some of the China parks' opening schedules caused by recent macroeconomic events that many companies are experiencing."  Reid-Anderson admitted that "*we now expect our [Zhejiang] parks to begin opening in mid- to late 2020 versus 2019, our Chongqing parks to begin opening in mid to late 2021 versus 2020, and Nanjing to begin opening in late 2022*," a 6-to-12 month delay.

114.    In other words, because the opening dates for the China parks were delayed, the pre-opening fees would be stretched over a greater number of quarters, resulting in smaller per-quarter revenue.  This revenue correction—which was no doubt recorded because the Company's auditor had raised concerns during its year-end audit that Riverside was not paying Six Flags its licensing fees—was an admission that the Company had recorded revenue improperly in the previous quarters, when Riverside was equally derelict in meeting its obligations.  In reality, because Defendants knew or were reckless in not knowing that Riverside was unable to develop

41

the Six Flags China parks at all, *none* of the revenue for the China parks should have been recorded.

115.    Investors were surprised to learn that Six Flags' China projects faced delays. Analysts expressed their concerns about both the disclosed delays to park development in and revenues from China, as well as whether those problems were greater than disclosed.  For example, on February 15, 2019, analyst Wedbush reported that "our 2020 estimate is down $22M, as we push back the openings of all three Chinese parks."  Similarly, *TheStreet.com* ran an article on February 14, 2019, titled "Six Flags Sinks as Revenue Misses Estimates Because of 'Challenging' China," reporting that "Six Flags Entertainment Corp. plunged more than 15%" in response to the Company's disclosure.

116.    In response to the disclosure that the China projects were delayed and the delay negatively impacted revenues, Six Flags stock had a statistically significant decline of 14.1%, falling from $63.87 per share on February 13, 2019 to $54.87 at the close of trading on February 14, 2019, on high volume.

117.    During the conference call on February 14, Defendants made false reassuring statements that were intended to and did mitigate the market's negative reaction to the news of delays in developing the Company's branded parks in China, and associated negative financial consequences.  Defendants blamed the delays on "macroeconomic" conditions that purportedly affected *all* private companies doing business in China, rather than on Six Flags- and Riverside-specific problems, including Riverside's longstanding but undisclosed inability to fund Six Flags projects supposedly under development.  Specifically, Defendants represented that they had "performed a comprehensive review of our project timelines jointly with [Riverside]," and as a result "ha[d] reasons to believe conditions could improve in China during the . . . second half of

42

2019," which purportedly enabled the Company's China parks to be slightly delayed but otherwise remain on track.

118.    During the February 14 earnings call, Defendant Reid-Anderson reassured investors that "*construction is continuing*" on the China parks, while stressing "that the 2020 [revenue] goal, getting there is possible," and that the Company's announced international parks, including the China projects, "will contribute to our long-term growth."  Reid-Anderson further reassured investors that problems with the China parks were only "short-term international setbacks," reinforcing his "belie[f] our stock price is fundamentally undervalued."

119.    In direct response to an analyst question from Janney Capital Markets asking Defendants to "talk a little bit more about your partner over there [in China]," including "[h]ow healthy are they right now" and "about the financing behind some of these projects[,] [a]re there any potential issues as far as having enough funds to continue to do construction," Reid-Anderson reassured investors that "[w]e really have *a first-class partner in China with Riverside*," which had "so far successfully navigated the political and the regulatory environment there" and experienced only those problems that were supposedly "being experienced by every other private company in China."

120.    Defendant Reid-Anderson then asked Defendant Barber to add his thoughts on Riverside—and then quickly had to interrupt when Barber almost admitted that Riverside was missing payments to Six Flags.  Specifically, Barber, in speaking about Riverside, reassured the analysts that:

> [Liquidity] has been tougher for other companies.  But he [Chairman Li]'s in good shape. *There's some gap . . . .*
>
> Defendant Reid-Anderson:  *He continues to pay*.

Barber quickly caught himself, continuing that Chairman Li "continued to pay us, and that's important," was "providing the funding for the development of the parks," had "the ability to source additional funding," and was "excited about the fact that [Riverside is] in pretty good shape, although in a tough environment." But this was not true—as discussed above, Riverside was missing or delaying payments and did not have the assets or liquidity to fund the developments.

121. Reid-Anderson added the "important" point that *"[w]e are continuing to build those parks, and they are still progressing*. . . . So that is ongoing as we speak," and told investors that "the financing is in place, and the financing then gets expanded as time goes on."

122. Defendants' statements falsely assured investors that Six Flags' China parks were still progressing as Riverside navigated ongoing macroeconomic issues supposedly beyond their control. But Defendants failed to disclose that, as FE 1 stated and subsequent events have confirmed, at the time, "there was no meaningful construction at all," and no material construction progress had been made on any of the China theme parks. Accordingly, while Six Flags claimed that the parks would be delayed only 6-12 months, Six Flags was functionally in the same position in February 2019 as it had been in mid-2018, when FE 1 first told Six Flags executives that the Company should put Riverside into breach of contract. According to FE 1, who had been overseeing the construction of the Six Flags China parks for nine months by this point, there had been no progress made that would justify the incredibly tight turnaround that Defendant Reid-Anderson's comments represented. Indeed, FE 1 said expressly that any claim that construction was continuing at the time was "not true."

123. Six Flags' claims about a "challenging macroeconomic environment" during late 2018 and into 2019 were also false. The Six Flags China team was aware at the time that Defendant Reid-Anderson and David McKillips had started to blame the lack of progress on "macroeconomic

44

issues," and members of the team would "laugh about it" after meetings and ask each other how Reid-Anderson and McKillips came up with that explanation. FE 1 recounted that he traveled throughout China during the period, and everywhere he went there was ongoing construction. There was no indication that "macroeconomic issues" were affecting construction.

124.   Construction was not only happening throughout China, it was happening on the exact land that Riverside was supposed to develop as part of the "Zhejiang Riverside Themed Town." According to FE 1, Sunac Holdings quickly developed the land that it had purchased from Riverside, and a commercial center and condominiums were built in less than 30 days. Riverside, in comparison, had not been able to develop the land during the three years that it had supposedly been doing construction on the Zhejiang Riverside Themed Town.

125.   Defendants' false reassurances had their desired effects, however, as investors remained in the dark. Analysts, trusting Defendants, downplayed concerns about Riverside and development of the China parks. For example, on February 15, 2019, Wedbush maintained its "Neutral" rating for Six Flags stock, noted approvingly that despite the disclosed delays in the China projects, "Management went on to say . . . they expect many of these factors to show improvement in the back half of 2019," and "Management stressed *the parks are still progressing as Riverside navigates the ongoing issues*." Berenberg similarly reported on February 15, 2019 that although "the feasibility of these [international] opportunities is likely being questioned. . . . we see international expansion as a low risk/high reward strategy . . . albeit one that will likely take longer than originally thought to come to fruition."

126.   On March 7, 2019, Defendants unexpectedly announced in a Form 8-K filed with the SEC that Six Flags had commenced a search for a successor to Defendant Reid-Anderson to serve as the Company's CEO, and that Reid-Anderson would retire by the end of February 2020.

45

**J.      On April 23-24, 2019, Six Flags Denied Any Additional Delays And Falsely Represented That "China Is Improving" And "There's Ongoing Building Going On"**

127.    On April 23, 2019, Defendants issued a press release and Form 8-K announcing the Company's financial results for the first quarter of 2019, and falsely pointed to the Company's international developments including in China as key drivers of the Company's purportedly positive financial condition and future growth.  Defendants reported that revenues declined $1 million, or 1%, from the first quarter of 2018, which decline would have been greater if it were not for "*an increase in revenue from international agreements*."  The press release quoted Defendant Reid-Anderson pointing to "*international expansion opportunities*," among other factors, as leaving the Company "very well-positioned to deliver our tenth consecutive year of record financial performance in 2019."

128.    During an earnings conference call with investors the next day, Defendants continued to falsely represent to investors that the Company's China parks would drive positive financial results.  In that call, Defendant Reid-Anderson told investors that Six Flags' "long-term international opportunities remain[] compelling," and represented that the Company had:

> [O]nly begun to build out our international function and expertise and realize the potential of this strategy . . . . *In the next 10 years, up to 1 billion people will enter the middle class, and the vast majority of them will be in emerging markets like China and India . . . . We continue to work with our international partner in China, meeting government officials for each of our 3 park complexes, and we believe conditions in China have slowly begun to improve*.

129.    Moreover, during the April 24, 2019 earnings call, Defendants again told investors that any delays in opening the China parks would be minor and would not have long-term negative consequences on the Company's financial condition.  Specifically, Reid-Anderson stated that "[l]ike virtually every theme park project in these markets, we have experienced some opening delays.  But we should not lose sight of the fact that *these short-term delays and lumpy revenue*

*patterns are not material in the context of the long-term opportunity*."  In response to analyst questions that directly inquired about delays to the China parks, Reid-Anderson reiterated that "[w]e've got parks in China . . . that are proceeding.  *[Zhejiang] in China is proceeding very nicely*. . . . *There are no delays that we're aware of on any of the [China] parks*."  Reid-Anderson further represented that "*the situation in China is improving*.  And as I said earlier, our partner Riverside remains very committed to developing Six Flags parks.  *There's ongoing building going on*. . . . We'll update you probably on the second quarter on any developments there."  In response to a question from a Wells Fargo analyst, Reid-Anderson again assured investors that "*the issues that we're facing aren't specific to us*, they're being faced by basically all companies, especially private companies in China," but that "Riverside [was] very successfully navigating the political and regulatory environment."

130.    Defendants' positive misstatements continued to mislead investors, as Defendants continued to falsely represent that delays in developing the China parks were due to macroeconomic factors affecting all private companies in China and that the China parks were under construction and would drive earnings and future growth.  As FE 1 has corroborated and subsequent events have confirmed, however, by this time Riverside's unique financial difficulties had been apparent for over a year and no further material construction progress had been made at any of the China parks.  Accordingly, claims that construction was "ongoing" were false and materially misled investors.

131.    Defendants' false reassurances had their desired effects.  Analysts credited Defendants' statements and dismissed concerns about development of the China parks.  For example, on April 24, 2019, William Blair reported that "[e]ncouragingly, management indicated work continues at each site and there have now been several meetings with various levels of local

government (which have included representatives from Six Flags and its Chinese partner). . . . *[T]he company did indicate that conditions in China have been slowly improving*." Wedbush likewise reported on April 25, 2019, that "management indicated . . . that the situation is improving." And in an April 24, 2019 report, SunTrust Robinson Humphrey relayed Defendants' expectation that the Chongqing and Nanjing parks would "receive approval over the next 6-12 months," while the Zhejiang park "remain[s] on track to open as planned."

**K.     Between May And July 2019, Six Flags Continued To Falsely Claim That Delays Were "Temporary" And Construction On The China Parks Remained Ongoing**

132.    On May 22, 2019, Defendants made a presentation to investors at the B. Riley FBR Investor Conference. During that conference, in response to a request to "update us on the current development plans and the time line in China," Defendant Barber represented that "we have 11 parks in China in 3 locations that were either in construction phase or design and development phase or master development phase," including specifically that "*[Zhejiang] is in construction. Chongqing is pretty far through master—through design and development*." As FE 1 has confirmed, however, at the time, material construction had halted at Zhejiang, including no theme park rides under construction, and Riverside had failed to pay key vendors, and was unable to do so due to Riverside's massive financing gap.

133.    Defendants continued to make false, reassuring statements to investors concerning purported progress of the Six Flags-branded parks in China. On May 30, 2019, analyst Wedbush reported on "investor meetings in Chicago and Milwaukee with Six Flags CFO Marshall Barber and SVP of Investor Relations Steve Purtell." According to Wedbush, "investors were at least as interested in the company's . . . international (asset-light) initiatives" as they were in the Company's domestic park business, and "management seem[ed] to have a high degree of confidence that these [China] projects will eventually be completed."

48

134.    On June 5, 2019, during a presentation at the William Blair Growth Stock Conference, Purtell stressed that the Company's international development agreements would be a growth driver for the Company, telling investors that "[o]ur partners are funding the entire park. . . . [W]e're earning $5 million to $10 million of EBITDA per year per park before the park opens.  Once the park opens, it switches to a royalty model and then that—the amount we're going to earn is roughly going to double from $10 million to $20 million per theme park per year."

135.    Shortly afterwards, on June 10, 2019, Barber and Purtell made a presentation to investors at the Stifel Cross Sector Insight Conference.  There, in response to an analyst's question "About China, you got—you have 11 parks going in China, *any worries there, over time*?," Purtell assured investors that "[i]f you look at what we have in China, we have 3 locations which have 3 to 4 parks each that are being built, so there's 11 parks in China being built," and that there was "*no new news to report*" concerning the developments and "*no reason to believe*" that previously disclosed timelines "*will not continue to hold*."

136.    Defendants released the Company's financial results for the second quarter and first half of 2019 in a press release and Form 8-K filed with the SEC on July 24, 2019.  That same day, Defendants held a conference call with investors to discuss the Company's financial results.  During that call, Defendant Reid-Anderson represented that positive progress continued on the Company's China projects.  Specifically, Reid-Anderson told investors that "in China, our partner continues to make progress obtaining local government support for our Chongqing parks," and "*[c]onstruction in both [Zhejiang] and Chongqing continues*."  Further, Barber stated that, regarding Riverside's work in Chongqing, "our partners have been progressing with the government approval process and *construction has continued*," and "we are pleased with their

*consistent progress* and are cautiously optimistic that both *[Zhejiang] and Chongqing will remain on schedule*."

137.    On the July 24, 2019 earnings call, Reid-Anderson likewise represented that the Company's "international franchise" was a key growth driver, including "8 parks in 3 locations under construction," and "work[] to restart construction on 4 additional parks in Nanjing, China." Directly responding to an analyst's request for an "update on construction" regarding "the first China site [Zhejiang]," Reid-Anderson stated that "the parks that we've talked about, both in [Zhejiang] and Chongqing, *the construction has continued there*. . . . [W]e are progressing at both of those parks." When asked if Defendants were representing that "the [China] timeline overall has improved, stayed the same, or slipped a little since 90 days ago," Reid-Anderson replied that "*the timeline that we described 180 days ago still holds right now*, . . . and the same as it was 90 days ago. And if anything changes, *we will update you and all of our shareholders*." In other words, as of this date Defendant Reid-Anderson claimed that the Zhejiang park was still on track to open within a year (or perhaps just over a year), and the other parks would follow.

