**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, ET AL., | Civil Action No. 4:20-cv-00201-P |
| Plaintiffs, | |
| v. | <u>CLASS ACTION</u> |
| SIX FLAGS ENTERTAINMENT CORPORATION, ET AL., | |
| Defendants. | |

**PLAINTIFFS' MOTION FOR FINAL APPROVAL**
<u>**OF SETTLEMENT AND PLAN OF ALLOCATION; AND BRIEF IN SUPPORT**</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

MOTION ............................................................................................................... 1

BRIEF IN SUPPORT ........................................................................................... 1

ARGUMENT ........................................................................................................ 5

I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
      ADEQUATE, AND WARRANTS FINAL APPROVAL UNDER RULE 23(E) ............ 5

      A.    Plaintiffs and Lead Counsel Have Adequately Represented the Settlement
            Class ........................................................................................................ 6

      B.    The Settlement Was Reached After Substantial Discovery and Arms'-
            Length Negotiations Between Experienced Counsel, on the Cusp of a
            Scheduled Court-Ordered Mediation ...................................................... 7

      C.    The Settlement is Fair and Adequate in Light of the Costs and Delay of
            Further Litigation .................................................................................... 8

      D.    The Stage of the Proceedings Warrants Final Approval of the Settlement ............ 9

      E.    The Settlement is Fair and Reasonable in Light of the Risks of Further
            Litigation ................................................................................................ 10

            1.    Risks Related to Falsity ................................................................. 10

            2.    Risks Related to Materiality ........................................................... 12

            3.    Risks Related to Scienter ............................................................... 12

            4.    Risks Related to Loss Causation and Damages ......................... 13

            5.    Risks Related to Class Certification .............................................. 15

      F.    The Settlement is Well Within the Range of Reasonableness ............................. 16

      G.    Plaintiffs, Lead Counsel, and the Reaction of the Settlement Class to Date
            Support Final Approval of the Settlement ............................................. 17

      H.    The Other Factors Set Forth in Rule 23(e)(2) Support Final Approval of
            the Settlement ......................................................................................... 18

            1.    The Proposed Method of Distributing Settlement Proceeds is
                  Effective .......................................................................................... 19

2.      The Requested Fees and Expenses are Fair and Reasonable ................... 19

3.      The Supplemental Agreement Does Not Affect the Fairness of the Settlement ............................................................................................... 20

4.      The Settlement Treats Settlement Class Members Equitably ................. 20

II.     THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED ................................................................... 21

III.    CERTIFICATION OF THE SETTLEMENT CLASS REMAINS WARRANTED ........ 22

IV.     NOTICE TO THE SETTLEMENT CLASS SATISFIED RULE 23 AND DUE PROCESS ........................................................................................................... 23

CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Apache Corp. Sec. Litig.*,
2024 WL 4881432 (S.D. Tex. Nov. 25, 2024) ....................................................16

*Arkansas Teacher Ret. Sys. v. Goldman Sachs Group, Inc.*,
77 F.4th 74 (2d Cir. 2023) ...............................................................................15

*Baker v. SeaWorld Ent., Inc.*,
2020 WL 4260712 (S.D. Cal. July 24, 2020) .......................................................14

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
2011 WL 1585605 (S.D. Fla. Apr. 25, 2011), *aff'd*, 688 F. 3d 713 (11th Cir.
2012) ...............................................................................................................9

*Billitteri v. Sec. Am., Inc.*,
2011 WL 3586217 (N.D. Tex. Aug. 4, 2011) .......................................................16

*In re Biolase, Inc. Sec. Litig.*,
2015 WL 12720318 (C.D. Cal. Oct. 13, 2015) .....................................................17

*Celeste v. Intrusion Inc.*,
2022 WL 17736350 (E.D. Tex. Dec. 16, 2022)..................................10, 12, 14 ,16

*In re Chicken Antitrust Litig. Am. Poultry*,
669 F.2d 228 (5th Cir. 1982) .......................................................................16, 21

*In re China Sunergy Sec. Litig.*,
2011 WL 1899715 (S.D.N.Y. May 13, 2011) .......................................................17

*Cotton v. Hinton*,
559 F.2d 1326 (5th Cir. 1977) ...........................................................................5

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) .............................................................................5

*In re Dell Inc., Sec. Litig.*,
2010 WL 2371834 (W.D. Tex. June 11, 2010), *aff'd*, 669 F.3d 632 (5th Cir.
2012) ...........................................................................................................8, 21

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)........................................................................................13

*Erica P. John Fund v. Halliburton Co.*,
2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) .................................................16, 20

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.,*
  4 F. Supp. 3d 94 (D.D.C. 2013) ..................................................................17

*In re FibroGen Sec. Litig.,*
  2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) ..........................................15

*Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.,*
  594 U.S. 113 (2021) .......................................................................................15

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.,*
  851 F. Supp. 2d 1040 (S.D. Tex. 2012) ..........................................7, 8, 10

*In re Katrina Canal Breaches Litig.,*
  628 F.3d 185 (5th Cir. 2010) .......................................................................23

*Klein v. O'Neal,*
  705 F. Supp. 2d 632 (N.D. Tex. 2010) ........................................................8

*Maher v. Zapata Corp.,*
  714 F. 2d 436 (5th Cir. 1983) .....................................................................23

*Manchaca v. Chater,*
  927 F. Supp. 962 (E.D. Tex. 1996) ............................................................10

*Marcus v. J.C. Penney Co., Inc.,*
  2017 WL 6590976 (E.D. Tex. Dec. 18, 2017), *report and recommendation
  adopted*, 2018 WL 307024 (E.D. Tex. Jan. 4, 2018) ...........................5, 17

*Meredith Corp. v. SESAC, LLC,*
  87 F. Supp. 3d 650 (S.D.N.Y. 2015) ..........................................................14

*Newby v. Enron Corp.,*
  394 F.3d 296 (5th Cir. 2004) .........................................................................6