138.    All of these statements continued to mislead investors. The situation in China had not improved—in fact, as later reported by Chinese media company Phoenix New Media in December 2019, Riverside performed mass layoffs in July and August 2019, cutting its staff down significantly.[6] Riverside also faced dozens if not hundreds of lawsuits, reaching over 200 lawsuits by December 2019.[7]

---

[6] iFeng, *The Truth About The Layoffs At Shanshui Wenyuan*, (Dec. 14, 2019), https://travel.ifeng.com/c/7sNOq290EVF.

[7] iFeng, *Equity of Cultural Tourism Companies Under Riverside Group Frozen*, Beijing Business Today (Dec. 23, 2019), https://ihouse.ifeng.com/news/2019_12_23-52499222_0.shtml.

139.    Analysts credited Defendants' false assurances that the China parks' development was continuing as planned.  For example, in a July 24, 2019 report, Macquarie Research stressed that the Company's "*int'l story has improved*," pointing specifically to management's representations "that Chongqing revenue recognition was flowing again with the project back on track, and with no change to the last timeline given."  William Blair reported that day that "the revised projected opening timelines for the company's licensed parks in China remain intact, and its partner made progress with the government for the parks in Chongqing. . . . The company also remains hopeful to resume development and revenue recognition for the parks in Nanjing later this year or early next year."  And on July 25, 2019, Jefferies reported that one of the "Key Takeaway[s]" of the Company's earnings announcement was "positive commentary on China," Wells Fargo reported "management confirmation that the timeline for China park development is intact," and Wedbush reported "China Turning the Corner," which the analyst called "the bigger news" reported by Defendants.

**L.    On October 22-23, 2019, Defendants Reported Cutting Back On Revenue Recognition For International Licenses And Again Blamed Macroeconomic Conditions**

140.    On October 22, 2019, Defendants issued a press release and a Form 8-K filed with the SEC to announce the Company's financial results for the third quarter and year-to-date 2019. Defendants reported, in direct contrast to months of positive statements, "an expected 26 percent decrease in sponsorship, international agreements and accommodations revenue."

141.    During the next day's earnings conference call, on October 23, 2019, Defendants admitted that Six Flags' park openings in China could be delayed further, disclosing that "there's a very high likelihood going forward that we will see changes in the timing of park openings," and that "it's unrealistic to think" that the timeline for development in China was "going to be exactly as we've outlined," but placed blame for any delays on conditions in China, rather than Riverside's

51

continued utter failure to obtain financing.  For example, Defendant Barber gave as reasons for further delays that "discussions with the local government [in Nanjing] are still ongoing," and that "the city of Chongqing has made the decision to open 1 park per year, which moved up the opening of our adventure park by 6 months and delayed the opening of our kids park by 15 months, resulting in a net reduction of revenue recognition in the quarter. . . . the Chinese market continues to be very challenging for our partner."

142.  Defendants again discussed the Company's 26% decline in sponsorship, international agreement, and accommodations revenue for the third quarter of 2019 compared to the third quarter of 2018.  Defendant Reid-Anderson acknowledged that "the international numbers were, obviously, not as expected by The Street."  Barber similarly answered an analyst's question regarding the Chongqing park by disclosing that, although he was "not going to break out individual revenue per park or per market," "[t]he biggest impact, obviously, for the quarter was the fact that we don't have Dubai . . . *and we also don't have Nanjing, which we were recording last year*."  Barber further disclosed "an impact for . . . Chongqing."

143.  Analysts reacted to Defendants' disclosure with surprise and concern.  For example, on October 23, 2019, Macquarie Research reported that the Company was taking "Two steps forward, one step back" in connection with international parks, noting that "Mgmt. focused on the challenging Chinese regulatory environment when announcing further complications."  Wells Fargo reported on October 23, 2019 that the analyst was "clearly disappointed by SIX's Q319 shortfall in admissions and sponsorship/international revenues which drove the Adj EBITDA miss," which it characterized as "especially disappointing" given other positive trends, and Wedbush similarly reported that the 26% decline in sponsorship, international agreements, and

accommodations revenue exceeded their estimate of a 19% decline (and consensus estimates of an 18% decline).

144. In response to Defendants' disclosure, Six Flags stock declined more than 12%, falling from $51.23 per share on October 22, 2019 to $44.88 at the close of trading on October 23, 2019, on high volume.

145. On the October 23, 2019 earnings conference call, Defendants made false reassuring statements to mitigate the market's negative reaction to the devastating news of additional delays and approval problems with the China parks. In response to an analyst question, Defendant Barber denied that there was "any material change in the time line of China over the last 90 days." Investors credited those reassuring false statements. For example, in an October 24, 2019 report, SunTrust Robinson Humphrey noted that, despite delays in the development of Six Flags Dubai, "[t]he remainder of SIX's international projects remain on track." SunTrust Robinson Humphrey maintained its "Buy" rating.

146. The day after the Company's earnings call, on October 24, 2019, Defendants announced that Defendant Reid-Anderson was almost immediately retiring as the Company's Chairman, President, and CEO, effective November 18, 2019. The Company announced that Reid-Anderson would be replaced by Michael Spanos, former President and CEO of PepsiCo's Greater China Region. As SunTrust Robinson Humphrey reported on October 24, 2019, although the news was "not necessarily a complete surprise" given that the Company had previously announced that Reid-Anderson would leave the Company by February 2020, "the timing is somewhat curious as SIX just reported 3Q19 results 48 hours ago and it did not appear that an announcement was imminent."

**M.**    **On January 10, 2020, Six Flags Disclosed Riverside's Default On Payments And The Potential Termination Of All Six Flags China Projects**

147.    By early 2020, investors still believed, based on Defendants' materially false statements, misrepresentations, and omissions, that the China parks' development was proceeding roughly on schedule.

148.    On January 10, 2020, Defendants filed a Form 8-K with the SEC in which they admitted that, rather than merely delayed, the entire future of the Company's China projects was in jeopardy.  That day, Defendants disclosed that the Six Flags-branded parks in China continued to encounter challenges and had not progressed as expected.

149.    Moreover, Defendants disclosed that Riverside had defaulted on its payment obligations to Six Flags—which caused one-time charges of $10 million to the Company—and that Six Flags was holding Riverside in default, as FE 1 had encouraged senior executives to do since May 2018.  Defendants further disclosed that, in the fourth quarter of 2019, Six Flags did not realize any revenue in connection with its agreements with Riverside, and rather expected a *negative* revenue adjustment of $1 million related to those agreements.

150.    Specifically, Defendants disclosed that:

The development of the Six Flags-branded parks in China has encountered continued challenges and has not progressed as Six Flags Entertainment Corporation (the 'Company') had expected. *The Company's partner in China, Riverside Investment Group ("Riverside"), continues to face severe challenges* due to the macroeconomic environment and the declining real estate market in China.  *This has led Riverside to default on its payment obligations to the Company and, as such, the Company has delivered formal notices of default under its agreements*.  While the Company continues to work with Riverside and each of Riverside's governmental partners, the eventual outcome is unknown and could *range from the continuation of one or more projects to the termination of all the Six-Flags branded projects in China*.

In the fourth quarter of 2019, the Company will realize no revenue from the China international agreements and expects a negative $1 million revenue adjustment related to the China international agreements that will offset a portion of the revenue of the Company's remaining international agreements.  In addition, the

54

Company expects aggregate one-time charges of approximately $10 million related to the China international agreements . . . . For 2020 . . . the loss of all the China projects would result in no revenue for that market if Riverside does not cure the default and the Company is not able to engage other partners to complete any of the projects.

151.    As *TheStreet.com* noted in a January 10, 2020 article, the Company "slumped on Friday after the theme-park developer disclosed that a payment default by a partner could prompt the company to end all its projects in China."  In response to the January 10, 2020 corrective disclosure, Six Flags stock declined nearly 18%, falling from $43.76 per share on January 9, 2020 to $35.96 at the close of trading on January 10, 2020, on high volume.

152.    The harsh market reaction to Defendants' disclosures reflected investors' developing knowledge of the Company's deeply troubled China projects.  Multiple analysts expressed their surprise and downgraded Six Flags on this news.  For example, in a January 10, 2020 report, Wedbush downgraded Six Flags from "buy" to "neutral," and pointed to news of Riverside's defaults as the "primary reason" for the downgrade.  Wedbush reported that "2020 was expected to mark the next step in the evolution of Six Flags' international strategy," but given the Company's negative disclosures, "the start of the year has left this business on life support." Indeed, as Wedbush wrote,

> Six Flags has been trading at a sizable premium to the rest of the group for years, *which we attributed primarily to the significant growth represented by the international opportunity*. . . . Based on management's previously communicated timetable, we previously estimated China revenue contributions of $31M in 2020, $44M in 2021, $51M in 2022, and $59M in 2023, *while management continued to tell anybody that would listen until very recently that incremental projects (and revenues) in China were likely*.

153.    Also on January 10, 2020, William Blair reported that "the confirmation of the default position clearly comes as a disappointment . . . and clearly brings into question any remaining hopes about the viability of the company's broader international licensing opportunity," while attributing "the pullback in the shares Friday morning" to "the impact of this news," which

55

the analyst reported was not fully reflected in prior stock price declines. Likewise, analyst Janney downgraded the Company from "buy" to "neutral," while reporting that Six Flags "announced its partner in China had defaulted on its obligations, creating uncertainty about whether these parks will ever open. Given these issues, we think it's difficult to defend the stock at current levels." And *The Deal Pipeline* reported on January 10, 2020 that the Company "has run into more than a little trouble with its China-based partners" and "has seen its China-focused ambitions more or less go under" given Riverside's disclosed defaults.

154.     On January 10, 2020, Defendants made false reassuring statements to mitigate the market's negative reaction to the devastating news that Riverside had defaulted on payments and the future of the China parks was in jeopardy. In their disclosures that day, Defendants repeatedly represented the possibility of "the continuation of one or more projects" in China, despite lacking any reasonable basis that the China projects would continue.

155.     Analysts credited that reassurance, which tempered their negative reactions to the otherwise overwhelmingly negative news. For example, in its January 10, 2020 report, Janney acknowledged the possibility of "the termination of all SIX branded projects in China," but considered that dire outcome only one "eventual outcome[]," which also included "the continuation of one or more projects." Jefferies similarly reported that day that "the eventual outcomes could include the continuation of one park or termination of all parks," and pointed to "[i]nternational agreements in China" as a catalyst for the Company. Oppenheimer reported that day that, "[w]hile Riverside has defaulted on its payments to the company, SIX continues to work with Riverside and its government partners on a solution." And William Blair similarly reported on January 10, 2020 that, "[w]hile the company continues to work with Riverside to find a path

forward, the eventual outcome is unknown, which includes a range of potential outcomes," including "the continuation of one or more of the projects."

**N.      On February 20, 2020, Six Flags Disclosed The Termination Of Its Riverside Agreements And A Resulting $10 Million Quarterly Revenue Decrease**

156.    On February 20, 2020, investors finally learned the full truth—that the Six Flags-branded parks the Company was developing in China with Riverside would not be completed, and that Six Flags' revenues and future growth were substantially lower as a result.  On that day, Six Flags disclosed its financial results for the fourth quarter and full-year 2019 in a press release and Form 8-K filed with the SEC.  Defendants disclosed that the Company had terminated its development agreements with Riverside due to Riverside's default on its payment obligations during 2019.  Defendants admitted that, as a result, the Company would not recognize *any* revenues or income from the development of Six Flags-branded parks in China.  The potential for 20 parks generating hundreds of millions of dollars of revenue per year had gone up in smoke.

157.    In addition, the Company announced a dismal earnings outlook for 2020, driven by "significantly lower revenue contribution from the Company's international development agreements."

158.    In the February 20, 2020 earnings release, Defendants disclosed that: "During 2019, the company's partner in China defaulted on its payment obligations to the company.  As a result, in February 2020 the company terminated the development agreements.  It is unlikely that the company will recognize any revenue or income in 2020 related to the development of parks in China."

159.    Defendants further disclosed that "full-year revenue growth was . . . offset by . . . a 3 percent decline in sponsorship, international agreements, and accommodations revenue," and the Company's reported "decrease in net income was primarily due to . . . charges of approximately

57

$10 million related to the company's China development agreements . . . and . . . the recording of a valuation allowance related to foreign tax credits due to the termination of the company's China development agreements," among other factors.

160.   Also on February 20, 2020, Defendants announced the sudden departure of the Company's CFO, Defendant Barber, whose tenure as CFO would end within days, on February 24, 2020.

161.   That same day, Six Flags held a conference call with investors to discuss the Company's earnings release.  Neither Reid-Anderson nor Barber participated in the call, but their recently announced successors—CEO Michael Spanos and Interim CFO Leonard Russ— discussed the Company's financial performance with investors, finally admitting what FE 1 has confirmed was true and known to senior management by the beginning of the Class Period:  that the China parks would not open on time (or at all), Riverside lacked the funding to construct the parks, and construction had stalled out.

162.   During the call, Russ purported to "provide additional details on the challenges we are facing related to our international development projects," again disclosing that:

> In China, our partner was unable to meet the financial terms of our contract.  Last month, we issued default notices for a lack of payment.  Since that time, they did not clear their defaults, and we terminated our agreements with them this month. ***Therefore, we are planning with the assumption that there will be no revenue in 2020 from our activities in China***.

Russ further disclosed that "we are going to have some extra costs associated with China until we determine what's ultimately going to happen with the development of those parks as well as the cost of our international development group, which we're looking to kind of reallocate those resources into other areas of the business that'll actually help spur base business growth for the long term."  Spanos further confirmed that Riverside "was unable to make payments" and the Company had "delivered notices of default."