*In re OCA, Inc. Sec. & Derivative Litig.,*
  2009 WL 512081 (E.D. La. Mar. 2, 2009) ...........................................9, 10, 14, 19

*Reed v. Gen. Motors Corp.,*
  703 F.2d 170 (5th Cir. 1983) .........................................................................6

*Schwartz v. TXU Corp.,*
  2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ....................................... *passim*

*Shaw v. Toshiba Am. Info. Sys., Inc.,*
  91 F. Supp. 2d 942 (E.D. Tex. 2000) .........................................................19

*In re Signet Jewelers Ltd. Sec. Litig.,*
  2020 WL 4196468 (S.D.N.Y. July 21, 2020) .............................................20

iv

*In re SolarWinds Corp. Sec. Litig.*,
    2023 WL 11892313 (W.D. Tex. July 28, 2023) ....................................................................24

**STATUTES AND RULES**

Fed. R. Civ. P. 23 ................................................................................................................ *passim*

## MOTION

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Lead Plaintiff" or "Oklahoma Firefighters") and additional Named Plaintiff Key West Police & Fire Pension Fund ("Key West" and, together, "Plaintiffs"), on behalf of themselves and the Settlement Class, will and hereby do respectfully move the Court, pursuant to Rule 23(e)(2) of the Federal Rules of Civil Procedure, before the Honorable Mark T. Pittman, on January 28, 2025, at 9:00 a.m., for (1) entry of a judgment granting final approval of the $40 million Settlement reached in this Action (the "Settlement") and (2) entry of an order approving the proposed plan for allocating the proceeds of the Settlement (the "Plan of Allocation").[1]  A proposed Judgment and a proposed Order Approving Plan of Allocation are submitted with this Motion.  If necessary, updated versions will be submitted with Plaintiffs' reply papers, following the opt-out and objection deadlines.

## BRIEF IN SUPPORT

Plaintiffs are pleased to present for the Court's final approval their agreement to settle this securities class action in exchange for a cash payment of $40,000,000 for the benefit of the Settlement Class.[2]  Plaintiffs respectfully submit that the proposed Settlement is a favorable result for the Settlement Class in light of the risks of continued litigation and the range of potential outcomes at trial.  The proposed Settlement was achieved after more than four years of litigation, which included a thorough investigation of the claims, preparation of a detailed complaint, two

---

[1] Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated September 3, 2024 (ECF No. 145) (the "Stipulation") or in the Declaration of John Rizio-Hamilton in Support of: (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Rizio-Hamilton Declaration" or "Rizio-Hamilton Decl."), filed filed in the accompanying Appendix (App. 4-48).  Citations to "¶ __" refer to paragraphs in the Rizio-Hamilton Declaration; citations to "Ex. __" refer to exhibits to the Rizio-Hamilton Declaration; and citations to "App. __" are to pages in the Appendix.

[2] The Settlement Amount has been deposited into the Escrow Account and is earning interest.

appeals to the Court of Appeals concerning dismissals of the Action at the pleading stage, discovery and work with experts. The Settlement is the product of arm's-length negotiations between experienced and well-informed counsel, which occurred in the weeks before a scheduled mediation with Judge David L. Evans. As detailed in the accompanying Rizio-Hamilton Declaration and summarized herein, the proposed Settlement provides a substantial, certain, and near-term recovery for the Settlement Class while avoiding the risks of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount—or nothing at all—after years of additional litigation, appeals, and delay.

The proposed Settlement is the result of Plaintiffs' and Lead Counsel's substantial litigation efforts. Those efforts started over four years ago when Lead Counsel began an investigation of the claims at issue, which included an extensive review of public SEC filings, conference calls, analyst reports, and news articles and interviews with over 50 potential witnesses, including former Six Flags employees. ¶¶ 20-22. Based on this extensive investigation and consultation with experts, Plaintiffs prepared a detailed 114-page Consolidated Complaint. ¶ 23. Thereafter, Plaintiffs extensively litigated two rounds of motions at the pleading stage—including Defendants' motion to dismiss the consolidated complaint and Defendants' motion for judgment on the pleadings, as well as Key West's motion to intervene—and two appeals to the Fifth Circuit from the dismissals of the Action. ¶¶ 24-48. Plaintiffs also began substantial fact discovery efforts, which included comprehensive document requests, interrogatories, and document subpoenas directed to 14 third parties, including Six Flags' auditor and several of the consultants, designers, and ride suppliers for the China Parks. ¶¶ 37-38, 51-52. Lead Counsel obtained over 180,000 pages of documents from Defendants. Lead Counsel searched these documents for what they believed were the most relevant documents and analyzed them closely. ¶ 52. As a result of these

efforts and others described herein, Plaintiffs and Lead Counsel possessed a well-developed understanding of the strengths and weaknesses of the claims when the Settlement was reached. ¶ 4.

In addition, the Settlement was achieved only after arm's-length negotiations between the Parties, which were conducted in anticipation of a pending mediation session with the Honorable David L. Evans, a highly respected judge in Fort Worth. In advance of the scheduled mediation, the Parties exchanged and submitted detailed mediation statements to Judge Evans, which the Parties supported through numerous exhibits. ¶¶ 56-57. In the weeks leading up to the mediation, with the benefit of these extensive mediation submissions, the Parties continued to negotiate toward a potential settlement. The Parties came to an agreement shortly before the scheduled mediation. ¶¶ 57-58.