58

163. Investors were shocked by Defendants' disclosure. For example, on February 20, 2020, Janney reported that "We Didn't Think It Could Get Worse…But It Just Did," while William Blair reported that the "Second Shoe Finally Drops as the Price Reaches a New Bottom." Oppenheimer reported "Key Points" including a decline in adjusted EBITDA of $72 million, "largely driven by the decline in revenues from soft attendance and termination of the China development agreements."

164. In response to Defendants' disclosure that the Company had terminated its agreements with Riverside and would not realize any revenues from the China projects, Six Flags stock declined more than 16%, falling from $38.02 per share on February 19, 2020 to close at $31.89 on February 20, 2020, on high volume.

165. In all, Six Flags stock declined by more than half from its Class Period high of $73.38 on June 22, 2018, to close at $31.89 on February 20, 2020, the Company's lowest stock price in over seven years.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSED SUBSTANTIAL LOSSES TO INVESTORS

### A.    First-Quarter 2018 Financial Reporting And Earnings Call (April 24-25, 2018)

166. On April 24, 2018, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the first quarter of 2018. In that release, Defendants announced "that revenue for the first quarter of 2018 increased by $29 million or 30 percent from the first quarter of 2017 to a record-high $129 million," which Defendants represented "resulted primarily from," among other reasons, "*the success of . . . the company's . . . international licensing program*." The release quoted Defendant Reid-Anderson as stating that due in substantial part to "international licensing agreements," the Company was "poised to deliver

59

another record year of financial performance in 2018," and that Defendants "remain[ed] laser-focused on exceeding $600 million of Modified EBITDA in 2018."

167.    In the Company's financial report for the first quarter of 2018, filed on Form 10-Q on April 25, 2018, signed by Defendants Reid-Anderson and Barber, Six Flags reported that, "[d]uring the first three months of 2018, our park earnings before interest, taxes, depreciation and amortization ("Park EBITDA") increased primarily as a result of a 27% increase in attendance, and *a 21% increase in sponsorship and international licensing revenue*."

168.    Defendants also represented in the financial report that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States ('U.S. GAAP')," and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP." Consistent with their purported GAAP compliance, Defendants represented that Six Flags "*recognize[d] revenue under these [international licensing] agreements over the relevant service period of each performance obligation based on its relative selling price, as determined by our best estimate of selling price*," and that "*[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year*."

169.    That same day, during the Company's first-quarter 2018 earnings conference call with analysts and investors, in response to an analyst's question concerning "how much you—during the quarter you had in international licensing revenue," Defendant Barber responded, "We did not say, but *it's about $9 million. It's just under $9 million for the quarter*."

170.    Defendants' statements concerning international licensing revenue that the Company recognized discussed in Paragraphs 163-164 and 166 above were materially false and misleading, and omitted material facts necessary in order to make those statements not misleading.

60

By the end of the first quarter of 2018, Six Flags had entered into international licensing agreements for the Zhejiang and Chongqing sites in China, as well as a park in Dubai (the Nanjing and Saudi Arabia agreements had just been announced and presumably did not contribute to revenue for the quarter).  It was materially false and misleading, as well as improper under GAAP, to recognize such revenue in connection with the Zhejiang and Chongqing sites, however, given that the represented timeline for the parks' opening could not be met, as evidenced by the fact that Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on any of the China parks.  Accordingly, it was also materially false and misleading for Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, they would have recognized substantially less, or no, revenue at the time in connection with their international licensing agreements with Riverside.

171.    On April 25, 2018, Six Flags also held its first-quarter 2018 earnings conference call with analysts and investors.  Defendant Reid-Anderson provided an update on the Company's international licensing business, including on the ten parks that Six Flags had announced were in progress in Zhejiang, Chongqing, and Nanjing, and remarked that the "3 new parks in [Nanjing] China are expected to begin opening in 2021."

172.    During the call, an analyst stated that he was "very encouraged by the parks that you announced in China," and asked Defendant Reid-Anderson, "Where are we as far as the Chinese expansion? Maybe what inning are we in?  Or how many more opportunities do you think we're going to see there or that can be weighted towards just other regions of the world?"

173.    Defendant Reid-Anderson stated:

61

[W]hen we announced the initial Riverside deals, I said that the discussions with our partner, and we had had [sic] focused in on really being in the range of at least 10 parks within 10 years, and we're at 10 announced already. . . . *We will not be stopping at 10 parks, I can assure you that, and our partner is very excited about being able to expand further with us*.

174. During the call, an analyst also asked Defendant Reid-Anderson, "I guess just following up on China specifically there, we have seen some, I guess, news flow from the National Development and Reform Commission that they would maybe put more scrutiny on these kind of large-scale theme park developments. Any kind of color or commentary there, if that impacts you guys or how that can impact the industry overall?"

175. Defendant Reid-Anderson stated:

We obviously keep track of what's going on in all of the countries in which we operate. And I think the way to think about it is really as follows. You've heard me talk about our partners, an incredible partnership with Riverside. *They are building 10 parks. They're on their way to building 10 parks*. We've talked about building multiple parks. There is no ban on theme park development in China. There are a series of guidelines that were issued regarding theme park development. They're mostly focused on the real estate aspects of theme park development but also touched on enhanced park standards. They're not laws, but they do portend greater regulation of theme park development, in line with what we have in North America or Europe or around the world generally. *Our partner has not only successfully navigated the regulatory environment in China before but will continue to do so going forward*. And I think it's really good to have regulations that make sense. So right now, barring some other decision that's made, *all our parks are progressing nicely towards their anticipated opening dates*. And hence, we've announced 3 more parks. We're very confident.

176. Defendant Reid-Anderson also emphasized the importance of the multiple Six Flags China parks as a hedge against other developments. Defendant Reid-Anderson stated:

The international piece of this is going to continue to grow as we build our resources and expertise—we can run multiple projects annually. *We're in this position where we've developed all these incremental parks, 12 parks coming, we've got a great pipeline of deals that provide a hedge against any one single deal or any one single market*. China is the biggest of all, and the vision of both Six Flags and Riverside is to build multiple parks.

177. The above statements made by Defendant Reid-Anderson during the first-quarter 2018 earnings conference call were materially false and misleading when made and omitted material facts necessary to make the statements not misleading.  The statements that "all our parks are progressing nicely towards their anticipated opening dates," that "[t]hey are building 10 parks," that "[t]hey're on their way to building 10 parks," and that "3 new parks in [Nanjing] China are expected to begin opening in 2021" were materially false and misleading because construction was at a standstill at the time the statements were made.  Practically no progress on construction had been made at Six Flags Zhejiang during the three years since it broke ground in January 2016, and future construction on any of the parks was unlikely because Riverside still did not have the funding to pay for the necessary manpower, construction drawings or theme park rides.

178. Defendant Reid-Anderson's statements that Six Flags "will not be stopping at 10 parks" in China, that Six Flags had "developed all these incremental parks [with] 12 parks coming," and that Six Flags has "got a great pipeline of deals that provide a hedge against any one single deal or any one single market," were materially false and misleading because, at the time the statements were made, Riverside was Six Flags' sole Chinese partner and it had lost financing from and the support of the local Chinese governments necessary for the construction of Six Flags theme parks in China.  Six Flags could not develop "10 parks" in China or deliver on a "pipeline of deals" there because Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags China parks.

179. Defendant Reid-Anderson's statements concerning Riverside were also materially false and misleading when made and omitted material facts necessary to make the statements not misleading.  The statements that Six Flags had an "incredible partnership with Riverside" and that

63

Riverside had "not only successfully navigated the regulatory environment in China before but will continue to do so going forward" were materially misleading because, at the time the statements were made, Riverside already had lost financing from and the support of the local Chinese governments and its financial condition had already deteriorated to the point that it could not fund the development and construction of the China projects.

**B.**      **Goldman Sachs Lodging, Gaming, Restaurant And Leisure Conference (June 5, 2018)**

180.    On June 5, 2018, Defendant Barber spoke at the Goldman Sachs Lodging, Gaming, Restaurant and Leisure Conference.  During the conference, Barber stated:

> So our partner in China has—we have 3 locations there now with 11 parks.  He has said he wants to do 10 or 11, 10 to 20 locations, with multiple parks in each.  Given that we're already at 11, I think 20 parks is possible.  I think China could be larger.  We could have more parks in China than we have in the U.S. for too many more years.  So I think it's a great market for us.  It's 4x the size of the United States with half the theme parks in it.  So I think that's sort of China specifically.

181.    The above statements made by Defendant Barber during the Goldman Sachs Lodging, Gaming, Restaurant and Leisure Conference were materially misleading when made and omitted material facts necessary to make the statements not misleading.  It was misleading to state that it "[was] possible" for Riverside to build "20 parks" in China when, at the time the statements were made, Riverside had lost financing from and the support of local Chinese governments. Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects.

**C.**      **Oppenheimer Consumer Conference (June 20, 2018)**

182.    On June 20, 2018, Defendant Barber spoke at the Oppenheimer Consumer Conference.  During the conference, Barber stated that "we have additional parks in China that our

64

partner has said he wants to build[,] 10 parks—20 parks, 10 properties. He's been a very good partner for us."

183. The above statements made by Defendant Barber during the Oppenheimer Consumer Conference were materially misleading when made and omitted material facts necessary to make the statements not misleading. It was misleading to state that Riverside wants to build "20 parks, 10 properties," and that Riverside has "been a very good partner for us" when, at the time the statements were made, Riverside had lost financing from and the support of the local Chinese governments. Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects.

D.     **Second-Quarter 2018 Financial Report And Earnings Call (July 25, 2018)**

184. On July 25, 2018, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the second quarter of 2018. In that release, Defendants announced "that revenue for the second quarter of 2018 increased $23 million or 5 percent from the second quarter of 2017 to $445 million," which Defendants represented "resulted primarily from," among other reasons, "*a 9 percent increase in sponsorship, international licensing and accommodations revenue*." The release quoted Defendant Reid-Anderson as attributing the Company's "continued strong momentum and execution in the quarter" to "expand[ing] our global footprint." Moreover, in the release, Defendants stated that, "[f]or the first six months of 2018, revenue was $574 million, a 10 percent increase compared to the prior year period, driven primarily by," among other things, "*a 12 percent increase in sponsorship, international licensing and accommodations revenue*."

65

185.    In the Company's financial report for the second quarter of 2018, filed on Form 10-Q on July 25, 2018, signed by Defendants Reid-Anderson and Barber, Six Flags reported that, "[d]uring the first six months of 2018, our park earnings before interest, taxes, depreciation and amortization ("Park EBITDA") increased primarily as a result of," among other things, "*a 12% increase in sponsorship, international licensing and accommodations revenues*."   Further, Defendants reported in the second-quarter 2018 Form 10-Q that "[r]evenue for the three months ended June 30, 2018 totaled $445.4 million, an increase of $23 million, or 5%," compared to the second quarter of 2017, attributable in substantial part to "*a 9% increase in sponsorship, international licensing and accommodations revenue*."

186.    Defendants also represented in the financial report that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States ('U.S. GAAP'), and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP."   Consistent with their purported GAAP compliance, Defendants represented that Six Flags "*recognize[d] revenue under these [international licensing] agreements over the relevant service period of each performance obligation based on its relative selling price, as determined by our best estimate of selling price*," and that "*[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year*."

187.    That same day, during the Company's second-quarter 2018 earnings conference call with analysts and investors, Defendant Barber represented that during the first half of 2018, "*international licensing revenue was up $4.6 million or 24%*."   In response to an analyst's question about "[i]nternational revenue and EBITDA contribution in Q2 versus the comp last year," Defendant Barber responded that "*we had $14.7 million of revenue in the second quarter*

and the EBITDA margin is in the 80% range as well, as it has been."  And in response to another analyst's question about if there was "any benefit from the Chinese park [i.e., Nanjing] announced in late June to the international piece," Defendant Barber responded:

> So we actually announced the park in China—or the parks in China, in April, I believe.  But yes, in terms of the run rate, it's *about $15 million in Q3.  That will go up as we now have those 4 parks in China plus Saudi Arabia, we'll be in for a full quarter.*  And then, that'll pretty much be the run rate until they open or until we announce new parks.

Defendant Reid-Anderson added, "*[t]he revenue that we generated in Q2 for international is the highest in our history, and it's growing really nicely. . .  we're registering records and we believe we will continue to do that*."  Further, in response to an analyst's question regarding how "the international contribution . . . ramps over time," Defendant Barber stated that "*if you look at the $14.7 million, you add in a little bit for a full quarter for the 4 parks in China* plus the one park in Saudi Arabia, I think you'll get to a pretty good run rate going forward until we start opening parks or until we sign more deals."

188.    Defendants' statements concerning international licensing revenue that the Company recognized discussed in Paragraphs 181-182 and 184 above were materially false and misleading, and omitted material facts necessary in order to make those statements not misleading. By the end of the second quarter of 2018, Six Flags had entered into international licensing agreements for the Zhejiang, Chongqing, and Nanjing sites in China, as well as developments in Saudi Arabia and Dubai.  It was materially false and misleading, as well as improper under GAAP, to recognize such revenue in connection with the China parks, however, given that the represented timeline for the parks' opening could not be met, as evidenced by the fact that Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects.  Indeed, according to FE 1, by

this date, Riverside had procured no rides for any of its parks, no material progress on construction had occurred at any of the Six Flags China parks, and Defendants' publicly represented timeline for opening the China parks was impossible to meet based on the lack of progress to that point. Accordingly, it was also materially false and misleading for Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, they would not have recognized any revenue at the time in connection with their international licensing agreements with Riverside.

189.    Also during the July 25, 2018 earnings conference call, an analyst asked Defendants Barber and Reid-Anderson "is there any update on the opening timetable of the initial Chinese parks?  I think it was 3 parks in late 2019 and another 4 in early 2020, if I'm right?"

190.    Defendant Barber responded, "That's right."  Defendant Reid-Anderson followed up on Defendant Barber's statement, and stated, "*[t]he timing of the parks remains exactly the same as previously disclosed, there's no change on any of those*."