Plaintiffs and Lead Counsel believe that the proposed Settlement is a favorable result for the Settlement Class, given the risks that Plaintiffs faced in proving their securities fraud claims, as well as the costs and delays that would accompany continued litigation. As discussed further below and in the Rizio-Hamilton Declaration, Plaintiffs faced challenges in establishing the elements of their claims—including on issues of falsity, materiality, scienter, loss causation and damages. Plaintiffs faced challenges in proving that Defendants made materially false and misleading statements during the Class Period. For example, Defendants were expected to argue that Riverside had continued to make some payments to Six Flags and its vendors until the end of the Class Period, and that Defendants had no obligation to disclose Riverside's purported financial difficulties until the end of the Class Period, when Six Flags decided to terminate their agreements with Riverside. ¶¶ 70-71. Plaintiffs also faced challenges in proving scienter. For example, Defendants were expected to argue that they updated investors each time that they became aware

of delays to the China Parks' timelines and that they had no motive to mislead investors. There was a risk that the Court or jury might agree with Defendant's assertions at summary judgment or trial. ¶¶ 74-77.

Plaintiffs also faced further risks relating to proof of loss causation and damages. Plaintiffs would have to show that Defendants' alleged corrective disclosures directly caused investors' losses. Defendants were expected to argue that the market was already aware of much of the information in the corrective disclosures and therefore the stock price declines at issue were not a result of that information, but other "confounding" information, *i.e.*, negative information not related to the fraud, that was intertwined with the corrective disclosures. ¶¶ 78-80. If Plaintiffs were unable to convince a jury on any one of the elements of liability, investors would have recovered nothing. In light of these risks, the $40 million Settlement represents a favorable resolution of the Action for the Settlement Class. ¶ 87.

Although the deadline to object to the Settlement has not yet passed, to date, after mailing of more than 96,000 Notices to potential Settlement Class Members, no Settlement Class Members have objected to any aspect of the Settlement and just two requests for exclusion have been received. ¶¶ 94.

In light of these considerations and the other factors discussed below, Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court. Additionally, Plaintiffs request that the Court approve the Plan of Allocation, which is set forth in the Notice mailed to potential Settlement Class Members. The Plan of Allocation, which Lead Counsel developed in consultation with Plaintiffs' damages expert, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid

claims based on damages they suffered on their transactions in Six Flags common stock during the Class Period.

## ARGUMENT

I.    **THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL UNDER RULE 23(E)**

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class action claims. *See* Fed. R. Civ. P. 23(e).  A class action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Fifth Circuit has long adhered to a policy that favors and promotes the settlement of disputed claims, particularly in class actions. *See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement."); *In re Deepwater Horizon*, 739 F.3d 790, 807 (5th Cir. 2014) (noting the "'overriding public interest in favor of settlement' that [the Fifth Circuit has] recognized 'particularly in class action suits'") (citation omitted); *see Marcus v. J.C. Penney Co., Inc.*, 2017 WL 6590976, at *3 (E.D. Tex. Dec. 18, 2017) ("There is a strong judicial policy in favor of settlements, particularly in the class action context."), *report and recommendation adopted*, 2018 WL 307024 (E.D. Tex. Jan. 4, 2018).

Rule 23(e)(2) provides that, in determining whether a class action settlement is fair, reasonable, and adequate, the Court should consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. Rule 23(e)(2) (as amended on December 1, 2018).

The Fifth Circuit has also established a six-pronged test, which includes certain factors that overlap with the Rule 23(e)(2) factors, to be applied to the approval of class settlements:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983); *see also Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004) (applying *Reed* factors to proposed settlement of securities class action).[3]

As discussed below, the proposed Settlement satisfies each of the factors established by Rule 23(e)(2) and the Fifth Circuit and thus warrants approval.

## A.    Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class

In determining whether to approve a class action settlement, the Courts consider whether Plaintiffs and Lead Counsel "have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). Here, for example, Lead Plaintiff vigorously litigated this Action on behalf of the Settlement Class for more than four years. Plaintiffs consulted with Plaintiffs' Counsel on strategy and case developments. In addition, Plaintiffs have claims that are typical of other Settlement Class Members and have no conflict of interests with other members of the Settlement Class.

Plaintiffs' Counsel likewise have adequately represented the Settlement Class throughout the litigation. Among other things, Lead Counsel: (i) conducted an investigation of the claims asserted in the Action, including interviews with over 50 potential witnesses; (ii) researched and

---

[3] The factors set forth in Rule 23(e)(2), which were added by amendment effective December 1, 2018, are not intended to "displace any factor" traditionally used by the Courts of Appeal to assess final settlement approval, but rather to focus on core concerns to guide the approval decision. *See* Fed. R. Civ. P. 23, 2018 Advisory Committee Notes.

drafted a detailed Consolidated Complaint; (iii) opposed Defendants' motion to dismiss and motion for judgment on the pleadings; (iv) brought two successful appeals to the Fifth Circuit; (v) engaged in substantial document discovery, which involved obtaining more than 180,000 pages of documents; (vi) consulted with various experts in financial economics (including loss causation, damages, and market efficiency); accounting; the theme-park construction industry; and Chinese government-funded construction projects; and (vii) engaged in arms'-length settlement negotiations. ¶¶ 3, 17-61. As a result of the significant time and effort that Plaintiffs and Lead Counsel dedicated to litigating this Action, they had a well-developed understanding of the strengths and weaknesses of the Action at the time the Settlement was reached, which informed their determination that the Settlement is fair, reasonable, and adequate. Accordingly, this factor supports final approval of the Settlement.

### B. The Settlement Was Reached After Substantial Discovery and Arms'-Length Negotiations Between Experienced Counsel, on the Cusp of a Scheduled Court-Ordered Mediation

Rule 23(e)(2)(B) and the first *Reed* factor also support final approval because the Settlement was negotiated at arm's length after meaningful discovery and there is no evidence of fraud or collusion. As discussed above, the Settlement was reached only after arm's-length negotiations by experienced counsel that were conducted in anticipation of a scheduled mediation before Judge Evans. ¶¶ 56-58. The arm's-length negotiations demonstrate that the Settlement is procedurally fair and is not the product of fraud or collusion. *See*, *e.g.*, *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1063-65 (S.D. Tex. 2012) (approving settlement where parties engaged in arm's-length negotiations to gauge the strengths and weaknesses of the case); *Schwartz v. TXU Corp.*, 2005 WL 3148350, at *21 (N.D. Tex. Nov. 8, 2005) (where the "settlement was the result of intense, arms-length negotiations between the parties," this factor supported approval).