191.    The above statement made by Defendant Reid-Anderson during the second-quarter 2018 earnings conference call was materially false and misleading when made and omitted material facts necessary to make it not misleading.  It was materially false and misleading to state that "[t]he timing of the parks remains exactly the same" and "there's no change on any of those" because, at the time, 17 months from Zhejiang's supposed opening date, no progress at all had been made on the construction of the parks despite Riverside breaking ground on construction of Six Flags Zhejiang in January 2016.  By May 2018, the Six Flags China parks were already so behind schedule that FE 1 informed the Company that they "[couldn't] build [Zhejiang] in 18

68

months" or open on time "even if everything was in [their] hands right now" and that Six Flags should put Riverside in breach of contract due to Riverside's lack of progress.

192.    The statement was also false and misleading because Riverside's lack of financing and lack of support from the local Chinese governments also made any future progress impossible. Riverside could not afford the 1,500 to 2,000 construction workers that would be necessary to build even one park, and only ever had 300 construction workers on site at maximum, which often dropped below one hundred.  Riverside was unable to afford the basic construction drawings necessary for construction workers to follow to make significant construction progress.  Riverside also had no theme park rides to even construct, because it failed to pay its ride vendors for commissioned rides, so all of Riverside's commissioned rides were cancelled by the vendors or sold to other theme parks.  As FE 1 stated, because the ride orders had been cancelled, Riverside and Six Flags were "not going to get the rides in time" to meet the opening date "even if they were able to catch the construction up" elsewhere.  By this time, Riverside had even missed its scheduled licensing payments to Six Flags, which further showed that the parks were off track.

**E.**    **Third-Quarter 2018 Financial Report And Earnings Call (October 24, 2018)**

193.    On October 24, 2018, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the third quarter of 2018.  In that release, Defendants announced "that revenue for the third quarter of 2018 increased $39 million or 7 percent from the third quarter of 2017 to $620 million," which Defendants represented "was primarily driven by," among other reasons, "*a 42 percent increase in sponsorship, international licensing and accommodations revenue.*"   The release quoted Defendant Reid-Anderson as attributing the Company's reported positive financial results to "[o]ur five key growth initiatives," including "pursuing additional Six Flags-branded international parks."  Moreover, in the release, Defendants stated that, "[f]or the first nine months of 2018, revenue was $1.2 billion, an 8 percent

increase compared to the prior-year period, driven primarily by," among other things, "*a 23 percent increase in sponsorship, international licensing and accommodations revenue*."

194.    In the Company's financial report for the third quarter of 2018, filed on Form 10-Q on October 24, 2018, signed by Defendants Reid-Anderson and Barber, Six Flags reported sponsorship, international agreements and accommodations revenue of *$35.891 million and $85.182 million for the third quarter of 2018 and the first nine months of 2018, respectively*. Defendants represented in the third-quarter 2018 Form 10-Q that, "[d]uring the first nine months of 2018, our park earnings before interest, taxes, depreciation and amortization ('Park EBITDA') increased primarily as a result of," among other things, "*a 23% increase in sponsorship, international licensing and accommodations revenues*."   Further, Defendants reported in the third-quarter 2018 Form 10-Q that "[r]evenue for the three months ended September 30, 2018 totaled $619.8 million, an increase of $39.4 million, or 7%," compared to the third quarter of 2017, attributable in substantial part to "*a 42% increase in sponsorship, international licensing and accommodations revenue*."

195.    Defendants also represented in the financial report that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States ('U.S. GAAP'), and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP."   Consistent with their purported GAAP compliance, Defendants represented that Six Flags "*recognize[d] revenue under our international [licensing] agreements over the relevant service period of each performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price*," and that "*[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year*."

70

196.   That same day, during the Company's third-quarter 2018 earnings conference call with analysts and investors, Defendant Reid-Anderson stated that Six Flags "continue[d] to grow through our international agreements," and as a result, "*our quarterly run rate for revenue has increased more than 50%*."  Defendant Barber represented that in the third quarter of 2018, "year-over-year total revenue increased $39 million or 7% as a result of a 5% increase in attendance and an *$11 million or 42% growth in sponsorship, international licensing and accommodations revenue*" and, "[o]n a year-to-date basis, revenue was up $92 million or 8%, driven primarily by a 6% increase in attendance and a *23% increase in sponsorship, international licensing and accommodations revenue*."  In response to an analyst's question about "growth in international revenue during the quarter," Defendant Barber reiterated, "it's $40 million.  It's a growth of 40% over prior year, year-to-date."  The analyst asked for confirmation whether "that's specifically just international," and Barber responded, "That is international."

197.   Defendants' statements concerning international licensing revenue that the Company recognized discussed in Paragraphs 190-191 and 193 above were materially false and misleading, and omitted material facts necessary in order to make those statements not misleading.  By the end of the third quarter of 2018, Six Flags had entered into international licensing agreements for the Zhejiang, Chongqing, and Nanjing sites in China, as well as developments in Saudi Arabia and Dubai.  It was materially false and misleading, as well as improper under GAAP, to recognize such revenue in connection with the China parks, however, given that the represented timeline for the parks' opening could not be met, as evidenced by the facts that Riverside had already failed to make required licensing payments to Six Flags, and Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags

71

Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects.  Indeed, according to FE 1, by this date, Riverside had procured no rides for any of its parks, no material progress on construction had occurred at any of the Six Flags China parks, and Defendants' publicly represented timeline for opening the China parks was impossible to meet based on the lack of progress to that point. Accordingly, it was also materially false and misleading for Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, they would have recognized substantially less, or no, revenue at the time in connection with their international licensing agreements with Riverside.

198.    Also during the October 24, 2018 earnings conference call, an analyst asked for information regarding the Company's Dubai park opening date, "whether we should be pushing that back," and for an update on the "3 Chinese parks that were expected to open in the fourth quarter of next year as well."

199.    Defendant Reid-Anderson disclosed that the Company's Dubai park was delayed and asked Defendant Barber to "go through all the other parks *which are on time*."  Defendant Barber responded:

> So you mentioned the Chinese parks.  We—those start to come online in Zhejiang, the theme park, water park and kids' park are early 2020.  The Chongqing parks are during 2020.  That's a theme park, a water park, a kids' park and an adventure park.  Those are mid-2020.  And then Nanjing, those will start to open in 2021.  The water park, Kids World first, the adventure park in 2021 as well in Nanjing.  And then the Nanjing Theme Park will actually open up in 2022 midyear.

200.    The analyst also asked Defendant Barber "to clarify" whether "the first round of Chinese parks," the Zhejiang parks, were "pushed back" from "late [2019]."  Defendant Barber responded, "They have it's—technically, it's the first of 2020.  I think ultimately—earlier we were

72

saying late 2019, which was in the fourth quarter.  So it—really the shift is [a] month or 2.  It's not much."

201.    The above statements made by Defendant Reid-Anderson and Barber during the third-quarter 2018 earnings conference call were materially false and misleading when made and omitted material facts necessary to make the statement not misleading.  Defendant Reid-Anderson's statement that the Six Flags China parks "are on time, " and Defendant Barber's statements that the "theme park, water park and kids' park" in Zhejiang "start to come online" in "early 2020," the "Chongqing parks are 2020," Nanjing will "start to open in 2021" with the "Nanjing Theme Park" to "open up in 2022 midyear," and that the "shift" in the timeline "is [a] month or 2" and "not much" were materially false and misleading when made because, at the time, 14 months from Zhejiang's supposed opening date, no progress at all had been made on the construction of the parks despite Riverside breaking ground on construction of Six Flags Zhejiang in January 2016.  By May 2018, the Six Flags China parks were already so behind schedule that FE 1 informed the Company that they "[couldn't] build [Zhejiang] in 18 months" or open on time "even if everything was in [their] hands right now" and that Six Flags should put Riverside in breach of contract due to Riverside's lack of progress.

202.    The statements were also false and misleading because Riverside's lack of financing and lack of support from the local Chinese governments also made any future progress impossible.  Riverside could not afford more the 1,500 to 2,000 construction workers that would be necessary to build even one park, and only ever had 300 construction workers on site at maximum, which often dropped below one hundred.  Riverside was unable to afford the basic construction drawings necessary for construction workers to follow to make significant construction progress.  Riverside also had no theme park rides to even construct, because it failed

73

to pay its ride vendors for commissioned rides, so all of Riverside's commissioned rides were cancelled by the vendors or sold to other theme parks.  As FE 1 stated, because the ride orders had been cancelled, Riverside and Six Flags were "not going to get the rides in time" to meet the opening date "even if they were able to catch the construction up" elsewhere.  By this time, Riverside had even missed its scheduled licensing payments to Six Flags, which further showed that the parks were off track.

**F.    Fourth-Quarter And Full Year 2018 Financial Report And Earnings Call (February 14, 2019)**

203.    On February 14, 2019, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for fourth-quarter and full-year 2018.  In that release, Defendants announced that, for the year 2018, "revenue increased $105 million or 8 percent to $1.5 billion," driven in substantial part by "*a 7 percent increase in sponsorship, international agreements and accommodations revenue*."

204.    That same day, during the Company's fourth-quarter and full-year 2018 earnings conference call with analysts and investors, Defendant Reid-Anderson stated that in 2018, Six Flags "*increased revenue from our international agreements by 10%*," and that "*[o]ur international agreements continue to be a significant contributor to revenue growth as revenue approached $42 million in 2018*."  Defendant Barber represented that the reported increase in the Company's revenues for 2018 over 2017 was driven by, among other factors, "*a $4 million increase in international agreements revenue*."

205.    In the Company's financial report for fourth-quarter and full-year 2018, filed on Form 10-K on February 20, 2019, signed by Defendants Reid-Anderson and Barber, among others, Six Flags reported sponsorship, international agreements and accommodations revenue of *$100.116 million* for the year ended December 31, 2018, and represented that the Company's

74

increase in reported revenues over 2017 was "primarily driven by," among other factors, "*a 7% increase in sponsorship, international agreements and accommodations revenue*."

206. The financial report contained a report by Six Flags' outside auditor, KPMG LLP, providing the auditor's opinion that "the consolidated financial statements referred to [in the report] present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, . . . in conformity with U.S. generally accepted accounting principles." Consistent with their purported GAAP compliance, Defendants represented that Six Flags "*recognize[d] revenue under our international [licensing] agreements over the relevant service period of each performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price*," and that "*[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year*."

207. Defendants' statements concerning international licensing revenue that the Company recognized discussed in Paragraphs 200-01 and 203 above were materially false and misleading, and omitted material facts necessary in order to make those statements not misleading. By the end of 2018, Six Flags had entered into international licensing agreements for the Zhejiang, Chongqing, and Nanjing sites in China as well as developments in Saudi Arabia and Dubai, but had by that point reported decreased revenue recognition in connection with the Dubai development and, contemporaneous with the February 2019 earnings release, a $15 million revenue write-down related to the China parks. Revenues from the China parks still contributed to Defendants' reported financial results included in the $100.1 million in international licensing and related revenues reported in the 2018 10-Q, however, as well as the "lumpy" international licensing revenues that Defendants represented would be recognized in 2019. It was materially false and misleading, as well as improper under GAAP, to recognize such revenue in connection

with the China parks, however, given that the represented timeline for the parks' opening could not be met, as evidenced by the facts that Riverside had already failed to make required licensing payments to Six Flags, and Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects. Indeed, according to FE 1, by this date, Riverside had procured no rides for any of its parks, no material progress on construction had occurred at any of the Six Flags China parks, and Defendants' publicly represented timeline for opening the China parks was impossible to meet based on the lack of progress to that point. Accordingly, it was also materially false and misleading for Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, they would have recognized substantially less, or no, revenue at the time in connection with their international licensing agreements with Riverside.

208. In addition, during the February 14, 2019, earnings conference call, Defendant Reid-Anderson announced that Six Flags "performed a comprehensive review of our project timelines jointly with our partner" and "now expect our [Zhejiang] parks to begin opening in mid- to late 2020 versus 2019, our Chongqing parks to begin opening in mid to late 2021 versus 2020, and Nanjing to begin opening in late 2022," but *our partner in China remains fully committed to developing and opening these parks, and construction is continuing.*"

209. Further, during the call, an analyst asked Defendants Reid-Anderson and Barber "how healthy [is Riverside] right now," asked Defendants to "talk about the financing behind some of these projects," and if there were "any potential issues as far as having enough funds to continue to do construction." In response, Defendant Reid-Anderson stated, "We are continuing to build

those parks, and they are still progressing. And they're not just parks. They are—there's much more beyond that. They're entertainment centers, housing developments all around the park. So *that is ongoing as we speak*."

210. Defendant Barber also responded to the analyst's question and stated that "[Riverside] has a lot of assets." Barber continued, assuring the analyst of Riverside's liquidity before Defendant Reid-Anderson interjected:

> Defendant Barber: [Liquidity] has been tougher for other companies. But [Chairman Li]'s in great shape. *There's some gap….*
>
> Defendant Reid-Anderson: *He continues to pay*.

211. Defendant Barber caught himself, and continued by stating that Riverside "continued to pay us, and that's important," was "providing the funding for the development of the parks," had "the ability to source additional funding," and was "excited about the fact that [Chairman Li]'s in pretty good shape, although in a tough environment."

212. Defendants Reid-Anderson and Barber were also asked by an analyst if "the financing for each park in China [is] entirely in place" or if it still "need[s] to be secured." Defendant Barber responded:

> [T]he financing comes from many sources, including the federal government and the local governments. . . . [a]nd our partner as well. So what I'd say is that the— there's—that Riverside is providing the funding for the development of the parks. They have the—also have the ability to source additional funding from other lenders and equity investors as well as the government. So as these parks progress on from announcement going forward, their dollars will be—will come as they're committed, and they'll come as the parks are being built.

Defendant Reid-Anderson responded and stated "[s]o *the financing is in place, and the financing then gets expanded as time goes on* and parts are—parks are added on."