7

C.     **The Settlement is Fair and Adequate in Light of the Costs and Delay of Further Litigation**

Rule 23(e)(2)(C)(i) and the second *Reed* factor further support final approval of the Settlement.  Continued litigation of the Action would involve complex and lengthy pre-trial, trial, and post-trial proceedings that would delay the ultimate resolution of the claims without any guarantee of recovery for the Settlement Class.  "When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened."  *Klein v. O'Neal*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010); *see also Heartland*, 851 F. Supp. 2d at 1064 (approving settlement and noting that litigating case to trial would be "time consuming, and '[i]nevitable appeals would likely prolong the litigation, and any recovery by class members, for years'") (citation omitted); *In re Dell Inc., Sec. Litig.*, 2010 WL 2371834, at *7 (W.D. Tex. June 11, 2010) (noting that "[s]ecurities litigation on the whole is 'notoriously difficult and unpredictable' . . . . Thus the complexity, expense, and likely duration of the suit weighs in favor of approval of the settlement."), *aff'd*, 669 F.3d 632 (5th Cir. 2012).

Continuing to litigate this Action would have required substantial additional time and delay, in the face of multiple risks and with no guarantee of success.  In the absence of the Settlement, this would have included, among other things, the completion of fact discovery, including taking a series of depositions of senior Six Flags executives; substantial expert discovery; moving for class certification; surviving Defendants' anticipated motions for summary judgment; and then achieving a litigated verdict at trial.  Defendants made serious arguments contesting key issues such as the falsity of Defendants' alleged misstatements, materiality, scienter, and loss causation.  While Lead Counsel was prepared to rebut those arguments, it is clear that achieving a litigated verdict would have carried risks.

Moreover, if Plaintiffs did succeed at trial, it is virtually certain that Defendants would appeal, further delaying the receipt of any recovery by the Settlement Class. *See In re OCA, Inc. Sec. & Derivative Litig.*, 2009 WL 512081, at *11 (E.D. La. Mar. 2, 2009) ("After trial, the parties could still expect years of appeals."); *Schwartz*, 2005 WL 3148350, at *19 (noting that even "if Plaintiffs were to succeed at trial, they still could expect a vigorous appeal by Defendants and an accompanying delay in the receipt of any relief"). Further, there is always a risk that a jury verdict could be reversed by the trial court or on appeal. *See*, *e.g.*, *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605, at *38 (S.D. Fla. Apr. 25, 2011) (overturning jury verdict in favor of plaintiffs and granting judgment for defendants as a matter of law), *aff'd*, 688 F. 3d 713 (11th Cir. 2012). All of the foregoing would pose substantial expense for the Settlement Class and delay the ability to recover damages—assuming, of course, that Plaintiffs were ultimately successful on their claims.

In contrast, the Settlement provides a substantial, certain, and near-term cash recovery of $40 million, without exposing the Settlement Class Members to the risk, expense, and delay of continued litigation. Accordingly, this factor strongly supports final approval of the Settlement.

### D.    The Stage of the Proceedings Warrants Final Approval of the Settlement

The third *Reed* factor also weighs in favor of final approval of the Settlement. The Settlement was reached after the Parties engaged in extensive litigation efforts over the course of four years. This included an investigation by Lead Counsel, thorough briefing on Defendants' motion to dismiss and motion for judgment on the pleading and related appeals, and substantial fact discovery, including obtaining 180,000 pages of documents from Defendants in response to Plaintiffs' discovery requests, searching them for what Lead Counsel believed were the most relevant documents, and analyzing those. ¶¶ 51-52. In addition, as previously noted, the Parties exchanged detailed mediation statements and engaged in arm's-length settlement negotiations.

¶¶ 56-57.  As a result, Plaintiffs and Lead Counsel had an understanding of the legal and factual issues surrounding this case, including the strengths and weaknesses, when negotiating and evaluating the proposed Settlement.  *See Manchaca v. Chater*, 927 F. Supp. 962, 967 (E.D. Tex. 1996); *see also Heartland*, 851 F. Supp. 2d at 1064 ("Under [this] factor, the key issue is whether 'the parties and the district court possess ample information with which to evaluate the merits of the competing positions'").  Plaintiffs and Lead Counsel were able to make an informed evaluation of the case and reasonably conclude that the Settlement is highly favorable to the Settlement Class. ¶¶ 7, 87.

### E.    The Settlement is Fair and Reasonable in Light of the Risks of Further Litigation

Rule 23(e)(2)(C)(i) and the fourth *Reed* factor further support final approval of the Settlement.  While Plaintiffs and Lead Counsel believe the claims asserted against Defendants in this action are meritorious, they recognize that this Action presented a number of risks to establishing Defendants' liability.   Weighing these risks against the certain and substantial recovery for the Settlement Class demonstrates that the Settlement is fair, reasonable, and adequate.  *See, e.g.*, *OCA*, 2009 WL 512081, at *13 (settlement approval favored where plaintiffs faced substantial risks in establishing elements of securities law violations); *Schwartz*, 2005 WL 3148350, at *18 ("plaintiffs' uncertain prospects of success through continued litigation" supported approval of securities class action settlement); *Celeste v. Intrusion Inc.*, 2022 WL 17736350, at *4 (E.D. Tex. Dec. 16, 2022) ("Securities claims are particularly 'difficult to prove' because of the high bar for establishing falsity and scienter.").

#### 1.    Risks Related to Falsity

Plaintiffs faced risks in proving that Defendants made materially false and misleading statements.  ¶¶ 69-72.  While the majority of Plaintiffs' claims ultimately survived the motion to

dismiss stage, it was only after two dismissals of the Action and two appeals. Plaintiffs recognize that they would continue to face challenges in proving that Defendants' statements were materially false and misleading at summary judgment and at trial. ¶ 69.