213. The above statement made by Defendant Reid-Anderson concerning the new timeline for the parks was false and misleading when made and omitted material facts necessary

to make the statements not misleading.  The statement that "we now expect our [Zhejiang] parks to begin opening in mid- to late 2020 versus 2019, our Chongqing parks to begin opening in mid to late 2021 versus 2020, and Nanjing to begin opening in late 2022," was materially false and misleading when made because, at the time, 17 to 23 months from Zhejiang's revised opening dates, no progress at all had been made on the construction of the parks despite Riverside breaking ground on construction of Six Flags Zhejiang in January 2016.  By May 2018, the Six Flags China parks were already so behind schedule that FE 1 informed the Company that they "[couldn't] build [Zhejiang] in 18 months" or open on time "even if everything was in [their] hands right now" and that Six Flags should put Riverside in breach of contract due to Riverside's lack of progress.  There was also no significant progress on the parks between May 2018 and February 2019 that changed this fact and that would have allowed for the Six Flags Zhejiang parks to be completed by the revised mid-to-late 2020 opening date.

214.    The statements were also materially false and misleading because Riverside's lack of financing and lack of support from the local Chinese governments also made any future progress impossible.  Riverside could not afford the 1,500 to 2,000 construction workers that would be necessary to build even one park, and only ever had 300 construction workers on site at maximum, which often dropped below one hundred.  Riverside was unable to afford the basic construction drawings necessary for construction workers to follow to make significant construction progress.  Riverside also had no theme park rides to even construct, because it failed to pay its ride vendors for commissioned rides, so all of Riverside's commissioned rides were cancelled by the vendors or sold to other theme parks.  As FE 1 stated, because the ride orders had been cancelled, Riverside and Six Flags were "not going to get the rides in time" to meet the original opening date "even if they were able to catch the construction up" elsewhere.  This fact remained true as to the revised

78

opening dates because Riverside still had failed to procure any rides even after the park delays were announced. By this time, Riverside had even missed its scheduled licensing payments to Six Flags, which further showed that the parks were off track.

215. Likewise, the above statements by Defendants Reid-Anderson concerning the construction progress at the parks were materially false and misleading when made and omitted material facts necessary to make them not misleading. Defendant Reid-Anderson's statements that "[w]e are continuing to build those parks, and they are still progressing," that "construction is continuing" and "that is ongoing as we speak" were materially false and misleading because construction was at a standstill at the time the statements were made. Practically no progress on construction had been made at Six Flags Zhejiang during the three years since it broke ground in January 2016 and future construction on any of the parks was unlikely because Riverside still did not have the funding necessary to pay for the necessary manpower, construction drawings or theme park rides.

216. The above statements by Defendants Reid-Anderson and Barber concerning Riverside's financial condition were also false and misleading when made and omitted material facts necessary to make them not misleading. Defendant Barber's statements that Chairman Li "[was] in great shape" or "pretty good shape" and that Chairman Li "continued to pay us," and Defendant Reid-Anderson's statement that Chairman Li "continues to pay us" and "the financing is in place" were materially false and misleading when, at the time the statements were made, Riverside and Chairman Li had lost financing from and the support of the local Chinese governments. Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, its licensing payments to Six Flags, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing

and Six Flags Nanjing projects.  Moreover, it was misleading to state that Riverside "continues to pay us" when Riverside had missed scheduled licensing payments to Six Flags and Defendants did not disclose that the "gap" Defendant Barber started to reference was a gap in Riverside's licensing payments to Six Flags.

**G.      First-Quarter 2019 Financial Report And Earnings Call (April 23-24, 2019)**

217.    On April 23, 2019, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the first quarter of 2019.  In that release, Defendants announced that, for the first quarter of 2019, reported revenue of $128 million "declined $1 million or 1 percent from the first quarter of 2018," driven by a decrease in the number of guests visiting Six Flags parks, which decrease "*was almost entirely offset* by a 5 percent increase in total guest spending per capita *and an increase in revenue from international agreements*."

218.    In the Company's financial report for the first quarter of 2019, filed on Form 10-Q on April 24, 2019, signed by Defendants Reid-Anderson and Barber, Six Flags reported sponsorship, international agreements and accommodations revenue of *$23.135 million* for the first quarter of 2019, and represented that the Company's reported revenue decline "mostly offset by," among other factors, "*a 13% increase in sponsorship, international agreements and accommodations revenue*."

219.    Defendants also represented in the financial report that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States ('U.S. GAAP'), and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP."  Consistent with their purported GAAP compliance, Defendants represented that Six Flags "*recognize[d] revenue under our international [licensing] agreements over the relevant service period of each performance*

80

*obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price*," and that "*[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year*."

220. That same day, during the Company's first-quarter 2019 earnings conference call with analysts and investors, Defendant Reid-Anderson stated that for the first quarter of 2019, "[d]espite the decrease in attendance . . . total revenue in the quarter was down less than $1 million, primarily a result of," among other things, "*an increase in revenue from international agreements*." In response to an analyst's request for "international revenue and EBITDA numbers" and "which parks, exactly, are contributing to that," Defendant Barber represented that "*[t]he first quarter revenue was $11.4 million of international,*" "*EBITDA was little over $9 million of EBITDA for international*," and that those revenues were attributed to "Saudi and *Haiyan [i.e., Zhejiang]* as well as the Dubai."

221. Defendants' statements concerning international licensing revenue that the Company recognized discussed in Paragraphs 214-215 and 217 above were materially false and misleading, and omitted material facts necessary in order to make those statements not misleading. Although the Company had in February had a downward revision to recognized revenues attributed to the China parks, based on Defendant Barber's representation during the first-quarter 2019 earnings call, revenues attributed to the Zhejiang parks still contributed to Defendants' reported financial results included in the $22.135 million in international licensing and related revenues reported in the first-quarter 2019 10-Q, and the "$11.4 million of international" revenue and $9 million of "EBITDA for international" that Defendants represented. At the time, it was materially false and misleading, as well as improper under GAAP, to recognize such revenue in connection with the China parks, given that the represented timeline for the parks' opening could

81

not be met, as evidenced by the facts that Riverside had already failed to make required licensing payments to Six Flags, and Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects.  Indeed, according to FE 1, by this date, Riverside had procured no rides for any of its parks, no material progress on construction had occurred at any of the Six Flags China parks, and Defendants' publicly represented timeline for opening the China parks was impossible to meet based on the lack of progress to that point.  Accordingly, it was also materially false and misleading for Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, they would have recognized substantially less, or no revenue at the time in connection with their international licensing agreements with Riverside.

222.    During the April 24, 2019 earnings conference call, Defendant Reid-Anderson also stated that "[w]e continue to work with our international partner in China, meeting government officials for each of our 3 park complexes, and we believe conditions in China have slowly begun to improve" and "we should not lose sight of the fact that these short-term delays and lumpy revenue patterns are not material in the context of the long-term opportunity."  Defendant Reid-Anderson further stated, "We're cautiously optimistic, but the situation in China is improving. And as I said earlier, *our partner Riverside remains very committed to developing Six Flags parks. There's ongoing building going on*.  But it's just going to take a little while longer to open these parks, and we're working very closely with local governments to ensure that happens."

82

223.     Defendant Reid-Anderson further addressed the Chongqing and Nanjing parks and stated "*the dates that we had described on the last call and still hold now really reflect awaiting government approval*."

224.     Defendant Reid-Anderson also was asked by an analyst whether "there is any . . . new incremental delays to any of the parks that we should be aware of or you foresee coming in the sort of near term."  Defendant Reid-Anderson stated, "*No . . . . There are no delays that we're aware of on any of the parks.  The same timing as we outlined on the fourth quarter call*."

225.     During the call, Defendant Barber also stated that "*in terms of what parks contributed to Q1 . . . it's the [Zhejiang] parks because they're progressing nicely*.  I think those – the 2 parks, [Zhejiang] and Saudi Arabia, will be contributing as they'll be progressing nicely in the future."

226.     The above statements made by Defendant Reid-Anderson during the first-quarter 2019 earnings conference call concerning the opening timeline of the parks were materially false and misleading when made and omitted material facts necessary to make the statements not misleading.  The statements that the opening dates described on the prior earnings call "still hold" and that "[t]here are no delays that we're aware of on any of the parks" were materially false and misleading when made because, at the time, 14 to 20 months from Zhejiang's revised opening dates, no progress at all had been made on the construction of the parks despite Riverside breaking ground on construction of Six Flags Zhejiang in January 2016.  By May 2018, the Six Flags China parks were already so behind schedule that FE 1 informed the Company that they "[couldn't] build [Zhejiang] in 18 months" or open on time "even if everything was in [their] hands right now" and that Six Flags should put Riverside in breach of contract due to Riverside's lack of progress.  There was also no significant progress on the parks between May 2018 and April 2019 that changed this

83

fact and that would have allowed for the Six Flags Zhejiang parks to be completed by the revised mid-to-late 2020 opening date.

227. The statements were also materially false and misleading because Riverside's lack of financing and lack of support from the local Chinese governments also made any future progress impossible. Riverside could not afford the 1,500 to 2,000 construction workers that would be necessary to build even one park, and only ever had 300 construction workers on site at maximum, which often dropped below one hundred. Riverside was unable to afford the basic construction drawings necessary for construction workers to follow to make significant construction progress. Riverside also had no theme park rides to even construct, because it failed to pay its ride vendors for commissioned rides, so all of Riverside's commissioned rides were cancelled by the vendors or sold to other theme parks. As FE 1 stated, because the ride orders had been cancelled, Riverside and Six Flags were "not going to get the rides in time" to meet the original opening date "even if they were able to catch the construction up" elsewhere. This fact remained true as to the revised opening dates because Riverside still had failed to procure any rides even after the park delays were announced. By this time, Riverside had even missed its scheduled licensing payments to Six Flags, which further showed that the parks were off track.

228. The above statements made by Defendants Reid-Anderson and Barber during the first-quarter 2019 earnings conference call concerning the progress of the parks were likewise materially false and misleading when made and omitted material facts necessary to make the statements not misleading. Defendant Reid-Anderson's statement that "[t]here's ongoing build going on" and Defendant Barber's statements that the "[Zhejiang] parks" were "progressing nicely" in the first quarter of 2019 and that "they'll be progressing nicely in the future" were materially false and misleading because construction was at a standstill at the time the statements

84

were made. Practically no progress on construction had been made at Six Flags Zhejiang during the three years since it broke ground in January 2016 and future construction on any of the parks was unlikely because Riverside still did not have the funding to pay for the necessary manpower, construction drawings or theme park rides.

229. The above statements made by Defendant Reid-Anderson concerning Riverside and the conditions in China were also false and misleading when made and omitted material facts necessary to make the statements not misleading. The statements that "the situation in China is improving," that "Riverside remains very committed to developing Six Flags parks" and that "we should not lose sight of the fact that these short-term delays and lumpy revenue patterns are not material in the context of the long-term opportunity" were materially false and misleading when made because, at the time the statements were made, Riverside had lost financing from and the support of the local Chinese governments. Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, its licensing payments to Six Flags, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing and Six Flags Nanjing projects. The "situation in China" also was not "improving," the delays were not "short-term," and there was no "long-term opportunity" because Riverside's financial condition continued to worsen over time.

**H.    B. Riley FBR Institutional Investor Conference (May 22, 2019)**

230. On May 22, 2019, Defendant Barber spoke at the B. Riley FBR Institutional Investor Conference. During the conference, Defendant Barber stated, "*[T]here's been struggles over the last 4 or 5 years that we've been working with [Riverside] that they've always managed to get through* . . . [a]nd we're optimistic that [they] can get through this."

231. The above statements made by Defendant Barber during the B. Riley FBR Institutional Investor Conference were materially false and misleading when made and omitted

85

material facts necessary to make the statement not misleading. It was materially false and misleading to state that Riverside had "always managed to get through" the "struggles over the last 4 or 5 years" during which Six Flags had worked with them because, at the time the statements were made, Riverside already had lost financing from and the support of the local Chinese governments. Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, its licensing payments to Six Flags, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects.

## I.    Second-Quarter 2019 Financial Report And Earnings Call (July 24, 2019)

232.    On July 24, 2019, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the second quarter of 2019. In that release, Defendants announced that "*revenue for the second quarter of 2019 increased $32 million or 7 percent from the second quarter of 2018 to $477 million*," and that "[t]he revenue growth resulted primarily from," among other factors, "*a 14 percent increase in sponsorship, international agreements and accommodations revenue*, which included a $7.5 million settlement related to the company's discontinued project in Dubai." Defendants further reported that "*[n]et income for the quarter increased $5 million or 7 percent*, and diluted earnings per share increased 7 percent to $0.94, primarily due to," among other factors, "the company's international agreements," and "[f]or the first six months of 2019, *revenue was $605 million*, a 5 percent increase compared to the prior year period, driven primarily by," among other things, "*a 14 percent increase in sponsorship, international agreements and accommodations revenue*."

233.    In the Company's financial report for the second quarter of 2019, filed on Form 10-Q on July 24, 2018, signed by Defendants Reid-Anderson and Barber, Six Flags reported sponsorship, international agreements and accommodations revenue of *$33.047 million* for the

86

second quarter of 2019 and sponsorship, international agreements and accommodations revenue of *$56.182 million* for the first half of 2019, and represented that the Company's revenue was "primarily derived from," among other things, "*sponsorship, international agreements and accommodations, including revenue earned under international development contracts.*" Defendants further reported that "[d]uring the first six months of 2019, our park earnings before interest, taxes, depreciation and amortization ('Park EBITDA') decreased relative to the comparable period in prior year," but that "*[t]hese decreases were partially offset by,*" among other things, "*a 14% increase in sponsorship, international agreements and accommodations revenue*" and, similarly, that "*[d]uring the three month period ended June 30, 2019, Park EBITDA increased over prior year primarily as a result of,*" among other things, "*a 14% increase in sponsorship, international agreements and accommodations revenue.*"   In addition, Defendants reported that "*[r]evenue for the three months ended June 30, 2019 totaled $477.2 million,* an increase of $31.8 million, or 7%," and "*[r]evenue for the six months ended June 30, 2019 totaled 605.4 million,* an increase of $31.0 million, or 5%," attributable to, among other things, "*a 14% increase in sponsorship, international agreements and accommodations revenue,*" and that Six Flags' reported year-over-year decline in total revenue per capita for the second quarter of 2019 was "partially offset by," among other things, "*the increase in sponsorship, international agreements and accommodations revenue.*"

234.    Defendants also represented in the financial report that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States ('U.S. GAAP'), and "[o]ur accounting policies reflect industry practices and conform to U.S. GAAP."  Consistent with their purported GAAP compliance, Defendants represented that Six Flags "*recognize[d] revenue under our*

87

*international [licensing] agreements over the relevant service period of each performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price*," and that "*[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year*."