For example, Defendants were expected to argue that Riverside had continued to pay Six Flags and its vendors during the time period at issue. ¶ 70. Defendants would also argue that they had no obligation to disclose Riverside's financial difficulties to investors until the end of the Class Period, when Six Flags decided to terminate its agreements with Riverside. *Id.*

Similarly, Defendants would continue to argue that their statements about progress of the China Parks and the timeline for opening of the China Parks were true at the time they were made and were based on best information that Defendants had at the time—or were inactionable as either puffery or protected forward-looking statements. ¶ 71. With respect to this issue, Defendants could point to the fact that they repeatedly updated investors during the Class Period concerning developments that had delayed the timelines for the opening of the China Parks. *Id.* To prove the falsity of Defendants' statements, Plaintiffs could not simply show that the development of the China Parks was delayed: Plaintiffs would need to prove that the delays were much more significant than anything Defendants had disclosed *and* were known by Defendants earlier than disclosed. *Id.*

Finally, with respect to the alleged misstatements concerning revenue recognition, Plaintiffs expected that Defendants would argue that their revenue recognition was appropriate at all times under the relevant accounting standards at issue. Plaintiffs anticipated that Defendants would point to the fact that the Six Flag's auditor, KPMG (one of the "Big Four" accounting firms), had reviewed and approved the Company's revenue recognition practices and that the Company's past revenue numbers were never restated. ¶ 72.

### 2.    Risks Related to Materiality

Defendants were also expected to argue that—even if any of the statements concerning the progress of the China Parks or revenue recognition were found to be false or misleading—these statements were not material to Six Flags' business because international licensing revenue only accounted for 3% of the Company's total revenue.   ¶ 73.   Moreover, any adjustment to the Company's licensing revenue based on delays in the timeline for the opening of the China Parks would not have eliminated that revenue entirely, but only caused it to be proportionally adjusted based on the revised timetable.  *Id.*  Thus, Defendants would have a colorable argument that any such revenue adjustments would be immaterial to investors.

### 3.    Risks Related to Scienter

The Action also presented risks to proving that Defendants acted with scienter, *i.e.*, that Defendants acted intentionally or severely recklessly when making the alleged misstatements and omissions.  ¶¶ 74-77.  This element would have been particularly challenging. *See Celeste*, 2022 WL 17736350, at *6 (noting that scienter is a "notoriously difficult element in a securities claim").

Throughout this litigation, Defendants have vigorously contended that they believed their statements to be true.  ¶ 74.  Defendants would certainly have continued to press those arguments at summary judgment and trial.  Defendants were expected to argue that they honestly believed all of their statements regarding the progress of, and timeline for, opening the China Parks, and that they updated investors each time they became aware of developments that would delay the China Parks.  ¶ 75.  Defendants would argue that these disclosures and other cautionary statements showed that Defendants were making their best efforts to keep investors updated on the evolving progress of the China Parks.  *Id.*  If the case had proceeded, Plaintiffs would have sought to marshal evidence showing that Defendants knew that the delays were more significant than what was disclosed to investors.  But there was no certainty that Plaintiffs would succeed in doing so.  *Id.*

Defendants would also point to the approval of the Company's handling of revenue recognition by its auditor, KPMG, as further evidence that Defendants honestly believed that their statements about revenue were accurate. ¶ 76.

Moreover, Defendants would also seek to rebut Plaintiffs' motive allegations based on their bonus compensation structure. ¶ 77. Among other things, Defendants would attempt to point to the fact their voluntary revenue adjustment in February 2019 had caused Defendants to lose their bonuses and thus weighs against any inference of scienter. ¶ 76.

### 4.    Risks Related to Loss Causation and Damages

Even assuming that Plaintiffs and Lead Counsel overcame Defendants' arguments and established liability at trial, Plaintiffs would have still confronted additional challenges in establishing loss causation and damages. In order to establish loss causation, Plaintiffs would be required to prove that the stock declines that give rise to their damages were caused by the disclosure of facts concerning Defendants' alleged misstatements. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005). Plaintiffs and Lead Counsel anticipate that Defendants would argue at trial, and subsequent stages of the proceedings, that the declines in the price of Six Flags common stock identified by Plaintiffs were not caused entirely—or at all—by the alleged corrective disclosures.

First, Defendants were expected to argue that by October 23, 2019 sufficient information about the difficulties in the development of the China Parks had been disclosed to the public, such that full truth was on the market. ¶ 79. Defendants would argue that, therefore, the third and fourth alleged corrective disclosures (on January 10, 2020 and February 20, 2020) did not include any information related to the alleged fraud that had not already been disclosed to the market, and the price declines following those disclosures could not be included in damages. *Id.* For these disclosures, Defendants were expected to argue that analysts knew about Riverside's financial

13

difficulties and had already removed revenue attributable to the China Parks from their financial models for Six Flags. *Id.*

If that argument did not prevail, Defendants had other significant arguments that substantial amounts of the price declines at issue were caused by information other than the alleged corrective disclosures. ¶ 80. Plaintiffs expect that Defendants would have argued that each of the alleged corrective disclosures coincided with the release of other non-fraud related negative information which must be disaggregated from any measure of damages. For example, Defendants would likely have argued that even the earlier February 2019 and October 2019 disclosures were accompanied by non-fraud related negative disclosures that would need to be disaggregated, including, for example, decreased park attendance growth, admissions per capita growth, and in-park spending per capita growth. *Id.*

These issues of loss causation and damages would have been hotly contested at any trial and resolution of those issues would likely have depended on an unpredictable battle of financial experts. This further increases the litigation risk for Plaintiffs and the class and supports the reasonableness of the Settlement. *See*, *e.g.*, *Celeste*, 2022 WL 17736350, at *7 (contested issues of loss causation and disaggregation would lead to a "protracted battle of the experts that is avoided through the proposed settlement"); *OCA*, 2009 WL 512081, at *14 ("Because the jury would have been faced with competing expert opinions, the resulting damage award would have been highly unpredictable."); *see also Baker v. SeaWorld Ent., Inc.*, 2020 WL 4260712, at *7 (S.D. Cal. July 24, 2020) (the fact that "Plaintiffs' ability to prove loss causation and damages would 'come down to an unpredictable battle of the experts'" supported approval of settlement); *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) ("On the issue of damages, a trial would

14

likely have turned heavily on a 'battle of the experts' between the parties' respective economists. It is impossible to predict which party's model of damages—if either—the jury would credit.").