235.    That same day, during the Company's second-quarter 2019 earnings conference call with analysts and investors, Defendant Barber stated that "*second quarter [2019] revenue was up 7%*" and "*[r]evenue in the first half of the year was up 5%*," both "driven" in party by "*a 14% increase in sponsorship, international agreements and accommodations revenue*."  Further, Barber represented that "*[i]nternational agreements revenue was up $7.5 million or 32% in the first 6 months of 2019, with revenue of $20 million in the second quarter*," which "included a $7.5 million settlement related to the termination of our contract in Dubai, *and a cumulative catch up revenue adjustment related to Chongqing*."  Moreover, Defendant Barber represented that "*international revenue will remain lumpy going forward*."  In response to an analyst's request for information on revenues attributable to the China parks, Barber clarified that the revenue figure included the three parks in Zhejiang, the four parks in Chongqing, and the park in Saudi Arabia, but did not include the park in Nanjing presumably because of the lack of progress on Nanjing.

236.    Defendants' statements concerning international licensing revenue that the Company recognized discussed in Paragraphs 229-230 and 232 above were materially false and misleading, and omitted material facts necessary in order to make those statements not misleading. Defendants represented during the second-quarter 2019 earnings call that the $20 million in international licensing revenue that the Company recognized that quarter included revenue in connection with the Chongqing and Zhejiang parks, that revenues in connection with the Nanjing parks was forthcoming, and that revenues would be international licensing revenue would be

88

"lumpy" moving forward.  At the time, it was materially false and misleading, as well as improper under GAAP, to recognize such revenue in connection with the China parks, given that the represented timeline for the parks' opening could not be met, as evidenced by the facts that Riverside had already failed to make required licensing payments to Six Flags, and Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects.  Indeed, according to FE 1, by this date, Riverside had procured no rides for any of its parks, no material progress on construction had occurred at any of the Six Flags China parks, and Defendants' publicly represented timeline for opening the China parks was impossible to meet based on the lack of progress to that point. Accordingly, it was also materially false and misleading for Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, they would have recognized substantially less, or no, revenue at the time in connection with their international licensing agreements with Riverside.

237.    During Defendants' July 24, 2019 earnings conference call, Defendant Reid-Anderson stated:

> And in China, our partner continues to make progress obtaining local government support for our Chongqing parks. ***Construction in both [Zhejiang] and Chongqing continues***.
>
> Though our partner has ongoing negotiations concerning the full integrated resort in Chongqing, ***we are pleased with their consistent progress and are cautiously optimistic that both [Zhejiang] and Chongqing will remain on schedule***.
>
> ***We have 8 parks in 3 locations under construction and are working to restart construction on 4 additional parks in Nanjing, China.***  Our pipeline remains robust, and we are optimistic that we will be able to announce new locations in the coming years.

89

238.    Defendant Barber provided additional information on the status of the Chongqing park.  Defendant Barber stated, "[O]ur partners have been progressing with the government approval process and *construction has continued*.  This adjustment brings us in line with the park opening schedule that was announced in our Q4 2018 earnings call.  Going forward, we expect to continue recognizing revenue for Chongqing and are hopeful to resume development and revenue recognition for Nanjing later in the year or early next year."

239.    Defendant Reid-Anderson also was asked for an "update on construction" for the Zhejiang and Chongqing parks.  Reid-Anderson stated that "I can tell you that the parks that we've talked about, both in [Zhejiang] and Chongqing, *the construction has continued there*.  And the timing that we had given you—I think Marshall [Barber] referred to this as being on the fourth quarter call, *those hold*.  At this time, if there's ever an update, I promise you, we will give you an update.  *But we are progressing at both of those parks*."

240.    Defendant Reid-Anderson was further asked to provide more specific clarification on the timeline.  An analyst asked "[s]o broadly, when you look at China collectively, would you say the timeline overall has improved, stayed the same, or slipped a little since 90 days ago?"  Reid-Anderson responded that "*I think the timeline that we described 180 days ago still holds right now, Tim, and the same as it was 90 days ago*."

241.    The above statements made by Defendant Reid-Anderson and Defendant Barber concerning the construction progress at the parks were materially false and misleading when made and omitted materials facts necessary to make the statements not misleading.  Defendant Barber's statement that "construction has continued" on the Chongqing parks and Defendant Reid-Anderson's statements that "[c]onstruction in both [Zhejiang] and Chongqing continues," that "[w]e have 8 parks in 3 locations under construction" that "both in [Zhejiang] and Chongqing, the

construction has continued there" and "we are progressing at both of those parks" were materially false and misleading because construction was at a standstill at the time the statements were made. Practically no progress on construction had been made at Six Flags Zhejiang during the three-and-a-half years since it broke ground in January 2016 and future construction on any of the parks was unlikely because Riverside still did not have the funding necessary to pay for the necessary manpower, construction drawings or theme park rides. Likewise, Defendant Reid-Anderson's statement that they were "working to restart construction on 4 additional parks in Nanjing" was materially false and misleading when made because material construction in Nanjing had never started.

242. Similarly, the statements made by Defendant Reid-Anderson and Defendant Barber concerning the opening timeline for the parks were materially false and misleading when made and omitted materials facts necessary to make the statements not misleading. Defendant Reid-Anderson's statements "the timing that we had given" on the fourth-quarter 2018 earnings conference call still "hold," that "the timeline we described 180 days ago still holds right now," and is "the same as it was 90 days ago," and Defendant Barber's statement that progress was "in line with the park opening schedule that was announced in our Q4 2018 earnings call" were materially false and misleading when made because, at the time, 11 to 17 months from Zhejiang's revised opening dates, no progress at all had been made on the construction of the parks despite Riverside breaking ground on construction of Six Flags Zhejiang in January 2016. By May 2018, the Six Flags China parks were already so behind schedule that FE 1 informed the Company that they "[couldn't] build [Zhejiang] in 18 months" or open on time "even if everything was in [their] hands right now" and that Six Flags should put Riverside in breach of contract due to Riverside's lack of progress. There was also no significant progress on the parks between May 2018 and July

91

2019 that changed this fact and that would have allowed for the Six Flags Zhejiang parks to be completed by the revised mid-to-late 2020 opening date.

243.    The statements were also materially false and misleading because Riverside's lack of financing and lack of support from the local Chinese governments also made any future progress impossible.  Riverside could not afford the 1,500 to 2,000 construction workers that would be necessary to build even one park, and only ever had 300 construction workers on site at maximum, which often dropped below one hundred.  Riverside was unable to afford the basic construction drawings necessary for construction workers to follow to make significant construction progress.  Riverside also had no theme park rides to even construct, because it failed to pay its ride vendors for commissioned rides, so all of Riverside's commissioned rides were cancelled by the vendors or sold to other theme parks.  As FE 1 stated, because the ride orders had been cancelled, Riverside and Six Flags were "not going to get the rides in time" to meet the original opening date "even if they were able to catch the construction up" elsewhere.  This fact remained true as to the revised opening dates because Riverside still had failed to procure any rides even after the park delays were announced.  By this time, Riverside had even missed its scheduled licensing payments to Six Flags, which further showed that the parks were off track.

**J.    Third-Quarter 2019 Financial Report And Earnings Call (October 22-23, 2019)**

244.    On October 22, 2019, Six Flags issued a press release, filed with the SEC on Form 8-K, announcing the Company's financial results for the third quarter of 2019.  In that release, Defendants announced that "***revenue was $621 million for the third quarter of 2019***, a $1 million increase over the same period in 2018," which "was partially offset by," among other things, "***an expected 26 percent decrease in sponsorship, international agreements and accommodations revenue***."  Defendants further reported that, "***[f]or the first nine months of 2019, revenue was $1.2 billion, a 3 percent increase compared to the prior year period***," which was "partially offset

by," among other things, "*a 3 percent decrease in sponsorship, international agreements and accommodations revenue*."

245. In the Company's financial report for the third quarter of 2019, filed on Form 10-Q on October 23, 2019, signed by Defendants Reid-Anderson and Barber, Six Flags reported sponsorship, international agreements and accommodations revenue of *$26.457 million* for the third quarter of 2019 and sponsorship, international agreements and accommodations revenue of *$82.639 million* for the first nine months of 2019, and represented that the Company's revenue was "primarily derived from," among other things, "*sponsorship, international agreements and accommodations, including revenue earned under international development contracts*." Defendants further reported that "[d]uring the first nine months of 2019, our park earnings before interest, taxes, depreciation and amortization ('Park EBITDA') decreased relative to the comparable period in prior year," and that "[d]uring the three month period ended September 30, 2019, Park EBITDA increased over the prior year," which "increase was partially offset by an expected 26% decrease in sponsorship, international agreements and accommodations revenue." In addition, Defendants reported that "*[r]evenue for the three months ended September 30, 2019 totaled $621.2 million,* an increase of $1.4 million," which increase was "offset by a 26% reduction in sponsorship, international agreements and accommodations revenue,"  and "*[r]evenue for the nine months ended September 30, 2019 totaled $1,226.6 million,* an increase of $32.4 million, or 3%," partially offset by "a 3% decrease in sponsorship, international agreements and accommodations revenue."

246. Defendants also represented in the financial report that the Company's "unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States ('U.S. GAAP'), and "[o]ur accounting policies

reflect industry practices and conform to U.S. GAAP." Consistent with their purported GAAP compliance, Defendants represented that Six Flags "*recognize[d] revenue under our international [licensing] agreements over the relevant service period of each performance obligation based on its relative stand-alone selling price, as determined by our best estimate of selling price*," and that "*[w]e review the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year*."

247. That same day, during the Company's third-quarter 2019 earnings conference call with analysts and investors, Defendant Reid-Anderson represented that "international development projects . . . represent about 3% of our annual company revenue," and that although "the Chinese market remains difficult . . . *we are likely to continue to recognize lumpy international agreements revenue*," and that "[o]n a year-to-date basis, total revenue was up $32 million or 3%," offset by, among other things, "a 3% decrease in sponsorship, international agreements and accommodations revenue." In response to an analyst question for "the third quarter international revenue, what was recognized in that sponsorship in international line," Defendant Barber stated that "*[t]he Q3 revenue was $8.3 million*."

248. Defendants' statements concerning international licensing revenue that the Company recognized discussed in Paragraphs 241-242 and 244 above were materially false and misleading, and omitted material facts necessary in order to make those statements not misleading. The $8.3 million in international licensing revenue that the Company recognized that quarter included revenue in connection with the Chongqing and Zhejiang parks. Although the Company disclosed that international licensing revenues had declined by 26% over third-quarter 2018, in truth, the Company could not properly recognize any revenue in the quarter attributable to the China parks. Indeed, at the time, it was materially false and misleading, as well as improper under

GAAP, to recognize such revenue in connection with the China parks, given that the represented timeline for the parks' opening could not be met, as evidenced by the facts that Riverside had already failed to make required licensing payments to Six Flags, and Riverside's financial condition had already deteriorated to the point that it was unable to pay its employees, its park design firm, international ride vendors, and construction workers for work on the Six Flags Zhejiang, Six Flags Chongqing, and Six Flags Nanjing projects.  According to FE 1, by this date, Riverside had procured no rides for any of its parks, no material progress on construction had occurred at any of the Six Flags China parks, and Defendants' publicly represented timeline for opening the China parks was impossible to meet based on the lack of progress to that point. Accordingly, it was also materially false and misleading for Defendants to represent that they complied with GAAP and had "review[ed] the service period of each performance obligation on an ongoing basis and revise it as necessary throughout the year" because, had they done so, they would have recognized substantially less, or no, revenue at the time in connection with their international licensing agreements with Riverside.

249.    In addition, during the October 23, 2019 earnings conference call, in response to an analyst question, Defendant Barber denied that there was "any material change in the time line of China over the last 90 days."

250.    Defendant Barber's denial of "any material change in the time line of China over the last 90 days" was materially false and misleading when made and omitted necessary facts to make the statement not misleading.  The denial was false and misleading because, at the time, 8 to 14 months from Zhejiang's revised opening dates, no progress at all had been made on the construction of the parks despite Riverside breaking ground on construction of Six Flags Zhejiang in January 2016.  By May 2018, the Six Flags China parks were already so behind schedule that

95

FE 1 informed the Company that they "[couldn't] build [Zhejiang] in 18 months" or open on time "even if everything was in [their] hands right now" and that Six Flags should put Riverside in breach of contract due to Riverside's lack of progress. There was also no significant progress on the parks between May 2018 and October 2019 that changed this fact and that would have allowed for the Six Flags Zhejiang parks to be completed by the revised mid-to-late 2020 opening date.

## SUMMARY OF SCIENTER ALLEGATIONS

251. As alleged herein, numerous facts give rise to the strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that their statements and omissions, as set forth above, were materially false and misleading when made. The information in this section is a summary of certain of the allegations detailing Defendants' scienter that are set forth more fully above, though all allegations in this Complaint must be considered holistically in evaluating Defendants' scienter. The cumulative knowledge of all members of the Company's senior management team, including but not limited to the Individual Defendants, regarding the matters addressed here is properly imputed to Six Flags.

252. First, Defendants Reid-Anderson and Barber directly received reports that no significant progress on any of the parks was occurring and that Riverside was unable to pay its employees, its design firm, ride vendors, and construction contractors.