### 5.    Risks Related to Class Certification

While Plaintiffs and Lead Counsel believe that this Action is suitable for class certification, Defendants were expected forcefully to oppose it.   First, as discussed above, if Defendants successfully argued that Plaintiffs could not ultimately establish loss causation for one or both of the later alleged corrective disclosures, the length of the Class Period would be truncated accordingly. ¶ 81.

Second, Defendants were also expected to argue that there should be no class-wide presumption of reliance (and thus no class certification) on the grounds that there was no "price impact" from Defendants' alleged false statements.   ¶ 82.   As is common in securities fraud actions, Plaintiffs would have to rely on the stock price reactions to the alleged corrective disclosures to establish the price impact of the alleged false statements.  In turn, Defendants would have used this as an opportunity to attempt to "rebut the presumption of reliance" by showing that there was not a sufficiently direct connection between the alleged misstatements and the corrective disclosures to establish price impact as permitted by the Supreme Court's decision in *Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.*, 594 U.S. 113 (2021).  *See Arkansas Teacher Ret. Sys. v. Goldman Sachs Group, Inc.*, 77 F.4th 74, 96-105 (2d Cir. 2023) (decertifying a previously certified class on the ground that there was an "insufficient link between the corrective disclosures and the alleged misrepresentations"); *see also In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *11 (N.D. Cal. Mar. 11, 2024) (finding no price impact after a specified date, eliminating final corrective disclosure, and certifying shorter class period than that proposed by the plaintiff).

**F.     The Settlement is Well Within the Range of Reasonableness**

Rule 23(e)(2)(C)(i) asks the Court to consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal," and the fifth *Reed* factor similarly considers "whether the terms of the settlement 'fall within *a reasonable range of recovery*, given the likelihood of the plaintiffs' success on the merits.'" *Billitteri v. Sec. Am., Inc.*, 2011 WL 3586217, at *12 (N.D. Tex. Aug. 4, 2011) (emphasis in original).   In assessing the reasonableness of a proposed settlement under both these analyses, the inquiry "should contrast settlement rewards with likely rewards if [the] case goes to trial."   *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 239 (5th Cir. 1982); *see also Erica P. John Fund v. Halliburton Co.*, 2018 WL 1942227, at *5 (N.D. Tex. Apr. 25, 2018) ("In ascertaining whether a settlement falls 'within the range of possible approval,' courts will compare the settlement amount to the relief the class could expect to recover at trial, *i.e.*, the strength of the plaintiffs' case.").

Here, the Settlement is well within the range of reasonableness, particularly given the multiple risks associated with further litigation of the Action.   Plaintiffs understand, based on their expert's analysis, that maximum potential damages that could realistically be established at trial, taking disaggregation into effect, would range from approximately $370 million and $470 million. ¶ 85.   To be clear, even that range still assumes that Plaintiffs overcame other challenges and prevailed on liability arguments, kept in portions of all four corrective disclosures, and been able to maintain the full alleged Class Period.

Accordingly, the $40 million Settlement represents approximately 8.5% to 10.8% of the likely maximum achievable damages, which is a favorable result for the Settlement Class.   *See, e.g.*, *In re Apache Corp. Sec. Litig.*, 2024 WL 4881432, at *6 (S.D. Tex. Nov. 25, 2024) (approving securities class action settlement representing "approximately 4.4% of the potential estimated damages for the class period"); *Celeste*, 2022 WL 17736350, at *2 (approving settlement as fair,

reasonable and adequate where "class settlement value represents 7.61% of the maximum possible damages that could have been recovered at trial"); *see also In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (finding that a settlement recovery of 8% of estimated damages "equals or surpasses the recovery in many other securities class actions"); *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 103 (D.D.C. 2013) (settlement approximating "4-8% of the 'best case scenario' potential recovery" deemed reasonable); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting that the average settlements in securities class actions "have ranged from 3% to 7% of the class").

Defendants were expected to assert that the maximum damages were much lower than that range, or even zero. ¶ 86. Moreover, there were risks that certain corrective disclosures might be eliminated from the case entirely or that the Class Period might have been shortened, which would have furthered reduced potential damages. In sum, the $40 million recovery is a highly favorable result for the Settlement Class.

### G. Plaintiffs, Lead Counsel, and the Reaction of the Settlement Class to Date Support Final Approval of the Settlement

Plaintiffs and Lead Counsel endorse approval of the Settlement, which further supports final approval. *See J.C. Penney*, 2017 WL 6590976, at *3 ("Significant weight is given to the opinion of class counsel concerning whether the settlement is in the best interest of the class and the court is not to substitute its own judgment for that of counsel."); *Schwartz*, 2005 WL 3148350, at *21 ("where the parties have conducted an extensive investigation, engaged in significant fact-finding and Lead Counsel is experienced in class-action litigation, courts typically 'defer to the judgment of experienced trial counsel who has evaluated the strength of [the] case'").

After four years of litigation, review of documents produced by Defendants, and hard-fought settlement negotiations, Lead Counsel has a firm understanding of the strengths and risks

attendant to these claims. Based on this understanding, as well as Lead Counsel's substantial experience litigating complex securities class actions like this one, Lead Counsel has concluded that the Settlement is fair, reasonable, and adequate.