253. As described above, beginning in May 2018, FE 1 prepared regular presentations on the construction progress at the Zhejiang and Chongqing sites for Mark Kane, former General Manager and Park President of Six Flags Zhejiang, and David McKillips, former Senior Vice President of International Park Operations and President of Six Flags International. McKillips in turn presented the presentations and reports by FE 1 to Defendant Reid-Anderson and to the Six Flags Board of Directors. Kane and McKillips, who reported directly to Reid-Anderson, expressly informed FE 1 that the presentations were to be presented to the Board of Directors. Further, on

96

multiple occasions, McKillips requested that FE 1 provide presentations and information to him on construction progress so that McKillips could relay those presentations to Defendant Reid-Anderson and the Company's Board of Directors. This presentation of information was consistent with the Board of Directors' governance of the Company. According to Six Flag's proxy statements, the Board of Directors was "advised of the Company's business through discussions with the Chief Executive Officer and other members of management, by reviewing reports, analyses and materials provided to them." According to the Company's proxy statements for 2018 and 2019, the Board met six times in 2018 and eight times in 2019, during which the Board reviewed "significant developments affecting the Company." These presentations were highly detailed, and included updates on specific sectors of each park, specifying where there had been no progress over "x number of days" and that there was no infrastructure on the roads. FE 1's presentations demonstrated construction progress was "minimal" and that the project "probably had 300 people onsite at the peak when they should have had 1,500 to 2,000 people onsite working." The presentations also showed that the number of construction workers would often be much lower, with 300 people for one or two weeks, only for it to dwindle down to less than 10 before going up to 40 or 100, then dropping again and continuing to fluctuate the entire time.

254.    A comparison of the first presentation to the last also would show no meaningful construction on the parks had occurred during FE 1's tenure from May 2018 to September 2019, and what construction did occur—installing foundation piles—sometimes had to be done at "huge amounts of cost" because they were building off design drawings. The consistent message in the presentations was that no progress was being made on the Six Flags China parks.

255.    During 2018 and 2019, FE 1 also worked with Mark Kane to compile "master reports" to send to David McKillips, which McKillips would present to Defendant Reid-Anderson

97

and to Six Flags' Board of Directors.  Kane and McKillips expressly informed FE 1 that the reports were to be presented to the Board of Directors.  This presentation of information was consistent with the Board of Directors' governance of the Company.  According to Six Flag's proxy statements, the Board of Directors was "advised of the Company's business through discussions with the Chief Executive Officer and other members of management, by reviewing reports, analyses and materials provided to them."  According to the Company's proxy statements for 2018 and 2019, the Board met six times in 2018 and eight times in 2019, during which the Board reviewed "significant developments affecting the Company."  The master reports included information about the lack of construction progress and unpaid vendors.  FE 1 also explained that master reports prepared for McKillips by Kane prior to the start of FE 1's employment in May 2018 discussed that ride vendors had not been paid.  According to FE 1, Kane was honest about the progress of the parks in the master reports, which Kane shared with McKillips.  The Six Flags Board met six times in 2018 and eight times in 2019, during which Reid-Anderson and the Board reviewed the reports, analyses, and materials provided to them.

256.    Further, FE 1 had multiple calls with David McKillips, who reported directly to Defendant Reid-Anderson, during which FE 1 informed McKillips that Riverside had no money, "the emperor has no clothes," and that McKillips needed to shut down the China projects. McKillips informed FE 1 that they needed to wait because Riverside owed Six Flags outstanding licensing fees and that the Company did not want to upset Riverside.  According to FE 1, members in senior management "knew the whole time that [it] was a mess; there was no money for construction; there was no money for rides; there was no money to pay the design people; there was no money for anything."  FE 1 recounted voicing his concerns on a conference call with 17 people from Six Flags' U.S. headquarters and in China, during which he stated that Riverside was

in breach of contract and that Six Flags should hold Riverside in breach.  FE 1 was just told to hang on and that it would be discussed later.

257.    Ultimately, FE 1 was so outraged by the Company's handling of the China projects that he resigned from his position.  He announced his resignation in an August 3, 2019 letter that he sent to Kathy Aslin, Six Flags' Senior Vice President, Human Resources, and one of the Company's most senior officers who reported directly to Defendant Reid-Anderson.

258.    In his resignation letter, a copy of which is included below, FE 1 memorialized the facts that he had been conveying to senior management throughout and expressing his belief that "the projects [Six Flags is] undertaking in China are perhaps irreversibly off-track."  FE 1 noted that "top management staff" informed him before taking the job that the project was not "a mess," and yet "the word 'mess' only began to describe the state [the] project was in" when he began in May 2018.



259.    The full text of FE 1's resignation letter reads:

Dear Kathy,

I am writing this letter to inform you that after careful consideration, I have decided to leave my position as Director of International Construction with the Six Flags company. I came to work here at Six Flags to be part of something big; something never done before. It was worth the sacrifices I made to do so, or so I thought. As you are aware, *the projects we are undertaking in China are perhaps irreversibly off-track*.

*The current development partners [Riverside] are unable to control their projects and have made it clear that they have zero funds remaining to proceed with.* Project managers show zero management experience, and our partners have failed to retain enough funds to support their payroll. Employees have not been paid in nearly 90 days and are instructed to continue working anyway. In a completely unacceptable (and frankly disgusting) manner, they are seemingly forcing abused employees to resign under duress, while owed nearly 3 months back pay.

*Six Flags should have taken a legal stance against this partner some time ago. . . . and to this date we have done nothing to remedy the situation.* This, combined

100

with a complete lack of monetary support from our own company (Six Flags), forces me to remove myself from this situation as quickly as possible.

The examples of Six Flags' lack of support for our own team are plentiful and well-documented. *The company has failed to retain an adequate operating budget for this project to keep it viable.* One of the key questions I asked during my interview process was, "Is this project already a mess?" I was assured by two of Six Flags' top management staff that this was not the case at all. However, *from the very first day I landed in China, it was obvious to me (as well as my coworkers) that the word "mess" only began to describe the state this project was in*.

*This was a blatant misrepresentation to me on behalf of Six Flags*. At first, I attempted to rally our team request support from a true program management company and take over management of the project. However, it soon became apparent that Six Flags would not be dedicating ANY resources to help make this happen—whether it be from a program management, legal, contract bre[a]ch enforcement, or financial perspective. . . .

I am expected to work as the Director of Construction in a foreign country without an assigned translator. No housing has been provided either; instead, I am forced to live in a 400 sq. ft. hotel room with no means to store or cook my own food for 60 days at a time.

When I inquired about an apartment, I was told by our own staff to "go look for one". Anyone who has worked in China, knows you can't do anything like that here without a Chinese bank account. Housing was a requirement for this job, not a perk. No transportation has been provided to and from the jobsite. The commute from the hotel to the job site and back is a daily struggle. Cab drivers and DIDI drivers are reluctant to come here to the jobsite, they cancel reserved trips frequently, and many cannot find their way here, even when instructed. Further, I was not given any information toward access to medical care while in Haiyan and am forced to travel hours to Shanghai to seek medical care. In addition, I am forced to walk the site at an average of 4 miles per day, as Six Flags has provided no on-site transportation as requested in my budgets. After 14 months with this company, I can't even get approval for an office printer. I am confident that had the operations team been moved here from Beijing, these needs would have been met for them immediately. That is a poor reflection toward Six Flags' level of commitment to me as a Corporate Director.

*The fact that Six Flags will continue to do business with a partner whose practices are equivalent to that of illegal child labor is astounding to me. My initial perception of the Six Flags company has forever been altered, as I now feel the company cares more about its quarterly fiscal reports than it does this project, or any of its employees tied to it in the field.*

Six Flags has chosen a partner that will not be successful in building a safe and reliable theme park. I have been in the theme park and commercial construction

101

business for a very long time, and have built a reputation of success, integrity, and professionalism that I cannot sacrifice. *I have never seen such a poorly planned project set into motion in this industry*. . . . I cannot afford to have my name attached to a project that will be constructed so poorly and without care, and I refuse to be party to the misdealings and unscrupulous behavior of our partner.

My last day with Six Flags will be September 20th, 2019. Please call me at your earliest convenience to discuss.

260. FE 1's resignation letter was shared beyond just the Six Flags Human Resources department, which FE 1 knew because he "lost a lot of friends that day." The letter was shared with at least David McKillips and Mark Kane, who later contacted FE 1 about the letter. FE 1 expressed his frustration with McKillips and Kane and told them that they "lied to him" when he had asked prior to joining the Company whether the China developments were a "viable project."

261. Finally, according to FE 2, Six Flags' most senior management, including Brett Petit, Senior Vice President of Marketing and Sales, who reported to Defendant Reid-Anderson, was aware that Riverside was not paying the licensing fees it owed to Six Flags from at least August 2018 to December 2018. Petit discussed this issue widely within Six Flags, including with multiple other employees. There can be no doubt that the rest of the C-suite, including his direct supervisor Defendant Reid-Anderson, was also aware of this fact.

262. Second, the high profile and critical importance of international development to the financial success of the Company supports Defendants' scienter. On every Class Period earnings call, and at numerous investor conferences during the Class Period, at least one of the Individual Defendants spoke about, fielded questions concerning, or stressed the importance of international expansion and the China parks—frequently with specific discussion of the progress of the parks, including discussion of "a comprehensive review of the project timelines jointly with [Riverside]"—and the current and future revenue generated by the Company's international licensing agreements with Riverside. The Individual Defendants also repeatedly fielded questions

102

during the Company's fourth-quarter 2017 earnings call about the future of Six Flags Dubai after admitting to missed Dubai-related licensing payments —demonstrating the Individual Defendants' knowledge that missed international licensing payments and delays were an area of substantial concern to investors. Defendant Barber even personally visited the Six Flags Dubai site in February 2017 after the Company's partner missed the licensing payments, and Six Flags senior executives Mark Kane and David McKillips met with various local Chinese government officials regarding the Six Flags China projects, demonstrating the critical importance of international development for the Company. Defendants were therefore aware of and sensitive to the highly material nature of this information and held themselves out as knowledgeable about these topics. Therefore, investors reasonably expected them to have knowledge about the truth or falsity of their statements. The only other plausible inferences that can be drawn from these repeated and specific pronouncements is that Defendants either fabricated the information that they provided to investors and the market or that they acted with deliberate recklessness in ignoring information they possessed regarding such matters.

263. Third, Defendants Reid-Anderson's and Barber's departures as the fraud unraveled strengthens the inference of Defendants' scienter. On March 7, 2019, the Company disclosed that Defendant Reid-Anderson would retire from the position of CEO by February 28, 2020 and that the Company would undergo a process to evaluate candidates for the position of Chairman of the Board following Defendant Reid-Anderson's retirement. Instead of staying on until February 2020, two days after the Company's third-quarter 2019 earnings conference call, during which the Company announced additional park delays and Reid-Anderson disclosed that "there's a very high likelihood going forward that we will see changes in the timing of park openings," and that "it's unrealistic to think it's going to be exactly as we've outlined," the Company announced that Reid-

Anderson would be stepping down as Chairman, President and CEO as of November 18, 2019. Moreover, the Company announced that Defendant Reid-Anderson would resign as director as well, which had not occurred during Defendant Reid-Anderson's brief retirement from February 2016 to July 2017.

264.    Defendant Barber also resigned shortly after the Company fully disclosed the fraud regarding the Six Flags China projects.  On February 20, 2020, the same day that the Company disclosed that it had terminated its relationship with Riverside, the Company announced that Defendant Barber would be retiring from his position as CFO as of February 24, 2020, *four days later*, and would retire from the Company entirely on August 31, 2020.  Defendant Barber's retirement was unexpected.

265.    Other senior management announced plans to retire and began to retire as the extent of the fraud continued to be revealed.  On November 13, 2019, Lance Balk, Executive Vice President and the Company's General Counsel, announced plans to retire on or after February 28, 2020.  Lance Balk had served as the Company's General Counsel since 2010, including during the period that Six Flags negotiated the weak international licensing agreements with Riverside, and had been eligible to receive a Project 600 equity award had the Company met the Project 600 modified EBITDA target by end of fiscal year 2018.  Balk retired from the position of Executive Vice President and General Counsel on March 2, 2020.  Moreover, David McKillips, Senior Vice President of International Park Operations and President of Six Flags International, to whom FE 1 had repeatedly reported his concerns and who was responsible for reports to Defendant Reid-Anderson and for negotiating with Chinese officials, left the Company in or around January 2020.

266.    These key individuals were all connected with the Company's false and misleading statements and left after the truth about the Six Flags China projects emerged or just before the full extent of the false and misleading statements were revealed.

267.    <u>Fourth</u>, the problems with Six Flags' China developments was known more broadly throughout the Company because it impacted Six Flags' pre-existing relationships with U.S. and international ride vendors with whom Six Flags regularly worked to design and develop new rides for Six Flags' U.S. parks.  Six Flags and Riverside had commissioned rides from approximately 40 different vendors for the Six Flags China parks and convinced vendors to begin work on expedited basis and with only partial or no upfront payment, which was only possible due to Six Flags' relationships with the vendors.  However, as the design and development of the rides progressed, vendors expected payment.  Many of the vendors had acquired steel and other expensive materials for the commissioned rides, but had not received payments Riverside owed to them.  At least one ride vendor had started on a large wooden rollercoaster, but would not continue work because Riverside was unable to pay.  The ride vendor informed Six Flags that it was going to sell the ride to another client and that it would not provide Riverside with the commissioned ride by the deadline.

268.    According to FE 1, the lack of payment created "bad blood" between Six Flags and many of its ride vendors, and FE 1 and Mark Kane regularly needed to appease upset vendors. Ride vendors called Six Flags regularly to complain about Riverside's failure to pay, and Six Flags informed the vendors that payment would be coming.  In 2019, FE 1 even attended multiple International Association of Amusement Parks and Attractions (IAAPA) conferences, in Hong Kong and Shanghai, and met with vendors about their concerns, but Riverside continued to lack the funds necessary to pay for the construction of the rides.  Despite Six Flags' assurances,

Riverside never paid for the rides.  As FE 1 stated, "it was just all air; there was never a viable project."