The response of Settlement Class Members to date further supports final approval of the Settlement. The Court-appointed Claims Administrator, JND Legal Administration ("JND"), has mailed 96,288 copies of the Notice to potential Settlement Class Members and nominees through December 19, 2024. *See* Declaration of Luiggy Segura (Ex. 2, App. 79-84) ("Segura Decl."), at ¶ 12. The Notice describes the essential terms of the Settlement and informs Settlement Class Members of their right to opt-out of the Settlement Class or object to any aspect of the Settlement. As set forth in the Notice, the deadline for Settlement Class Members to submit objections or request exclusion from the Settlement Class is January 7, 2025. While this deadline has not yet passed, to date, there have been no objections to the Settlement or Plan of Allocation, and just two requests for exclusion from the Settlement Class have been received. Rizio-Hamilton Decl. ¶ 94 (App. 37); Segura Decl. ¶ 16. (App. 84).[4]

## H.    The Other Factors Set Forth in Rule 23(e)(2) Support Final Approval of the Settlement

Rule 23(e)(2) also considers (i) the effectiveness of the proposed method of distributing relief to the class; (ii) the terms of any proposed award of attorneys' fees; (iii) any agreements made in connection with the proposed settlement; and (iv) the equitable treatment of class members. *See* Fed. R. Civ. P. 23(e)(2)(C)(ii), (iii), and (iv); Fed. R. Civ. P. 23(e)(2)(D).

---

[4] Under the schedule set by the Court, Plaintiffs will file reply papers in further support of final approval on January 21, 2025, addressing any objection and all requests for exclusion that may be received.

### 1.    The Proposed Method of Distributing Settlement Proceeds is Effective

The proceeds of the Settlement will be distributed to Settlement Class Members who submit eligible Claim Forms with required documentation to JND.  JND will review and process the claims received, provide claimants with an opportunity to cure any deficiencies or request review of the denial of their claims by the Court, and will ultimately mail or wire claimants their *pro rata* share of the Net Settlement Fund as calculated under the Plan of Allocation.[5]  This type of claims processing is standard in securities class actions and has long been used and found to be effective.  *See, e.g.*, *OCA*, 2009 WL 512081, at *6; *Dell*, 2010 WL 2371864, at *10.

### 2.    The Requested Fees and Expenses are Fair and Reasonable

Lead Counsel has filed a motion for an award of attorneys' fees and Litigation Expenses concurrently with this motion.  As detailed therein, Lead Counsel has applied for attorneys' fees in an amount—25% of the Settlement Fund—that is consistent with attorneys' fee awards approved in comparable securities class actions litigated on a purely contingent basis. *See Schwartz*, 2005 WL 3148350, at *27 ("courts throughout this Circuit regularly award fees of 25% and more often 30% or more of the total recovery under the percentage-of-the recovery method"); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 972 (E.D. Tex. 2000) ("attorneys' fees in the range from twenty-five percent (25%) to [33%] have been routinely awarded in class actions").  The fee request is also reasonable in light of the efforts of Lead Counsel and the risks in the litigation.  Of particular note, the approval of the attorneys' fee award is separate from the approval of the Settlement, and neither Plaintiffs nor Lead Counsel may terminate the Settlement

---

[5] The Settlement is not a claims-made settlement.  If the Settlement is approved, Defendants will have no right to the return of any portion of Settlement based on the number or value of Claims submitted.  *See* Stipulation ¶ 13.

19

based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 18.

Pursuant to the terms of the Stipulation, and as is standard in securities class actions, attorneys' fees and expenses will be paid upon any such award granted by the Court, and shall be reimbursed to the Settlement Fund if the award is reduced or reversed in any subsequent legal proceedings. *See* Stipulation ¶¶ 16-17.

### 3.    The Supplemental Agreement Does Not Affect the Fairness of the Settlement

Rule 23(e)(2)(C)(iv) asks the Court to consider any additional agreements made by the Parties in connection with the Settlement. Here, the only such agreement is the Parties' confidential Supplemental Agreement that sets forth the conditions under which Six Flags would be able to terminate the Settlement if the number of Settlement Class Members who request exclusion from the Settlement Class reaches a certain threshold. *See* Stipulation ¶ 39(b). This type of agreement is standard in securities class actions and is routinely maintained as confidential to avoid allowing potential opt-outs to use this provision as leverage. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020).[6] The agreement has no negative impact on the fairness of the Settlement. *See*, *e.g.*, *Erica P. John Fund*, 2018 WL 1942227, at *5 (granting final approval of securities settlement that included a similar agreement).

### 4.    The Settlement Treats Settlement Class Members Equitably

Finally, the proposed Settlement treats members of the Settlement Class equitably relative to one another. *See* Fed. R. Civ. P. 23(e)(2)(D). There is no preferential treatment for any members of the Settlement Class. Plaintiffs will be eligible for recovery based on the same formula under

---

[6] If the Court requests, the Parties will submit the Supplemental Agreement to the Court *in camera* and request that the Court afford it confidential treatment.

the Plan of Allocation as all other Settlement Class Members. As discussed immediately below, the Net Settlement Fund will be distributed among Settlement Class Members in accordance with the Plan of Allocation, which provides a fair and equitable method of allocation.

## II.   THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED

The standard for approval of a plan of allocation of the settlement funds is the same as that for approving a settlement: whether it is "fair, adequate and reasonable and is not the product of collusion between the parties." *Chicken Antitrust Litig.*, 669 F.2d at 238. A plan of allocation need not be perfect—to be fair, reasonable, and adequate, "[t]he allocation formula 'need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel.'" *Dell*, 2010 WL 2371834, at *10.