269.    Six Flags' relationship with ride vendors is a core part of its U.S. operations because Six Flags regularly buys and installs new rides at its U.S. parks.  For example, in Six Flags' Form 10-K for the 2019 fiscal year, Six Flags reported that it had added approximately fifteen new rides to its U.S. parks and planned to add fifteen more rides in 2020.  Due to the importance of Six Flags' relationships with its vendors, it is not plausible that myriad members of Six Flags' senior management, including David McKillips, Mark Kane and FE 1, knew about Riverside's inability and failures to pay the ride vendors, the vendors' dissatisfaction, and the "bad blood" between the vendors and the Company, and yet none of these problems would have been reported to Defendants Reid-Anderson and Barber.  This is particularly the case where, as discussed above, both the Six Flags' China parks and the procurement of rides for U.S. parks were issues of paramount importance to the Company's financial position during the Class Period.

270.    <u>Fifth</u>, Defendants' compensation uniquely incentivized their fraud.  That Defendants hoped to—and nearly did—receive lavish bonuses pursuant to a special Six Flags incentive-based compensation plan, ***which they would earn irrespective of the long-term success of the Six Flags China parks***, further supports scienter.  As disclosed in Six Flags' SEC filings, Defendants Reid-Anderson, Barber, and other Six Flags executives and senior management would have received over $165 million in equity awards if the Company reported $600 million modified EBITDA by fiscal year 2017 and a partial award of over $66 million if $605.3 million was reached in fiscal year 2018, valued as of the likely award dates.  These substantial incentive-based amounts were in addition to Six Flags' annual salary and incentive bonus structure, under which Reid-Anderson was paid approximately $2.3 million for 2018, and Barber was paid approximately

$850,000. Reid-Anderson's and Barber's equity awards alone would have been worth over $29 and $3.6 million, respectively, if the Project 600 target had been reached in 2017, and over $12 million and $1.4 million, respectively, if the target had been reached in 2018, valued at the likely award dates.

271.    By 2017, it was apparent the Company would need to significantly accelerate short-term earnings growth to meet the Project 600 EBITDA target by fiscal year-ended 2018. After posting modified EBITDA annual increases of 7.7% each year on average from 2013-2015, the Company reported $545 modified EBITDA in 2016, a dismal 3.8% increase over the prior year. Due to the relatively poor performance in 2016, earnings in 2017 needed to surge to *10%* growth in 2017 to meet the Project 600 target. Six Flags fell far short of that goal, increasing modified EBITDA by only *2%* in 2017, to $558 million.

272.    Senior management, including Defendants Reid-Anderson and Barber, rushed to obtain the necessary short-term earnings increase by entering into additional licensing agreements with Riverside in 2017 and 2018. Between February 2017 and May 2018, the Company entered into additional agreements with Riverside to construct *nine* additional parks in China, bringing the total number of planned China parks from two to *eleven*. Senior management, including Defendants Reid-Anderson and Barber, entered into and announced these additional agreements even though Riverside had made little progress on the two previously announced parks in Zhejiang by February 2017. Due to the fiscal year ended 2018 deadline for the Project 600 target, senior management was incentivized to increase the short-term licensing and consulting revenue it could record from the Riverside agreements in 2017 and 2018, rather than focus on the progress and success of the two previously announced China parks, or the future prospects for any newly announced parks.

107

273.    Moreover, Defendants and senior management were incentivized to not disclose in the 2018 fiscal year the lack of construction progress and Riverside's inability to fund the parks, despite being aware of the issues, because the Company "recognize[d] revenue for each park ratably over the development period" and "park opening or funding delays require[d]" the Company to "adjust [its] revenue recognition to the newly expected project timelines." Specifically, disclosing that no material construction had occurred at the Zhejiang or Chongqing sites by the end of 2018, and that Riverside lacked adequate financing for the Zhejiang, Chongqing and Nanjing projects, would have required a significant downward revenue adjustment for the 2018 fiscal year, which would have made it impossible for Defendants Reid-Anderson and Barber and other senior management to achieve the Project 600 target and obtain over $75 million in equity awards.

274.    In fact, Defendants and senior management would have successfully met the Project 600 target in fiscal year ended 2018 but for the downward revenue adjustment announced in February 2018 that resulted due to the park delays that the Company avoided disclosing until completing its audited financial statements in February 2019. The $15 million in revenue that was reversed out of fiscal-year 2018 revenue would have resulted in approximately $12 million in modified EBITDA, allowing the Company and the Individual Defendants to meet their $605.3 million goal.

## LOSS CAUSATION

275.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class. Throughout the Class Period, Six Flags' stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions that created the false impression, among other things, that (i) Six Flags' Zhejiang, Chongqing, and Nanjing developments were progressing and remained on schedule to

108

open on their announced and later revised opening dates; (ii) Riverside's financial condition remained sufficient to continue work on the Six Flags Zhejiang, Chongqing, and Nanjing developments; (iii) Riverside was paying its licensing fees to Six Flags on time; (iv) Riverside and Six Flags had secured the necessary financing for the Six Flags Zhejiang, Chongqing, and Nanjing developments; and (v) Six Flags' revenue recognition accurately reflected the progress, or lack thereof, on the Six Flags Zhejiang, Chongqing, and Nanjing developments and the timeliness of Riverside's payment of licensing fees that it owed to Six Flags.

276.    Multiple separate disclosures on these topics revealed to the market on a piecemeal basis the false and misleading character of Defendants' statements and omissions.  First, on February 14, 2019, before the market opened, Six Flags filed a Form 8-K with the SEC, disclosing a negative revenue adjustment of $15 million for the fourth quarter of 2018 related to the Company's agreements with Riverside and delays in the opening dates of the China parks.  As a result, the Company also reported a 38% decline in the its sponsorship, international agreements, and accommodations revenue compared to the fourth quarter of 2017.  In response to these disclosures, the Company's stock price dropped over 14%, from $63.87 per share to $54.87 per share, on high trading volume.  This disclosure also revealed that Six Flags had not been accounting for its China park-related revenue correctly and had to reverse out a substantial sum given the delays in park openings.

277.    While the February 14, 2019 disclosures revealed the partial truth that the China parks would not open on time, it did not reveal the full truth to investors about the critical issues with the China parks' progress.  During the February 14, 2019 earnings call, Defendants continued to mislead investors about the delays and downward revenue adjustment, which the Company stated was due to "recent macroeconomic events" that "many companies [we]re experiencing,"

while falsely reassuring investors that "construction [wa]s continuing."  Defendant Reid-Anderson also stated that the delays set the parks' opening dates back by only approximately six to twelve months, from "mid- to late 2020 versus 2019," for Six Flags Zhejiang, "mid to late 2021 versus 2020," for Six Flags Chongqing, and "late 2022" for Six Flags Nanjing.  Defendants also continued to mislead investors about Riverside's and Chairman Li's financial condition, the licensing payments to Six Flags, and the status of financing for each park.  Defendants assured investors that "[Chairman Li]'s in great shape . . . [Chairman Li] has continued to pay us" and that "the financing" for the parks "is in place, and then gets expanded as time goes on and . . . parks are added on."  The Company also failed to disclose that recording *any* revenue at this time was improper, since the evidence indicated that it was more likely than not that the China parks would not be completed.

278.    Second, on October 23, 2019, Six Flags again revealed that the progress of the China parks was not on track and that the parks likely would miss the revised opening dates that were given on February 14, 2019 and that were reiterated during the April 24, 2019 and July 24, 2019 earnings calls.  During the October 23, 2019 earnings call, Defendant Reid-Anderson announced that "the Chinese market remains difficult, and we are likely to continue to recognize lumpy international agreements revenue until we see progress there from a macroeconomic, real estate and trade perspective," that "the city of Chongqing" had "made the decision to open 1 park per year, which moved up the opening of our adventure park by 6 months and delayed the opening of our kids park by 15 months, resulting in a net reduction of revenue in the quarter," and that "there's a very high likelihood going forward that we will see changes in the timing of park openings" and "it's unrealistic to think it's going to be exactly as we've outlined."  In response to

110

these disclosures, Six Flags' stock price fell from $51.23 per share to $44.88 per share, on high trading volume, a decline of more than 12%.

279.   As before, however, Six Flags' disclosures failed to reveal the full truth to investors and made false statements to mitigate the market's negative reaction.  Defendants did not disclose Riverside's worsening financial condition or Riverside's late and unpaid licensing fees, and misled investors to believe that progress was continuing in at least Chongqing, which it was not, and that the kids' park there would open early.  In response to an analyst question, Defendant Reid-Anderson even denied that there was "any material change in the time line of China over the last 90 days."

280.   Third, on January 10, 2020, before the opening of the market, Defendants filed a Form 8-K in which they finally admitted that Riverside had defaulted on its licensing payments, "faces severe challenges," and that the result could "range from the continuation of one or more [of the China] projects to the termination of all Six-Flags branded projects in China."  The Form 8-K also disclosed that for the fourth quarter of 2019, "the Company will realize no revenue from the China international agreements" and "expects a negative $1 million revenue adjustment related to the China international agreements" and "aggregate one-time charges of approximately $10 million related to the China international agreements."  In response to these disclosures, Six Flags' stock price fell from $43.76 per share to $35.96 per share, or nearly 18%, on high trading volume.

281.   Once again, Six Flags' disclosures did not reveal the full truth to investors and attempted to mitigate the market's negative reaction.  In their disclosures that day, Defendants represented the possibility of "the continuation of one or more projects" in China despite Riverside's financial deterioration and lack of financing.

282.    Finally, on February 20, 2020, before the market opened, Six Flags revealed in a Form 10-K that Riverside had "defaulted on its payment obligations," which it "was not able to cure," and that as a result Six Flags had "terminated [its] agreements with them on February 14, 2020." The Company also admitted that it was "unlikely that [it would] recognize any revenue or profit in 2020 related to development of parks in China." The Company also provided a dismal earnings outlook for 2020, driven by significantly lower revenue contribution from Six Flags' international development agreements. In addition, Six Flags announced the sudden departure of its Chief Financial Officer, Defendant Marshall Barber. In response to these disclosures, Six Flags' stock price declined from $38.02 per share to $31.89 per share, or more than 16%, on high trading volume.

283.    In all, disclosures of the true facts concerning Riverside's financial condition, the late and unpaid licensing fees, the lack of progress on the China parks, the lack of financing for the parks, and the need to adjust revenue downward caused massive losses to investors, with Six Flags shares falling nearly 50%, from $59.16 per share at the close of trading on April 24, 2018, to $31.89 per share at the close of trading on February 20, 2020. As a result of the stock price declines following these disclosures alone, Six Flags' market capitalization declined by approximately *$2.5 billion*.

284.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Six Flags' stock. It was also foreseeable to Defendants that the revelation of the truth about Riverside's financial condition, the late and unpaid licensing fees, the total lack of progress on the China parks, and resulting downward adjustments to Six Flags' recognized revenue would cause the price of the Company's stock price to fall as the artificial inflation caused by Defendants' misstatements and

112

omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## CLASS ACTION ALLEGATIONS

285. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the publicly traded common stock of Six Flags during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Six Flags and their families and affiliates.

286. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of February 20, 2020, Six Flags had over 84 million shares of common stock outstanding, owned numerous investors.

287. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact are common to the members of the Class, which predominate over questions which may affect individual Class members, including:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f) Whether Defendants' conduct impacted the price of Six Flags common stock;

(g) Whether Defendants' conduct caused the members of the Class to sustain damages; and

113

(h) The extent of damage sustained by Class members and the appropriate measure of damages.

288.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

289.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

290.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

291.    To the extent any of Defendants' alleged false and misleading Class Period statements are considered forward-looking (which they should not be), Six Flags' "Safe Harbor" warnings accompanying those statements were ineffective to shield those statements from liability.

292.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Six Flags who knew that the statement was false.

## PRESUMPTION OF RELIANCE

293.    At all relevant times, the market for Six Flags' common stock was an efficient market for the following reasons, among others:

(a) Six Flags common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Six Flags filed periodic public reports with the SEC and the NYSE;

(c) Six Flags regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations

of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Six Flags was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

294.    As a result of the foregoing, the market for Six Flags common stock promptly digested current information regarding Six Flags from all publicly available sources and reflected such information in the price of Six Flags common stock.  Under these circumstances, all purchasers of Six Flags common stock during the Class Period suffered similar injury through their purchase of Six Flags common stock at artificially inflated prices and the presumption of reliance applies.

295.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Six Flags' business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the development of Six Flags-branded parks in China through the Company's licensing agreements with Riverside to Six Flags' international strategy and the impact that could have on the Company's future revenue growth, that requirement is satisfied here.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Defendants Six Flags, Reid-Anderson, and Barber

296. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

297. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Six Flags common stock at artificially inflated prices.

298. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Six Flags common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

299. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

300. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

116

301.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Six Flags' true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

302.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Six Flags' common stock. Lead Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Six Flags' common stock had been artificially inflated by Defendants' fraudulent course of conduct.

303.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

304.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Defendants Reid-Anderson and Barber

305.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

306.    The Individual Defendants acted as controlling persons of Six Flags within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Six Flags, the Individual Defendants had the

117

power and ability to control the actions of Six Flags and its employees.  By reason of such conduct,

the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

307.    WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

308.    Lead Plaintiffs demand a trial by jury.

DATED: March 31, 2021                    Respectfully submitted,

*/s/ Katherine M. Sinderson*
**BERNSTEIN LITOWITZ BERGER &**
    **GROSSMANN LLP**
Hannah Ross (N.Y. Bar No. 4020285) (*pro hac vice*)
John Rizio-Hamilton (N.Y. Bar No. 4323846) (*pro hac vice*)
Katherine M. Sinderson (N.Y. Bar No. 4503405) (*pro hac vice*)
Adam D. Hollander (N.Y. Bar No. 4498143) (*pro hac vice*)
Christopher R. Miles (N.Y. Bar No. 5366216) (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Tel:     (212) 554-1400
Fax:     (212) 554-1444
hannah@blbglaw.com
johnr@blbglaw.com
katiem@blbglaw.com
adam.hollander@blbglaw.com
christopher.miles@blbglaw.com

*Lead Counsel for Lead Plaintiffs*

118

**McKOOL SMITH PC**

Lewis T. LeClair
Texas Bar No. 12072500
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Tel:    (214) 978-4000
Fax:    (214) 978-4044
lleclair@mckoolsmith.com

*Liaison Counsel for Lead Plaintiffs*