The proposed Plan of Allocation was developed by Lead Counsel in consultation with Plaintiffs' damages expert and takes into account the economic losses that Settlement Class Members suffered as a result of Defendants' alleged misrepresentations. ¶ 96. Under the Plan, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of Six Flags common stock during the Class Period listed in the Claim Form and for which adequate documentation is provided. The formula for calculating a claimant's Recognized Loss Amount is the same as that typically used in plans of allocation in other securities class action asserting Section 10(b) claims. In general, for each purchase of Six Flags common stock during the Class Period, the Recognized Loss Amount will be (a) the difference between the estimated artificial inflation in the stock price on date of purchase and the estimated artificial inflation on date of sale, or (b) the difference between the actual purchase price and sales price of the stock, whichever is less. ¶ 100. Plaintiffs' damages expert calculated the amount of estimated artificial inflation in the price of Six Flags stock by considering price changes in reaction to certain public

announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes on those days that were attributable to market or industry forces.  ¶ 98.

The sum of the Recognized Loss Amounts for all of a claimant's purchases of Six Flags common stock during the Class Period is the claimant's "Recognized Claim," and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  ¶¶ 102-103.  The Net Settlement Fund will be distributed to Authorized Claimants on this *pro rata* basis until the Net Settlement Fund is depleted or it is no longer cost effective to do so.  ¶ 104.

The proposed Plan of Allocation is similar to plans customarily adopted in comparable securities class action cases.  *See, e.g., Deka Investment GmbH v. Santander Consumer USA Holdings Inc.*, Civil Action No. 3:15-cv-02129-K (N.D. Tex. Dec. 8, 2020), ECF No. 264; *In re SolarWinds Sec. Litig.*, Case No. 1:21-cv-00138-RP (W.D. Tex. July 28, 2023), ECF No. 110. Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the alleged misconduct.  ¶ 105.  To date, no objections to the proposed Plan of Allocation have been received.  *Id*.

## III.    CERTIFICATION OF THE SETTLEMENT CLASS REMAINS WARRANTED

The Court previously found, for settlement purposes, that: (1) the Settlement Class met or was likely to meet each element required for class certification under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and (2) it would likely be able to certify Plaintiffs as the Class Representatives and Lead Counsel as Class Counsel for the Settlement Class pursuant to Rule 23(g).  *See* ECF No. 146, at ¶¶ 2-4.  None of the facts regarding certification of the Settlement Class have changed since Plaintiffs submitted their Motion for Preliminary Approval of

Settlement, and to date there has been no objection to certification of the Settlement Class. Accordingly, Plaintiffs respectfully request that the Court grant final certification of the Settlement Class and appoint Plaintiffs as Class Representatives and Lead Counsel as Class Counsel, for settlement purposes only, pursuant to Rules 23(a), (b)(3), and (g).

## IV.    NOTICE TO THE SETTLEMENT CLASS SATISFIED RULE 23 AND DUE PROCESS

Notice to the Settlement Class satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable" – *i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them."  *Maher v. Zapata Corp.*, 714 F. 2d 436, 451 (5th Cir. 1983); *see In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010) ("a settlement notice need only satisfy the 'broad reasonableness standards imposed by due process'").

Both the substance of the notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards.  In accordance with the Court's Preliminary Approval Order, JND began mailing copies of the Court-approved Notice and Claim Form to potential Settlement Class Members and nominees on October 7, 2024.  *See* Segura Decl. ¶¶ 3-8 (App. 80-81).  As of December 19, 2024, JND had disseminated 96,288 copies of the Notice Packet to potential Settlement Class Members and nominees.  *See id.* ¶ 12 (App. 82).  In addition, JND caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over the PR Newswire on October 17, 2024, and has maintained and updated as required a website and toll-free telephone number dedicated to the Settlement.  *See id.* ¶¶ 13-15 (App. 82-83).  This combination of individual mail to all Settlement Class Members who could be identified with

23

reasonable effort, supplemented by notice in an appropriate, widely-circulated publication, and transmitted over a newswire, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see In re SolarWinds Corp. Sec. Litig.*, 2023 WL 11892313, at *1 (W.D. Tex. July 28, 2023) (similar notice program "constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto"); *Schwartz*, 2005 WL 3148350, at *10 (same).

## CONCLUSION

Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate, and grant final certification of the Settlement Class for settlement purposes.

Dated: December 24, 2024

Respectfully submitted,

*/s/ John Rizio-Hamilton*
**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
John Rizio-Hamilton*
Katherine M. Sinderson*
Jesse Jensen*
John Esmay*
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
johnr@blbglaw.com
katiem@blbglaw.com
jesse.jensen@blbglaw.com
john.esmay@blbglaw.com

*Counsel for Plaintiff Key West and Lead*
*Counsel for Lead Plaintiff Oklahoma*
*Firefighters and the Settlement Class*

*\* admitted pro hac vice*

24

**THE LAW OFFICE OF JASON NASH,
    P.L.L.C.**
Jason C. Nash, Texas Bar No. 24032894
601 Jameson Street
Weatherford, TX 76086
Tel: 817 757-7062
jnash@jasonnashlaw.com

*Local Counsel for Plaintiff Key West and
Lead Plaintiff Oklahoma Firefighters*

**KLAUSNER, KAUFMAN, JENSEN
    & LEVINSON**
Robert Klausner, Texas Bar No. 24117265
Stuart A. Kaufman*
7080 NW 4th Street
Plantation, Florida 33317
Tel: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Plaintiff Key West*

*\* admitted pro hac vice*

## <u>CERTIFICATE OF CONFERENCE</u>

On December 23, 2024, I conferred with Scott Musoff and Ralph Duggins, counsel for Defendants. Defendants do not oppose the motion for final approval of the Settlement and take no position on Plaintiffs' motion for approval of the Plan of Allocation.

By: <u>*/s/ John Rizio-Hamilton*</u>
      John Rizio-Hamilton

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 24, 2024, I electronically filed the foregoing by using the court's CM/ECF system. Per agreement among the parties, all parties will be served by the CM/ECF system.

By: <u>*/s/ John Rizio-Hamilton*</u>
      John Rizio-Hamilton
